2. Forward a procurement request to the Country Office for brands of foreign manufacture. This request should be presented to the Embassy General Service Officer (GSO) for initiation of procurement. A fund citation will be included with the procurement request, upon determination of price.

F. Upon delivery of the OGV to the Embassy, the Country Attache should notify SAFP via teletype of the following:

VIN

Make/model/year/type/accessories

Delivery Condition (i.e., damage, missing equipment, etc.)

Cost (US dollars)

Odometer reading

Number of doors/Cylinders

SAFP fund citation

G. Upon receipt of this teletype, SAFP will assign an OGV number and issue a DEA-87. This form, plus copies of all delivery documents will be filed in the OGV file.

H. In concert with Embassy officials, the Country Attache should determine the need for and level of armoring of assigned OGVs. This matter must be coordinated with the Office of Security Programs (SP) and the Office of International Operations (OF).

I. Armouring will be accomplished at the time an OGV is placed in service. This can be accomplished in country or in the CONUS. Each instance will be reviewed by SAFP and SP to determine capabilities, costs and vendors.

J. Armouring adds significantly to the weight of a vehicle, which may adversely affect handling and performance. Therefore, the need for armouring will be a factor considered in the selection of new/replaced vehicles. Makes/models which cannot support this weight through a sufficiently heavy drive train and suspension options will not be considered.

**6124.2 ASSIGNMENT**

**6124.21 General Definitions**

A. OGV's will be assigned to field offices in accordance with 0320.1 of the Administrative Manual. With the exception of designated pool vehicles, field offices will assign OGV's to Individual employees. Such assignments will be in the interest of DEA and are not an employee prerogative. DEA SACs, Country Attaches (CAs), Laboratory Directors (LDs) and senior Headquarters Office Heads (HOH) are responsible for the operation and control of all official government vehicles assigned to their activities and for ensuring compliance with all policies and procedures of the DEA fleet management program affecting such vehicle assignments. (See DEA cable 24774 dated November 17, 1994, signed by Administrator Constantine.)

EXHIBIT
PENGAD 800-631-6989
Plaintiffs
8

B. The operation and maintenance of official government vehicles are the responsibility of the SAC, Country Attache, Laboratory Director, or senior Headquarters Office Head, or their designees, for those offices having assigned vehicles. Managers may authorize use of vehicles when Special Agents, Diversion Investigators and other DEA employees require motor transportation in the conduct of official business. Agents, Diversion Investigators and other DEA employees who use vehicles for official use will be held strictly responsible for the operation, maintenance and intermittent storage of the vehicles, as outlined in this section.

C. An OGV may only be assigned to or operated by any employee who possesses a valid operator's license issued by the state or country in which the employee is permanently stationed and/or has his principal place of residence. It is the responsibility of the employee to obtain and maintain a valid state or country operator's permit.

D. Upon placement into service, the Property Management Unit (SAFP) will classify every DEA vehicle as follows:

1. Special Purpose

a. Those vehicles which are not of general utility (e.g., surveillance vans, taxi cabs, tractor/trailers etc.); or those which are valued at $30,000 or more at the time they are placed into domestic service (e.g., certain luxury-type cars whose only purpose is for undercover use).

b. Special purpose vehicles will not be assigned to individual employees, nor will they be used for purposes other than that for which they were placed into service.

c. Special care must be taken with regard to those vehicles whose purpose is to facilitate undercover work or covert surveillance. These should be kept in a DEA garage or other secure location and removed only for their intended purpose or for maintenance/servicing purposes.

d. A log book will be kept for these vehicles each time the vehicle is used. The log book will have the following headings:

Date

Employee utilizing vehicle Synopsis of activity

Case number

Locale of use

Beginning mileage

Ending mileage

e. The log book should not be kept in the vehicle but in a central, secure location.

2. Nonstandard

a. Those vehicles which when new were valued at $30,000 or more, but due to age, mileage or condition are worth less than this at the time they are placed into service.

b. Nonstandard vehicles should not be assigned to SACs or ASACs, used to transport outside dignitaries or visiting officials, or used in other manners that may create an erroneous appearance of agency largesse.

3. Standard. Those vehicles purchased under GSA/State Department contract, or any seized or transferred vehicles not meeting the criteria for 1 or 2 above.

E. In the case of certain long-term undercover operations, it may be necessary, in the SAC's judgement, to use a luxury type special vehicle in the same manner as a primary vehicle. Where such a situation arises, the SAC should submit a request for a waiver of these requirements to the Chief of Operations (OC), setting forth justification and the use period necessary. OC, upon concurrence, will authorize such use via return correspondence. A copy of OC's concurrence will be forwarded to SC/SAFP for their records.

F. Standard and nonstandard vehicles, because of their general utility, are grouped under the heading "PRIMARY" vehicles for the purpose of establishing vehicle ceilings. Special purpose vehicles are not counted against field office ceilings. However, SAFP will monitor the number, types and utilization of special purpose vehicles in the field and make adjustments as necessary to assure appropriate utilization. Barring exceptional circumstance, all vehicles assigned to foreign offices will be considered primary vehicles.

G. Limited production vehicles such as the Rolls Royce, Maserati, Ferrari, Clenet, Zimmer, Lamborghini, DeLorean, etc., will not be placed into official use. These and similar vehicles are excessively expensive to maintain and so distinctive it is not in DEA's best interest to place them into official use.

**6124.22 Vehicle Ceilings**

A. SAFP will apportion DEA primary vehicles among the domestic and foreign field offices, based on written request by the SAC/CA as to the number of vehicles required, as set forth in 6124.31.

B. Ceilings will be based upon each office's official table of organization, including Deputized Task Force Officers in formally funded task forces, and will be reconciled on an annual basis via Annual OGV Report.

C. Where a field office's primary fleet exceeds its established ceiling, justification must be provided to SAFP via the return copy of the Annual OGV Report. Where the excess cannot be justified, SAFP will contact field management as to appropriate corrective measures (i.e., excessing or transfer elsewhere in the agency).

D. Special purpose vehicles are not counted against field division office ceilings. However, SAFP will monitor the number, types and utilization of these vehicles by the field offices, and make appropriate adjustments for maximum utilization.

**6124.23 Vehicle Identification**

A. Upon placement into official use (or, in the case of a leased vehicle, where the lease is to extend

beyond 60 days), SAFP will assign a specific seven character identification number to each vehicle. Once assigned, this number will be recorded on all documents related to the use of this vehicle (i.e., maintenance records, repair bills, gasoline receipts, etc.).

B. All DEA vehicles will be registered and inspected in full accordance with the laws of the state or country in which they are assigned. The Administrative Officer has responsibility to complete these initial requirements. The first line supervisor has oversight responsibility to ensure the continued completion of these requirements.

C. Liaison should be established with appropriate state or country authorities such that DEA vehicles can be registered in a manner not subject to compromise in security (i.e., the fact that they are DEA vehicles in not discloseable to routine inquiry). This may take the form of a confidential state registration file, or the use of fictitious names.

D. If multiple license plates are issued for a DEA vehicle, then the field office file for that vehicle will contain a complete and current listing of these license plates. Once issued to a DEA vehicle, license plates will not be used on another vehicle without appropriate documentation on file.

E. DEA vehicles will not bear any markings identifying them as such. A DEA Official Business placard may be used for parking in those situations where such use would not compromise security. DEA Official Business placards may only be used for vehicles used in the performance of official duties.

**6124.24 Vehicle Files**

A. Every office to which an OGV is assigned will maintain a file for that OGV. If an OGV is transferred to another office, the file will be transferred with the vehicle. Files for OGVs assigned to suboffices will be maintained by that office.

B. OGV files will be maintained for non-DEA vehicles assigned to task forces and where a Task Force Agreement specifies that DEA will assume costs of fuel/maintenance/repair.

C. Vehicle files will contain all correspondence relating to acquisition, maintenance, repair and ultimate disposition. This includes:

DEA-87, Motor Vehicle Assignment Record. (FFS: 1120-02)

All documents relating to registration/licensing (FFS: 1120-03) DEA-349's, Monthly Motor Vehicle Report (FFS: 1120-04) DEA-349a, Motor Vehicle Repair Requests (FFS: 1120-04) DEA-349b's, Use certification, all copies (FFS: 1120-02)

Copies of accident reports/investigations and related documents.

**6124.3 USE**

(See memorandum from Deputy Administrator Michele Leonhart, dated July 3, 2006, subject Use of Official Government Vehicles.)

A. Official Government Vehicles (OGVs) will be used only for official purposes. The term official purposes will be interpreted strictly and will not be construed to encompass the mingling of official business with personal business. Use of an OGV for transportation of employees between their

domiciles and place of employment can only be justified when affirmatively authorized by statute, as in Title 31, Section 1344 (31USC 1344).

**6124.31 Criteria for Use**

A. The overall criteria for use of OGVs by DEA personnel is Public Law 99-550. This has been codified into Title 31USC 1344 and its implementing regulations, 41CFR 101-6. These set forth the requirements governing the home to work use of any official vehicles by government employees. In essence, these state that any such use is prohibited unless it conforms to one of the four specified exemptions. Additionally, these criteria provide that only the head of a federal agency (that is, the Attorney General) may decide whether a given situation meets the standards for one of the exemptions.

B. For DEA, there exist four exemptions. These include, the Administrator, field work, criminal law enforcement and clear and present danger. The requirements for each of these exemptions is set forth as follows:

1. Pursuant to 31USC 1344(a)(2)(B), the DEA Administrator is granted the emergency use of an OGV for reasons of personal safety and security.

2. Under the provisions of 31USC 1344(a)(2)(A), Field Work is defined as those employees whose assignments and duties are such that a need periodically exists to report directly to various locations other than their fixed normal place of work, both within and without their normal commuting area or to remain at various locations after the close of normal business hours: in both instances the juxtaposition of their residence, normal place of work and that the work site being such as to make it advantageous to the government to authorize the home to work use of an OGV. The field work exemption specifically excludes the use of home to work transportation when the employee's work day begins at his or her official government duty station, or when the employees normally commutes to a fixed location, however far from his or her official duty station. For Headquarters motor pool. See 0325 of the Administrative Manual. Vehicles from the Headquarters motor pool may be assigned to specific elements (i.e. OC, DO, OF) with keys available to both motor pool and the element. The element chief will ensure that a DEA-349 is prepared each month and submitted by the fifth for review and approval of the Chief of the motor pool or the Office of Operations Management (OM). (See Exhibit 2). The motor pool chief will ensure that regular maintenance is routinely performed on all Headquarters OGVs per DEA policy.

a. All Headquarters assigned SES, GS/GM-1811, 1810, 132 and 1320 employees, including those at satellite locations such as EPIC, the Air Operations Center, Quantico and Newington, as well as all field assigned GM/GS-1810, 132, 1320 and 1802 are included under the provisions of the field work exemption, unless the criteria for criminal law enforcement described below can be met. See 6124.31B3.

b. OGVs assigned under this exemption should be on an individual case by case circumstance. Certification by the first line supervisor should be via DEA-349c and will not normally exceed fifteen days. Speciality purpose vehicles will be in this category. (See Exhibit 3 for DEA-349c.)

3. Title 31USC, Section 1344(A)2(B) provides that an agency, under appropriate circumstances and after obtaining and providing appropriate approvals, may authorize the home to work utilization of an OGV to promote the safe and efficient performance of criminal law enforcement duties. This provision,

in conjunction with 41CFR, Section 101-6.4, requires that the employee be continually available for communications and frequently involves the spontaneous recall to duty at locations other than the normal place of work, or where spontaneous need arises for him to remain on duty after normal business hours at locations other than the normal place of work and that their duties would be rendered inefficient or unsafe without home to work transportation and that the activities preformed by them would be adversely affected by lack of home to work transportation. No DEA employee may utilize an OGV for home to work transportation unless he or she is certified.

a. All field assigned SES, GS/GM-1811 and deputized task force officers are included under these criminal law enforcement provisions. All GS/GM-1811 assigned to field division specialty positions, including Public Information Officer (PIO), OCDETF Coordinator, Primary Firearms Officers, Divisional Training Coordinators (DTC) and Demand Reduction Coordinators (DRC), are also included under the provisions in the criminal law enforcement exemption.

b. These speciality positions should be held to the same criteria as for those employees under the criminal law enforcement exemption. For those Special Agents/Task Force Officers occupying speciality positions that cannot meet this criminal law enforcement criteria, these specific speciality position assignments should be on a collateral basis to assigned law enforcement duties. In those instances where the criminal law enforcement standard cannot be met, these employees should fall under the Field Work exemption stated above. See 6124.31B2.

c. Critical to the interpretation of the definition of criminal law enforcement is that the employee shows a pattern of activity meeting the criteria. This pattern should be independently certified and justified. This certification will be conducted by the first line supervisor on a quarterly basis, via the DEA-349b. (See Exhibit 4). This certification must be based on a review of the employees' DEA-352 (Biweekly Activity Report). (FFS: 520-13). (See Exhibit 5). Certification will also occur when there is a change in home address, assigned duties or whenever an OGV is first assigned or reassigned to an agent.

d. Certification of Special Agents/Task Force Officers who are assigned OGVs under the criminal law enforcement criteria will also occur on an annual basis by the SAC/CA. This may be accomplished by issuing a single comprehensive memorandum rather than through individual DEA Form 349b. The memorandum must list the name of each employee to be certified, the office or group to which assigned and the OGV number. The memorandum must contain the following certification:

I have reviewed the duties and activities of the following personnel from the perspective of their involvement in criminal investigations. I have determined that their duties require them to be continually available for recall to duty, that their duties would be rendered ineffective or unsafe without home-to-work transportation, or that the activities performed by these personnel would be adversely affected by lack of home-to-work transportation, (list names, office/groups and OGV numbers).

I therefore certify that home-to-work transportation is necessary for the above named employees for the safe and effective performance of criminal law enforcement duties.

The memorandum must be signed by the SAC/CA, and filed with the forms DEA-349b in a master file at the issuing office.

e. Factors which demonstrate a pattern of activity include but are not limited to the following:

(1) Ongoing case load

(2) Liaison

(3) Lack of alternative transportation

(4) SES (GM-1811) Official based on field management of operations, media relations and coordination of high level liaison functions.

4. Under the provisions of 31USC 1344(b)8, the clear and present danger exemption exists in documented threat situations. Approvals under this provision require the approval of the Attorney General, pursuant to Title 31USC 1344(d)3. This approval is subject to congressional notification under the provisions of Title 31USC 1344(d)4. There does not exist routine authorization under this provision. Emergency situations may develop at DEA, or involving DEA personnel, which would not permit DEA to meet the approval requirements in a timely manner. DEA does not have any OGVs assigned under this provision.

**6124.32 Unauthorized Use**

(See memorandum from Deputy Administrator Michele Leonhart, dated July 3, 2006, subject Use of Official Government Vehicles.)

(See Appendix A, including Standard Schedule of Disciplinary Offenses and Penalties. Also see Personnel Manual, Chapter 2735, Standards of Conduct. Also see Chapter 2735.16F, paragraphs 4-7, under the use of government property of the DEA Personnel Manual).

A. Using an OGV is strictly prohibited under the following circumstances: After the consumption of any amount of alcohol or drugs; solely for the purpose of travel to and from residences; for attending personal business; or for the transportation of any person not engaged in the conduct of official business or not otherwise being transported in the interest of the government.

**6124.33 Commuting Distances Between Domicile and Work**

A. In assessing the request for certification for home-to-work utilization of an OGV, the SAC/CA will determine if the employee's residence is located within the maximum allowable distance established for the particular office to which the employee is assigned. (See paragraph 1 below.)

1. Federal regulations (41CFR 101-6.402) state that, "Each Federal Agency shall consider the location of the employee's residence prior to authorizing home-to-work transportation. Such transportation shall be authorized only within the usual commuting area for the locals of the employee's place of employment." Accordingly, SACs and Country Attaches will publish division orders or office directives establishing maximum home-to-work distance policy for each office under their supervision. (Copies must be sent to OM and SARR). He/she will ensure that all employees newly assigned to the division or office are informed of the policy prior to relocation.

2. Any requests for exceptions to the maximum distance policy should be rare and must be

fully supported and justified to be considered. Such requests should be forwarded through the chain of command to the SAC or Country Attache. If the SAC or Country Attache concurs, the request will be forwarded to the Chief of Domestic Operations (DO) or the Chief of International Operations (OF), as appropriate, for approval or disapproval.

3. SACs and Country Attaches will review and update their maximum home-to-work distance policies, and submit these annually to Headquarters, Property Management Unit (SAFP).

**6124.34 Use of an OGV While in a TDY Status**

When an employee is in a temporary duty status (TDY), use of an OGV or a rental vehicle rented for official purposes is authorized to include transportation between places where the employees presence is required incident to official business. In this instance, the use of an OGV is limited to the nearest available place in the local area to obtain services of suitable eating places, drug stores, barber shops, places of worship, cleaning establishments and similar places necessary for the sustenance, comfort or health of the employee to foster continued efficient performance of government business.

**6124.35 Rentals**

A. The need to periodically rent vehicles may arise. Every effort should be made to minimize this practice, and use DEA vehicles instead. However, where the rental is deemed unavoidable, the following procedures shall apply:

1. Rentals may be authorized by the SAC/CA/Laboratory Director or Headquarters Office Head. Each rental will be justified in writing, attached to or included in the travel order or their authorizing document. If required for other than travel, the written justification will be via memorandum to the authorizing official.

2. All vehicle rentals are chargeable to the operating fund appropriate to the activity (i.e., OCDETF, Task Force, Divisional, etc.).

3. Rentals in excess of 60 days are subject to SAFP approval. This approval will be via teletype and will contain the same information as paragraph 1 above. SAFP will survey availability of OGVs as an alternative to long term rentals. If no alternative is feasible, SAFP will approve the rental via return teletype. If the same vehicle is to be rented for a period of in excess of 60 days (i.e., it will not be periodically switched for another vehicle to avoid disclosure of a surveillance operation), then the requesting office will include a full description of the vehicle, including VIN. In this case, SAFP will assign an OGV number to the vehicle, via DEA 87, and the requesting office will create an OGV file as per 6124.24.

4. Vehicle rental companies commonly offer a "collision damage waiver" as an extra cost item. This fee is non reimbursable to the employee. If the employee is involved in an accident in a rental vehicle while in the performance of official duties, the matter will be treated in the same manner as if this was a DEA OGV accident. See 6124.8. Questions on the foregoing should be directed to the Office of Chief Counsel (CC). See 6124.83

B. DEA employees should always ensure, if an operation or enforcement matter will not be compromised, that vehicles are rented pursuant to the Terms of the US Car Rental Agreement (as contained in the GSA Federal Travel Directory). The US Car Rental Agreement limits both the

employee's and the government's liability arising from any incident involving a rented vehicle. Vehicles rented under a standard consumer contract may be subject to both the renter and the United States to additional liabilities if an accident occurs.

C. When a government employee procures, obtains, operates or maintains a rental vehicle rented or leased in the name of the United States, the Department of Justice (DOJ), DEA, or any other Federal, State agency, he or she is provided benefits, rates and coverages not normally afforded the common consumer. Accordingly, DEA employees shall not utilize a rental vehicle obtained under these circumstances for any other purpose or venture which is not within the purpose of their official travel, official duties, or within the scope of their Federal employment, and an employee shall not utilize a vehicle rented under the above purposes during his or her off duty hours.

D. An employee who continues to retain a government vehicle when his or her official duties are completed potentially exposes the Federal Government to substantial liability for injuries or damages they may cause through use of their vehicle. For example, an employee cannot, after completion or during a break of his or her official trip, then retain a vehicle rented under the above circumstances and use that vehicle for non official purposes, even if:

1. The employee pays all costs associated with the continued retention of the vehicle, and

2. The government was not charged or assessed for the additional miles or use of the vehicle.

**6124.36 Use of an OGV to Attend Social Functions as Liaisons**

A. The DEA Standards of Conduct currently forbid DEA employees to use OGVs to travel to such events, such as retirement parties, "except when officially representing DEA." Violation of this prohibition is subject to mandatory minimum thirty-day suspension. If attendance at quasi-official functions of another law enforcement agency would promote DEA and contribute to DEA's continued effectiveness in the law enforcement community, then, as detailed below, specific DEA personnel may be authorized to attend such functions. Managerial employees should not be discouraged from authorizing employees to use OGVs to attend these functions as described.

B. Special Agents in Charge (or, as appropriate, Country Attaches, Laboratory Chiefs, and Office Heads) can give *advance written authorization* to SACs, CAs, ASACs, RACs, OCDETF Coordinators, PIOs, and other employees whose PRIMARY assigned duties involve liaison with *other agencies* to use OGVs to attend retirement parties and other quasi-official functions in their official capacities. This authority is, however, limited to attendance at functions of *other agencies* as an official representative of DEA, and does not include attendance at internal DEA social functions.

**6124.37 Use by Non-DEA Personnel**

A. Cooperating Individual. Barring a justifiable emergency, cooperating individuals may operate an OGV only as part of a specific enforcement-related event (e.g., an undercover buy), and only where a DEA Agent is present in the vehicle or where the vehicle is under continuous DEA surveillance.

B. Any such use of an OGV by a cooperating individual requires the approval of the SAC. Except in exigent circumstances, the approval shall be in advance.

C. Other Enforcement Officers. Aside from those vehicles assigned to officers of another agency as part

of a long-term contractual arrangement (e.g., a DEA Task Force cooperative agreement), OGV's may only be operated by a non-DEA officer as part of a specific enforcement-related event.

D. Barring some justifiable circumstance, such use must be continuously monitored either by a DEA agent being present in the vehicle or through surveillance at least participated in by DEA. Any use of an OGV by a non-DEA officer requires the approval of the SAC. Except in exigent circumstances, this approval shall be in advance.

**6124.38 Use in a Foreign Country**

A. All provisions of this Section (6124) and of Appendix A apply equally to domestic and foreign use.

B. While in a foreign country in an official capacity, DEA personnel are under the full authority of the US Ambassador. This shall include any instructions provided by the Ambassador governing the use of DEA vehicles, but only to the point that they do not conflict with DEA policies. The Comptroller General has ruled that the Ambassador, absent a bonafide emergency situation, may not direct or manage the utilization of vehicles not owned by the State Department.

C. DEA policy regarding the transportation of dependents in an OGV shall apply to use in a foreign country, but only with the following two modifications:

1. If the employee is assigned to a post of duty which has no suitable public transportation, no provisions for vehicle rental, and a personally-owned vehicle is justifiably unavailable for use, then the transportation of dependents via an OGV for the fulfillment of basic needs (e.g., shopping for food, transport to a school, etc.) may be deemed in the best interest of the Government and therefore allowable.

2. If the employee is assigned to a post-of-duty which is experiencing a high degree of civil unrest or terrorism, to the point that the transport of dependents via an OGV is deemed safer than any alternative means, then this may be deemed in the best interest of the Government, and therefore allowable. (See Appendix A, 2735.16 F6).

In either of the foregoing situations, written approval from the Country Attache shall be required. Except in exigent circumstances, such approval must be in advance. Approval, if given, shall be only for that specific period of time and circumstance deemed necessary.

3. Country Attaches may self authorize the use of their own assigned OGVs to transport dependents, provided that:

a. Such authorization is in writing;

b. the authorization is executed in advance of the need; and

c. a copy of the authorizing document is promptly forwarded to the Office of International Operations.

4. Written confirmation of approval to use an assigned OGV to transport dependents and of the circumstances which required that approval shall be retained in the motor vehicle management files of each office.

5. All employees should be aware that, even if permission is granted to use an OGV to transport dependents in a particular overseas duty location, all other provisions of the Standards of Conduct remain in effect. If there is any predictable possibility that the OGV will be needed for active enforcement work during the period when he vehicle will be used to transport dependents, for example, permission to transport dependents should not be sought and will not be granted. See Personnel Manual 2735.16.F7(e). Neither the Country Attache nor any other official can authorize dependents to operate an OGV. DEA personnel assigned to foreign areas who operate OGVs, remain subject to all statutes, regulations, rules and policies governing the operation of government vehicles.

6. Where a foreign office uses contract employees as Investigative Aides, and the nature of their duties requires the use of an OGV, there are certain considerations that must be taken into account:

a. Such employees are not protected from liability by either diplomatic immunity or DEA's authority to pay tort claims. Therefore, host country insurance coverage must be obtained for any actions by these employees that may give rise to claims for personal injury/property damage. Such coverage should be in amounts reflective of prevailing awards in the host country.

b. There is **no** provision under Public Law 99-550, Implementation Plan for the home-to-work use of OGVs by these employees. Any OGV assigned must meet the criteria for the Field Work exemption. See 6124.33.

c. There may be additional embassy or host country restrictions connected with this issue. It is incumbent upon the Country Office to fully explore such matters prior to submitting a request under this paragraph.

d. Requests for OGV ceiling increases under this paragraph shall be in writing to the Office of International Operations (OF) who will coordinate the request with SAFP. Upon concurrence, OF will coordinate with SAFP who will authorize such assignment via return correspondence. They must address the following:

The identity and full description of these employees and their duties.

A description of the insurance coverage necessary and available in the host country, including cost.

A description of the Embassy or host Country restriction which may govern.

A description of the circumstances of use of the OGV by these employees.

**6124.39 Suspension of OGV Use for Alcohol Related Incidents**

A. SACs and CAs will suspend the certification for the privilege of home-to-work utilization of an OGV for any employee involved in an alcohol-related incident while operating an OGV or POV. The suspension will remain in effect from the date of the incident for a period of not less than 60 days or until such time that the SAC or CA feels confident that the offense was atypical of the employee's normal conduct and recidivism is unlikely. Commencing from the date of the incident and continuing through any latter decisions to deny certification use of the OGV, the SAC/CA in reaching a decision in

this regard, may consult with the Manager, Employee Assistance Program (EAP), or the EAP Area Clinician, when appropriate.

B. Likewise, the SAC or CA will determine that reinstatement of the certification is justified. The reasons supporting the decision shall be articulated via memorandum. A copy will be forwarded to the Board of Professional Conduct (HB). SACs and CAs are accountable for carefully exercising good judgment in making these determinations.

**6124.40 Use of OGV to Attend Physical Fitness Facilities**

A. Although the DEA physical fitness program is not mandatory, DEA supports a physically fit work force. With the written permission of the SAC/CA, an OGV may be utilized to attend a physical fitness facility or approved exercise activity area under limited circumstances. All of the following criteria must be met:

1. The OGV is utilized for this purpose during a normally scheduled work day.

2. There must be a direct and reasonable distance between the residence of the operator, the physical fitness facility and the office of the operator.

3. The operator is participating in a structured physical fitness program.

4. The operator requests SAC/CA approval in advance of utilizing the OGV. This request must include the location of the exercise facility, and in so far as can be determined, the dates and schedule of such activity. The request will be made on at least a quarterly basis.

B. If the SAC/CA determines that the agent/operator is participating in a structured exercise program, that the use of an OGV would enhance the Agent's physical fitness, and that participation would not interfere with DEA's mission, he/she may grant approval. This approval can not be delegated below the SAC/CA level. The written request and approval will be filed in the OGV file.

C. Neither official duty time nor administrative leave can be authorized for fitness workouts.

**(See Memorandum dated September 18, 1996 by Deputy Assistant Administrator for Personnel, Retha M. Fulmore, subject: Clarification of the Voluntary Fitness Program.)**

**6124.5 OPERATING SAFETY**

A. Use of personal owned vehicles (POV's) in any aspect of an enforcement operation is prohibited. With the written permission of the SAC/CA, POV's may be utilized to attend social functions as liaisons and conferences, or travel from a residence to the DEA office, when an OGV is otherwise not available, if permission is obtained from the SAC/CA, pursuant to 6124.36B. In these instances, the owner/operator may request reimbursement for mileage pursuant to government travel regulations.

B. Field office management will arrange for appropriate training programs in defensive driving. All employees are expected to drive in a defensive manner and obey all traffic laws.

*C. Except in certain exigent, emergency enforcement situations or law enforcement duties, Federal regulations, Department of Justice policy and DEA policy in accordance with Executive Order (EO) 13043, require all DOJ employees occupying **any** seating position in a motor vehicle on official

business, whose seat is equipped with a seat belt, must have the seat belt properly fastened at all times when the vehicle is in motion. Disciplinary action may be taken for violation.*

D. In certain enforcement situations agents may have to violate traffic or parking laws. However, safety of the public and the agent have higher priority than any enforcement activity. Traffic and parking laws will not be violated to the detriment of public and personal safety.

E. Traffic and parking citations will be reported to the employee's supervisor within 48 hours. Field office management will establish liaison with appropriate area officials to handle citations arising out of official activities. In each instance, the circumstances causing the citation will be reviewed. Any indication that an employee is abusing his authority will be cause for him to assume personal responsibility for the citation. DEA is prohibited from paying fines for traffic violations.

[redacted]

[redacted]

L. Field office management will decide which OGVs shall be equipped with emergency lights and/or sirens, based upon operational requirements. Field office management will purchase and install this equipment according to state and/or local ordinances. (The use of personally owned emergency equipment is prohibited.) It is the responsibility of each DEA employee operating an OGV to ensure the presence of these items and to replace those items missing or in need of service. This equipment may only be used in the following situations:

1. To stop a vehicle for the purpose of making an arrest or executing a search warrant.

2. During a high-speed pursuit or emergency response.

3. As a warning device at a road block or when the OGV is disabled along the roadside (lights only).

4. In other enforcement situations in which the use of emergency equipment is justified.

M. When utilizing emergency lights and sirens during a high-speed pursuit or emergency response, the equipment should be activated continuously throughout the pursuit or emergency response, and the driver of an OGV utilizing such equipment must never assume or expect that vehicular or pedestrian traffic will always yield the right of way to the OGV. Agents will utilize emergency lights and sirens in accordance with applicable state and or local statutes.

N. Field office management will ensure that the following equipment is purchased, maintained in

operating order, and placed in each OGV:

1. Good spare tire.

2. Jack and lug wrench in good working condition.

3. Dry-type fire extinguisher.

4. Flares.

5. First aid kit.

6. Flashlight.

7. OGV accident package. See 6124.81(B) thru (D).

**6124.6 MAINTENANCE AND REPAIRS**

**6124.61 General Policies**

A. It is the responsibility of the employee to whom an OGV is assigned to ensure that all required maintenance service is performed at the appropriate intervals. Failure to do so could result in disciplinary action or personal liability for damages attributable to neglect. (See 0322 and 0317 of the Administrative Manual). Instructions concerning the maintenance and repairs of OGV's are set forth in this section. All Special Agents are to be familiar with these instructions.

B. Management will select vendors for maintenance services subject to mandatory GS contracts, and subject to the following factors:

Quality of work

Convenience/Timeliness

Security/Trustworthiness of facilities and personnel

C. Malfunctions to OGVs under warranty should be promptly serviced by an authorized warranty facility. Failure to do so may void the warranty, and result in the unnecessary expenditure of official funds. Warranty repairs should not be reported under Item 8 of the DEA-349, but under the "Remarks Section" (Item 8H).

D. Repairs under $50. May be paid by credit card or cash. Payment for repairs by credit card will be separated from fuel invoices. The paid invoice will be attached to the credit invoice, or marked paid cash, and filed in the OGV file.

E. Imprest funds may be used for reimbursement of cash payments and cleared via DEA-1164. No approval or DEA-349a completion is required for these repairs.

F. Repairs under $500. May be paid for by cash, credit card or purchase order. Advance approval of the Administrative Officer or other procurement contracting official is required. This will be completed via DEA-349a, Motor Vehicle Repair Request. The DEA 349a will be filed in the OGV file along with the

appropriate invoices.

G. Repair over $500. Must be paid via purchase order, unless a bonafide emergency exists. This emergency will be documented in memorandum, filed to the OGV file.

H. Repairs over $2500 shall be handled as in 6124.61 paragraphs E and F above, with the additional requirement of obtaining verbal and/or written estimates from three vendors. Verbal estimates require documentation via DEA 261, Informal Telephone Quotation. All estimates will be filed in the OGV file.

**6124.62 Repair Criteria**

The following limits shall be applied to single instance repair within a 12 month period. Repair estimates beyond these limits may only be authorized by the SAC/CA/Laboratory Director/Office Head. If not authorized, excess procedures should be initiated.

**Table 1. Repair Criteria**

| Age | Percent Current Value | Age | Percent Current Value |
|---|---|---|---|
| 1 | 37 | 4 | 10 |
| 2 | 26 | 5 | 8 |
| 3 | 18 | 6 | 5 |

**6124.63 FBI Maintenance/Repair**

A. In those locales where it is mutually determined by the FBI and DEA SACs that DEA's use of FBI repair/maintenance facilities would be desirable, such arrangements can be implemented via an interagency agreement.

B. See Administrative Manual, Chapter 02, Exhibit 6.

**6124.64 Credit Card Acquisition**

A. Management should survey the various fuel suppliers in the area of operations to determine the most prevalent brands.

Credit cards should be solicited from the fewest number of suppliers that will assure efficient availability of fuel for official activities. The choice of suppliers should be limited to those that do not charge an additional fee for purchases via credit cards versus cash. An exception to this may be made where such a limitation would significantly impair operational capabilities.

B. Credit cards should be obtained in the name(s) of fictitious individuals or companies.

C. Credit cards may be issued to all principal OGV operators, and the fewest number of other employees necessary to the office functioning. Cards will be issued via DEA-16, recording individual card numbers. Outstanding DEA-16's should be filed in a central, secure place.

D. Credit cards are expressly not for the purchase of any items (such as food, toiletries, or beverages) not directly related to the OGV.

E. Upon transfer or termination of employment, employees must return these cards to the issuing office.

**6124.65 Credit Card Use**

A. Credit cards will be issued for the purchase of fuel, supplementary additions of oil, and washing/waxing. As the use of credit cards to purchase fuel and oil enables the Government to claim reimbursement for state and local taxes, credit cards will be used for all but emergency circumstances, or when operational circumstances require the use of cash. When cash is used, the SF-1164 will contain a narrative justification. A copy of the SF-1164 will be attached to the DEA-349, and processed in the same manner as a credit card invoice. (See Exhibit 4.)

B. Credit cards may also be used to purchase repairs and maintenance, within the parameters of 6124.61D through F.

C. Credit card invoices will bear the DEA or other agency vehicle identification number, and a legible signature of the operator. Receipt copies will be submitted with the DEA-349 on a monthly basis.

D. The immediate supervisor of the OGV operator will review all receipt copies affixed to the DEA-349 to assure that:

1. The copies bear legible signatures, the DEA or other agency vehicle identification number, the vendor, date, and clearly reflect the goods/services purchased.

2. The amount of fuel purchased is commensurate with the reported mileage for the period.

3. The location of purchases coincide with the operator's official duties at the time.

4. The goods/services purchased were permissible within the limits of A. And B. Above.

5. The receipts are accurately summarized on the DEA-349.

6. Supplemental memoranda, credit card invoices, etc., are attached to the DEA-349.

E. The supervisor's signature on the DEA-349 is his certification that he has reviewed the form and attachments for the above factors, and that to the best of his knowledge and belief these expenditures were necessary for the conduct of official business.

F. Management officials will establish procedures that receipt copies are compared to monthly billings to assure charges are correct. This will be completed by the fleet manager. See 6124.65D.

**6124.66 Motor Vehicle Program Reports**

A. The DEA-349 will be completed by the principal operator of the OGV within 5 working days after the end of the month. Management will assign employees to complete the DEA-349 for unassigned OGVs. Instructions for completing the DEA-349 are on the reverse of the form. Information reported on this form is entered into M204 Motor Vehicle Program, and serve the basis for agency cost and energy consumption data concerning the motor vehicle fleet management.

**NOTE**: In the case of a non-DEA assigned vehicle to a DEA Task Force, and for which, under the Task Force agreement, DEA is obligated to pay the costs of fuel maintenance/repair, field management may require the preparation of the DEA-349 as an aid to track expenditures and mileage. The information from these DEA Form 349's will not be entered into M204.

B. The Annual OGV report will be issued in April of each year by SAFP to all agency components with assigned OGVs. This report will list each offices' most current OGV ceiling, current OGV inventory, and OGVs in a disposition pending status. Office management will review this report for accuracy, and respond via memorandum to SAFP within 45 days of receipt. Any disagreements regarding OGV ceilings must be fully justified.

**6124.67 Maintenance Responsibilities**

A. It is the responsibility of the assigned OGV operator to conduct routine maintenance and required repairs as follows:

1. Routine oil change and lube, every 3 months or 3,000 miles, which ever occurs first. OGV operators are required to change or replenish fluids or maintain a vehicle in the manner proscribed by the manufacturer is so recommended. Such maintenance will be noted in the remarks section of the DEA-349.

2. For vehicles under manufacturer's warranty, maintenance will be completed by the OGV operator, according to the established vehicle schedules in the owner's manual. Failure to adhere to these conditions could void the warranty.

3. A full tune up will be completed according to the vehicle factory warranty. Thereafter, this service will be completed every 20,000 miles or 12 months, whichever occurs first.

4. Other vehicle repairs will be performed, as required. These repairs will be approved, in advance, via completion of the DEA-349a by the operator and approval by the first line supervisor. These repairs will also be documented in the DEA-349.

5. Failure of the OGV operator to comply with these requirements may result in disciplinary action and/or a financial liability assessment against him. (See 0317 of the Administrative Manual.)

B. The first line supervisor will be responsible to ensure that the routine maintenance of all vehicles is completed according to the above schedule. First line supervisors will be responsible for conducting a physical inspection of all vehicles on at least a quarterly basis. First line supervisors will document certification of required routine maintenance and vehicle inspection in the "Remarks" section of the DEA-349.

C. The assigned Divisional Fleet Manager will review on a quarterly basis the compliance with required routine maintenance by divisional operators, through review of the DEA-349. In instances where required maintenance has not been completed, the Fleet Manager will forward a written reminder to the operator, and a copy to the first line supervisor. Subsequent reminders will be forwarded to the operator, the first line supervisor and the appropriate ASAC for corrective action.

**6124.7 THEFT AND VANDALISM**

A. Employees will assure that unattended OGV's are properly secured and locked. Equipment left in the OGV will be limited to basic tools and equipment of a nonsensitive nature, and these will be locked in the trunk. Portable radios, camera, technical equipment, and similar sensitive and costly equipment will not be left in an unattended OGV.

B. Official funds will not be stored in an unattended vehicle.

C. Sensitive documents and notes will not be stored in an unattended vehicle.

D. Firearms will not be stored in an unattended vehicle except in those instances where the SAC/Country Attache has authorized the storage of a shotgun in a locked rack in a locked trunk, or a short-term emergency situation (see 6122).

E. Neither seized property nor drug evidence will be stored unattended in an OGV.

F. Where short term storage of these items is unavoidable, these items will be stored in a locked trunk. Should it become necessary to park the OGV in a parking garage with either the doors unlocked or the leaving the OGV key with an attendant, such equipment may only be stored in the locked trunk if it can be locked with a separate key, inaccessible to the attendants.

G. Vandalism to or a theft of the OGV or any equipment in the vehicle will be reported to field office management immediately, and management will ensure that appropriate local authorities and, if applicable, the FBI are promptly notified. Theft or vandalism to an OGV will be reported in the same manner as an accident (see 6124.81 below) except that forms SF-91, SF-91a, SF-94 and 0F-26 do not apply. Thefts or damage to property valued in excess of $100 will be reported and processed in accordance with the Personal property Negligence/Liability Assessment process as set forth in Section 0317 of the DEA Administrative Manual . A finding of negligence on the part of the employee may result in disciplinary action and/or personal liability. Efforts taken to apprehend the perpetrator(s) and/or recover the property should be included in the DEA-29 and accompanying memoranda. If a stolen vehicle is subsequently recovered, this fact should be reported via teletype to Headquarters (SAFP and HB).

**6124.8 ACCIDENTS**

(See also Administrative Manual 0326 and Personnel Manual Section 2735.)

The following procedures apply to all DEA-controlled conveyances whether owned, leased, rented, or borrowed for official use by DEA, a DEA employee, or assigned/contract employee, including: land vehicles (car, truck, bus, motorcycle, etc.); aircraft (fixed wing, helicopter, glider, etc.); or marine vessels (boat, barge, etc.).

**6124.81 Accident Reporting**

**(See DEA Teletype 20974 dated 11/19/03, subject: Changes to the Notification Procedures for the DEA Headquarters Command Center)**

**(See DEA Teletype 20193 dated 11/07/03, subject: HQ Command Center Notification of a Critical Incident, Shooting, Threat/Assault, or Significant Enforcement Activity)**

A. Should an accident involving a DEA-controlled conveyance occur, regardless of the amount of damage, the employee-operator will take the following steps. If the employee-operator, due to injury, cannot perform these tasks, then the senior employee at the scene will do them. (See also 6124.82 for Vehicle Incidents).

1. Take appropriate measures to see that injured persons are tended to, and that the scene

does not create a hazard to passing traffic.

2. Notify local authorities (and if applicable NTSB, FSC, or the US Coast Guard); if not notified, explain in SF-91 or in DEA-6.

3. Avoid making statements to any witnesses or other parties to the accident as to cause or fault.

4. Obtain the identities of participants and witnesses for preparation of the SF-94.

5. Notify immediate supervisor as soon as possible (i.e., as soon as the circumstances of the accident will permit the employee to do so).

6. Cooperate with local authorities investigating the accident.

B. All accidents involving a DEA-controlled conveyance will be reported by the supervisor to the SAC/CA/Office Head in whose territory the accident occurred, within 24 hours. While a preliminary field investigation must be conducted of all instances of damage to an OGV, not all OGV-related incidents warrant the time and effort involved in a full investigation and Headquarters review. SACs have been authorized to close investigations of property damage to OGVs, not involving a non-DEA party, which were either trivial in amount (i.e., snapped antenna) or in which responsibility cannot be attributed to the DEA employee to whom the OGV had been assigned (i.e., OGV damaged while parked). This authority *cannot* be further delegated.

SACs must, however, continue to conduct a full investigation and refer to Headquarters for further action all other accidents and incidents, including all investigations of property damage to OGVs in which alcohol consumption, transportation of non-employees, or other unauthorized use may have occurred.

C. This delegated authority carries with it a requirement of accountability. The Office of Inspections (IN) therefore reviews all closed OGV incident files as part of the inspection of each Field Division. Primary responsibility for investigation of all reports of personal injury or property damage involving OGVs is reserved to Agents at the GS-14 level or above. This does not prohibit investigative contributions by non-supervisory personnel, who will be at the personal direction of a GS-14 Agent, who will assume responsibility for its direction. Each ASAC and SAC will personally review and approve all investigations, whether of OGV related incidents or alleged employee misconduct, before submitting them to Headquarters.

D. Within 1 working day the SAC/CA/Office Head will in turn notify by teletype the following:

1. Office of Professional Responsibility (OPR)

2. Board of Professional Conduct (HB)

3. DEA Safety Manager (HPMH)

4. Office of International Programs (OF)/Office of Domestic Operations (DO)/Office of Diversion Control (OD), as appropriate.

E. Immediate notification of the SAC/CA/Office Head, and OF/DO/OD, as appropriate, is required if

any of the following conditions exist:

1. An arrest or lawful detention of the DEA operator.

2. Any indication or allegation that the employee was operating the conveyance after consumption of an intoxicant of alcohol or drugs, leaving the scene of the accident, or operating outside the scope of employment.

3. Where there is a recognized potential for adverse publicity.

F. If any of the circumstances listed in 6124.81E above exist, the SAC/CA will immediately verbally notify the Chief Inspector (IG) and the Office of Professional Responsibility (OPR). The SAC/CA will follow-up with this notification to IG and OPR, via cable, within 24 hours.

G. The employee/operator (or the supervisor) will submit an accident package to the SAC/CA/Office Head within 10 working days for investigation. All prepared reports should be completed according to Agents Manual, 6211.1. The accident package will include:

1. Completed SF-91, Operator's Report of Motor Vehicle Accident. Insurance and policy numbers for nongovernmental controlled conveyances involved will be reported in Item VI on the SF-91 after estimated amount of damage; use for aircraft and vessel accidents also.

2. One (1) estimate, if damages are under $1,000, and three (3) estimates if damages are over $1,000.

3. If applicable, a copy of the CA-l, Federal Employees Notice of Traumatic Injury and Claim for Compensation. (See memorandum dated August 4, 1997, by Retha M. Fulmore, Deputy Assistant Administrator for Personnel, Subject: Use of Continuation of Pay.)

4. If necessary, a DEA-6 setting forth any extenuating circumstances (e.g., statement by other driver, witness statement, etc.).

5. Copy of the most recent DEA-349b.

H. Deliberate acts of misconduct which reflect adversely on an employees's character, integrity, or honesty will be dealt with severely. In appropriate cases, employees may be demoted to a non-supervisory grade or removed. Employees should not, however, fear that an honest mistake in operating an OGV will be treated as a disciplinary matter.

I. The SAC/CA/Office Head will initiate an investigation of all accidents involving all DEA-controlled conveyances by assigning an investigator promptly after receiving the package, taking into consideration that all aircraft-related accidents must be investigated by a DEA-certified Special Agent Pilot, vessel-related accidents must be investigated by DEA-certified Special Agent Boat Handlers, and the investigator must be of equal or higher rank than the operator. Laboratory Directors should refer the matter of an OGV accident by a laboratory employee to the SAC of the appropriate and corresponding Field Division for investigation. This would be the field division where the employee is geographically assigned. Headquarters Office Heads lacking appropriate investigative personnel should contact OPR for further instructions. The investigator will conduct interviews, complete, obtain, and submit:

1. SF-91, Investigation Report of a Motor Vehicle Accident. Use for aircraft and vessel

accidents also.

2. SF-94, Statement of Witness, from each witness and participant including drivers/passengers of all involved vehicles.

3. Photographs of the accident scene and damage to the Government-controlled conveyance and any other damaged property.

4. Obtain a copy of the reports prepared by local authorities, including a code sheet identifying entries on reports, if applicable, NTSB and FSC (aircraft accidents) and the US Coast Guard (vessel accidents), and citations issued, if any.

5. If personal injuries were involved, interview the attending physicians; where possible, obtain written statements or copies of treatment records.

6. Determine the cost of repairs of damages sustained by non-Federal vehicle(s) or property. Obtain a copy of estimates, if possible, or a paid receipt for the repaired damages.

7. DEA-6: If injuries/death are involved; local authorities were not notified; property other than Government-controlled was damaged; witness refuses to give a written statement but makes oral statement as to cause or liability; or extenuating circumstances exist which cannot be fully covered in the SF-91. DEA-6 must also include:

a. Identifying contributing factors identified in official reports;

b. Statement of the causes of the accident identified in official reports;

c. Attempts to resolve conflicting statements/facts; and

d. Explanation of failure to provide any of the data required and/or failure to meet established deadlines, if appropriate.

8. Copies of any SF-95's, Claim for Damage, Injury, or Death, that have been filed.

9. A DEA-29, Part II.

J. The accident investigation will be completed within 10 working days of assignment. The accident package, containing all available original documents and required copies listed above, will be forwarded by the SAC/CA/Office Head by cover memorandum entitled "Accident, (Date), (DEA Conveyance Identification Number or rental license tag number)" to the *Board of Professional Conduct (HB)*, with a copy of the entire package to the Chief Counsel (CC). Send a copy to the Operations Division, Investigative Support Section (OS), if the accident involved an aircraft or vessel. All reports must be legible, translated if appropriate, and submitted to Headquarters within thirty (30) days of the accident.

K. In the case of an OGV having been stolen or totaled in an accident, the SAC/CA/LD/HOH will notify SAFP in writing so the OGV may be deleted from that office's inventory. If the accident will otherwise be reported as per 6124.81, this may be accomplished by including SAFP on the HQS distribution.

L. Subsequent material concerning the accident received or generated will be distributed in the same manner.

a. The forwarding of a job application to DEA Headquarters for a DEA vacancy and/or for DEAs annual application rating process.

b. The submission of an employee grievance in accordance with Section 2771, DEA Grievance Procedures.

c. The forwarding of a response to a proposed adverse action to DEA's Deciding official in accordance with Section 2752, Discipline, Adverse Actions and Appeals. (DEA mailing privileges shall not be used to file appeals to the Merit Systems Protection Board or other adjudicatory body or to correspond with an employee's representative or attorney.

d. Communicating with or forwarding pertinent information to EEO counselors or investigators or filing initial appeals with the Equal Employment Opportunity Commission or the DOJ Complaints Adjudication Office.

H. Purchase of Seized Property. No employee of DEA may knowingly purchase, or have another person purchase on his or her behalf, property from the Federal government that was seized by DEA or another Federal agency during an investigation n which employees of DEA participated. Further, no employee may disclose to another person any information concerning such property (i.e., appraised value, etc.) which would give that person an advantage over other prospective bidders at auction.

I. Official Government Vehicles. Official Government vehicles (OGVs) shall only be used for official purposes. 31 U.S.C. 1349(b). The term official purposes will be interpreted strictly and will not be construed to encompass the mingling of official business with personal business. Use of an OGV for transportation of employees between their domiciles and places of employment can only be justified when affirmatively authorized by statute, as in 31 USC 1344.

1. The term Official Government Vehicles includes not only those vehicles assigned to DEA's fleet but also those vehicles which may be leased and rented and/or loaned to DEA by other agencies and entities to include vehicles rented or obtained pursuant to an agency travel orders, acquired under a government credit card or under the terms and conditions of the government car rental contract with various car rental companies. This term also includes aircraft and other modes of transportation.

2. OGVs shall be operated safely and prudently at all times. DEA personnel shall drive defensively and shall exercise due care in the operation of a vehicle. Except in exigent enforcement activities, DEA personnel shall obey all regulations, statutes, ordinances, and/or other applicable guidance in their operation of a vehicle. Even in exigent enforcement operations, vehicles shall be operated with due regard for the safety and preservation of human life.

3. An employee who willfully uses or authorizes the use of an OGV for other than official purposes is subject to disciplinary/adverse action. Title 31 USC1349(b) provides a minimum 30-day suspension for an employee who willfully uses or authorizes the use of any official Government owned or leased motor vehicle or aircraft for other than official purposes.

4. For the purpose of this section, willful use includes but is not limited to unauthorized use with or without illegal intent, intentional disregard, or plain indifference to statutory or regulatory requirements.

EXHIBIT
Plaintiff's
9
PENGAD 800-631-6989

5. While not all encompassing, listed below are some examples of instances wherein the use of the OGV is not authorized:

a. Operating an OGV without possessing a valid state driver's license from the state, territory or possession where currently assigned. (State driver's license includes those issued by the District of Columbia, Puerto Rico, or a territory or possession of the United States.) The license must be in the operator's possession at all times while driving an OGV.

b. Using an OGV to visit relatives, friends, acquaintances, etc., when such visits are not conducted for official business purposes.

c. Using an OGV to transport any individual when such individual is not in an official business capacity.

d. Transporting children to and from school or a spouse or friend to and from work even though the school or place of work is on the regular route to the operator's official duty station.

e. Using the OGV for the express purpose of transporting or towing of personal property when not related to official business; i.e., transporting furniture, gardening equipment and the like or towing boats and/or trailers.

f. Permitting an unauthorized person to operate an OGV.

g. Using an OGV solely for commuting purposes or for transportation between a person's residence. Storage of an OGV at an employee's residence is permissible only when authority is obtained in accordance with the Agents Manual, Section 6124, and the Administrative Manual, Subsection 0325.5.

h. Traveling to and stopping at a drinking establishment when not in the interest of official business. General discussions of official business relating to enforcement activities conducted in a bar or cocktail lounge do not constitute official business.

i. Using an OGV for personal business such as leaving the duty station or residence to cash paychecks, to pay bills, drop off or pick up mail, pick up dry cleaning, grocery shopping, etc.

j. While under the influence or after the consumption of alcohol.

k. Leaving the scene of an accident, or not cooperating with appropriate authorities conducting an investigation of an accident or other vehicle related incident or inquiry.

6. Alcohol related incidents involving DEA employees operating an OGV or privately-owned vehicle (POV) will be handled as follows:

a. The SAC, CA, or Office Head will immediately suspend the certification for the privilege of home-to-work utilization of an OGV for any employee involved in an alcohol-related incident operating an OGV or POV.

b. This suspension will remain in effect until such time that the SAC, CA or Office Head feels confident that the offense is atypical of the employee's normal conduct and that recidivism is unlikely. In no event shall the suspension of the home-to-work driving certification be less than 60 days. In reaching this decision, the Employee Assistance Program (EAP), EAP Clinician, or other agency designated health official may be contacted.

c. The suspension of an individual's home-to-work certification will be reported in a teletype to Headquarters, (attention: OPR, HB, and HPMH). When an individual's home-to-work driving privileges are restored, reasons supporting the decision shall be articulated via memorandum to HB. This memorandum to HB will be for informational purposes only, but HB can request additional if deemed appropriate.

d. SACs, CAs, and Office Heads are accountable for carefully exercising good judgment in making these determinations. In certain limited circumstances employees may transport dependents in an OGV when the dependents are accompanying them to quasi-social functions to which they have been invited in their official capacity. Prior approval must be granted before an OGV is use for such reasons. Employees should contact the Office of Personnel for additional guidance as needed.

7. Use of OGV's in foreign areas is also governed by embassy and other additional DEA policies and guidance.

J. DEA Records and Official Information. Employees will comply with all applicable regulations, guidance, and policy regarding the safe-guarding, review, and removal of documents by DEA personnel, the maintenance of personal papers by DEA personnel, and the security and integrity of official records. No employee shall:

1. Intentionally destroy, mutilate, remove, falsify, conceal, alter, or make an unauthorized copy of any Government record for his or her own purposes.

2. Make a false or fraudulent statement or create any false document.

3. Use information which directly or indirectly comes to that employee by reason of his or her employment with DEA for financial gain for himself/herself or for another person or make any other improper use of such information.

4. Communicate, furnish, transmit, or otherwise divulge privileged, administratively controlled or classified information to an unauthorized person.

5. Acquire, distribute, or maintain (either intentionally or in a negligent manner) administratively controlled, privileged, or classified information from another agency, person, or entity under false pretenses.

K. Employee Indebtedness. No employee is to fail, without good reason, to honor in a proper and timely manner all debts acknowledged by him or her to be valid, reduced to judgment by a court, or imposed by law, and to provide satisfactory settlement thereof.

L. Employee Testimony and Accuracy in Official Documents

**Memorandum**

| Subject | Date |
|---|---|
| Use of Official Government Vehicles (DFN: 060-01) | July 3, 2006 |

| To | From |
|---|---|
| All Employees | Michele M. Leonhart<br>Deputy Administrator |

It has been some time since guidance regarding the use of an Official Government Vehicle (OGV) has been issued. Authorization for home-to-work use of an OGV is in the best interest of the government and the penalties for unauthorized use and/or misuse of an OGV can result in serious disciplinary action. However, in keeping with the President's directive on conserving gasoline and because our employees work irregular hours and are subject to being recalled to duty at any time, in some circumstances it is both in the interest of the agency and efficient to permit incidental personal use of an OGV. With this in mind, I am issuing the following guidance regarding the OGV policy.

> An employee who is assigned an OGV must use that vehicle for official purposes only. It is in the interest of the agency to permit incidental personal use of an OGV which is secondary to the primary official use of an OGV. Accordingly, an employee who is using an OGV for an official purpose, including home-to-work transportation when authorized, is permitted to interrupt that official use to make stops for personal needs (such as picking up dry cleaning, hospital visitation, or stopping by a convenience store, bank, school or work out facility), so long as the stop is reasonable in distance and time and does not impair the mission of the agency. Similarly, an employee on a meal break may use an assigned OGV to travel to an eating establishment in the vicinity of the duty station or assignment.

The following activity is ***not*** authorized under this policy:

(1) Operating an OGV in violation of the agency's policies regarding consumption of alcohol while driving official vehicles;

(2) Operating an OGV when not performing official duties (such as weekends, holidays, or while on leave); and

EXHIBIT
Plaintiff's
10
PENGAD 800-631-6989

(3) Transporting unauthorized persons (including but not limited to family members)

This new guidance is effective immediately and will be incorporated into both the Agents and Personnel Manuals.

# DEA STANDARDS OF CONDUCT



EXHIBIT
PENGAD 800-631-6989
Plaintiff's
11

## EMPLOYEE RESPONSIBILITIES AND CONDUCT 2735

Standards of Conduct .......... 2735.1

Authority .......... 2735.11
Purposes and Scope .......... 2735.12
Responsibilities .......... 2735.13
Interpretation and Advisory Service .......... 2735.14
Employee Conduct .......... 2735.15
Light Duty .......... 2735.16
Limited Duty .......... 2735.17
Medical Advisory Notification .......... 2735.18
DEA Smoking Guidelines .......... 2735.19
Penalty Guidelines .......... 2735.20

# 2735 EMPLOYEE RESPONSIBILITIES AND CONDUCT

## *2735.1 STANDARDS OF CONDUCT

2735.11 Authority. In conformance with and through the authority of (as applicable and as may be modified, amended or superseded from time to time) 28 CFR 45.735, Executive Orders 11222, 12674, and 12731, 5 CFR 735, 5 CFR 752, 5 CFR 2635, 41 CFR 101, 18 USC 201-209, and 31 USC 1349(b) (and other statutes and regulations as may be applicable), the following Standards of Conduct are established for the Drug Enforcement Administration.

2735.12 Purpose and Scope

A. Purpose

1. To promote and maintain the highest levels of integrity and conduct of DEA personnel.
2. To inform personnel of the standards of conduct and integrity expected of them as employees of DEA.
3. To inform personnel of the potential penalties imposed for breaches of the standards expected of DEA employees.
4. To instill confidence in the DEA work-force by the American public.
5. To ensure DEA's law enforcement mission is not impeded, restricted, or otherwise adversely influenced by employee actions or inactions.
6. To maintain an ethic and atmosphere within the agency in which both professionalism and integrity are requisite attributes of all employees.

B. Scope

1. This section covers both regular employees and special Government employees, except where specifically excluded.
2. The absence of a specific regulation of conduct covering an act which tends to discredit DEA or the employee does not mean that such an act is condoned, permissible, or would not result in disciplinary/adverse action.
3. Violation of any provision of this issuance may subject the employee involved to appropriate disciplinary/adverse action including removal in addition to any penalty prescribed by statute or regulation.
4. The commission of four (4) acts of misconduct within a two (2) year period may be grounds for the removal of the employee, regardless of the nature of the offenses committed.

2735.13 Responsibilities. The intent of the disciplinary system is not to stifle the spirit of the well-intended employee but to guide the employee to the proper conduct, while at the same time ensuring the integrity of the agency. Willful violations, especially those involving integrity, criminal activity,

*Revision

modified, interpreted, or supplemented through the issuance of policy directions, instructions, orders, or other similar guidance as may be issued from time to time by the appropriate management personnel. Such guidance, when issued, shall continue in effect until rescinded or until it expires on its own terms.

B. Financial Interest

1. An employee, his or her spouse, minor child, or member of his or her immediate household related by blood is prohibited from having a direct or indirect financial interest that conflicts substantially or appears to conflict substantially with his or her DEA duties and responsibilities.
2. An employee shall not engage in, directly or indirectly, a financial transaction as a result of or primarily relying on information obtained through his or her DEA employment or with anyone who is a party to an official matter of DEA interest.

   a. A conflict of interest may exist even though there is no reason to suppose that the employee will, in fact, resolve the conflicting situation to his or her personal advantage.
   b. An employee is permitted to have a financial interest or engage in a financial transaction to the same extent as a private citizen not employed by DEA so long as it is not prohibited by Executive Order 11222, 28 CFR 45.735, Section 2734, provisions of this section, or other appropriate guidance, policy or regulations.
   c. For additional guidance regarding statements of employment and financial interest see Section 2734.

C. Gifts, Gratuities, Entertainment, and Favors

1. An employee may not accept or solicit any gift or gratuity which could possibly indicate a conflict of interest or create an appearance of a conflict or of impropriety.
2. This does not preclude an employee from:

   a. Accepting food and refreshments of nominal value in the ordinary course of a luncheon, dinner, or other meeting held on a personal basis.
   b. Accepting unsolicited advertising or promotional material such as pens, pencils, note pads, calendars, or other items of nominal value in quantities in which such items are normally distributed.
   c. Accepting bona fide reimbursement for actual expenses for travel other necessary subsistence for which no Government payment or reimbursement is made, if compatible with the restrictions set forth in 28 CFR45.735, and not otherwise prohibited by law. This does not allow reimbursement for excessive personal living expenses, gifts entertainment, or other personal benefits, nor does it allow

an employee to be reimbursed for travel on official business under DEA orders where reimbursement is prohibited. See Comptroller General's decision B128527 (46 Comp. Gen. 689).

3. Employees are required to report all gifts, decorations or gratuities (including travel expenses) received from foreign officials or governments which have an estimated value of $50 or more. This reporting requirement extends to gifts received by an employee's family members. A gift or decoration from a foreign official or government with an estimated value of less than $225 (as may be amended from time-to-time, 41 C.F.R. 101-49.001-5) may be retained by the employee or his or her family member. Gifts valued at $225 or more are considered Government property and the Office of Administration will determine the disposition of such gifts.

4. An employee may not solicit a contribution from another employee for a gift to an official superior, make a donation as a gift to an official superior, or receive a gift from an employee who receives less pay than himself/herself. Excluded from this regulation are truly voluntary gifts of nominal value or donations on a special occasion, such as marriage, illness, retirement, or death.

D. Speeches, Lectures, and Publications

1. An employee of DEA cannot accept a fee or remuneration from an outside source for a public appearance, a speech, a lecture, or a publication when its content came from official data or ideas which are not public information.
2. An employee shall not engage in teaching, writing or lecturing (with or without compensation) that is dependent on information obtained as a result of his or her Government employment except when either (1) that information has been made available
   to the general public or (2) the Deputy Attorney General gives written authorization for the use of non-public information on the basis that the use is in the public interest.
3. The Copyright Act of 1976 provides that any article, manuscript or other writing prepared by an officer or employee of the United States Government as part of that person's official duties is a "work of the United States Government." The act further provides that such "Government works" cannot be granted a copyright.

E. Employment Outside of DEA

1. Benefits. The term outside employment means any type of employment exclusive of DEA employment, including self-employment, employment by a third party, hobby-income, or participation in any business venture, whether or not there is any profit to the employee. Self-employment includes any participation or interest in a business, corporation or franchised operation. It includes any promotion or sale of items on behalf of a company, franchise, corporation, business, spouse, relative or friend.

2. Exclusions. Outside employment does not include the ownership of stocks and bonds and an employee's personal management of investments of this kind; nor does outside employment include the ownership of income producing real estate, as long as the employee does not in any manner utilize official time or facilities to manage such property. The management of real estate owned by third parties, however, is considered outside employment. This includes any employment as a "Resident Manager" of an apartment building or complex, even though the only pay received is in the form of reduced personal rent of the employee.

   a. **Certain volunteer activities are not considered outside employment. Services must be truly voluntary, result in no compensation to the employee, and be provided on the employee's own time. They cannot interfere or be inconsistent with the employee's federal job duties.
   b. Some acceptable volunteer activities are coaching and leading youth activities, donating time to nonprofit activities, helping senior citizens or disadvantaged persons, community programs, or religious activities.**
   c. DEA personnel who seek to engage in volunteer activities such as those listed above in subparagraphs a. and b. need not obtain the approval required in paragraph 6 below.

3. Prohibitions.

   a. No employee shall engage in any outside employment which will create or appear to create a conflict of interest, reflect adversely upon the Department of Justice, or in any manner interfere with availability or the proper and effective performance of the duties of his/her position. See 28 CRF, Section 45.735-9(f).
   b. **No employee may engage or participate in outside employment which involves or requires that he/she carry a firearm in association or fulfillment of that employment.
   c. No employee may engage or participate in outside employment which involves or requires the execution or performance of law enforcement duties or quasi-law enforcement duties.**

4. Use of Appropriated Funds. Employees who have secured approval to engage in outside employment are not authorized to use appropriated funds or items purchased or leased through the expenditure of appropriated funds in furtherance of their outside employment. While not all inclusive, use of the following items are also prohibited in the pursuit of non-DEA activities:

   a. Government office space.
   b. Government vehicles or Government-furnished transportation.

**Additions

c. Other Government employees, including courier or messenger services.
d. Franked envelopes or franked mail stickers.
e. Typewriters, word processors, reproduction equipment, bulletin boards, telephone service.

Any other item or service purchased by appropriated funds.

5. Specific Restrictions on Outside Employment

a. SES Employees. Employees in the SES require the approval of the Attorney General before they may engage in outside employment.
b. Special Agents. DEA Criminal Investigative (Special Agents) personnel, due to the nature of their jobs, are limited in the types of outside employment for which they may apply. In addition, Criminal Investigative personnel, given their often unpredictable time schedules, generally do not have hours of work conducive to many types of outside employment. Outside employment requests will often conflict with one or more of the restrictions listed in subparagraph 3 or 4 (above), and accordingly (in those instances) is prohibited.
c. Other Core Series Personnel. Requests from other core series employees (GS-1801, GS-1810, GS-132, and GS-1320 and any other classification which is designated as a core series) require careful scrutiny by the immediate supervisor of the individual concerned. The supervisor should pay particular attention to the restrictions listed above.
d. Non-core Series Personnel. Requests from non-core employees require a review by the immediate supervisor who, at his/her discretion and after conducting his/her review of the application, may favorably recommend requests for outside employment that do not conflict with the above restrictions, or exceed twenty hours per week for employees at grades GS-09 and below and a lesser number of hours for those at GS-11 and above. Note: Some employees, such as attorneys, have additional restrictions.

6. Request and Authorization for Outside Employment

a. All DEA employees must have received the appropriate approvals prior to engaging in outside employment. To obtain prior approval, an employee must present a DEA Form 478 to his or her immediate supervisor. The supervisor will concur or non-concur on the form and forward it through channels to the Deputy Assistant Administrator for Personnel for final approval/disapproval. In the case of SES Employees, the request will be forwarded through appropriate channels to the Deputy Attorney General.
b. Employees in foreign posts of duty must also have the approval of the Ambassador before engaging in outside employment in the host country.

c. Only after this process is complete may an employee begin his or her outside employment.

7. Annual Requirement

a. Employees who maintain outside employment with the same outside employer, in the same or similar capacity as previously approved, must submit anew request on DEA Form 478 annually between January 1 and January 31. Changes in outside employment must be approved prior to beginning the new employment. Disapproved requests will be returned promptly to the requester.

b. DEA personnel are specifically cautioned that inaccurate or untruthful submissions made in support or concurrent with an application for outside employment may result in disciplinary action and/or denial of the outside employment application.

F. Gambling, Betting, and Lotteries. DEA personnel are not to engage or participate in gambling, betting, or management of lotteries while on Government-owned or leased property or while on official duty, except in the maintenance of an undercover identity or in approved fund raising activities.

G. Use of Government Property

1. All employees are required to properly use and protect all equipment and supplies issued to or used by them. DEA personnel are to safeguard property in their possession, control, or work-area. Government property will only be used for officially approved purposes and will not be used for personal use or benefit, except for such de minimus use which involves negligible or no expense to the Government and does not interfere with or otherwise impede official business. This limited authority, i.e.: to make de minimus use of government property or materials, does not permit an employee to access administratively controlled information for his or her personal use nor to access informational databases.

2. Government mail privileges may only be used for the following (in addition to the forwarding of official correspondence):

   a. The forwarding of a job application to DEA Headquarters for a DEA vacancy and/or for DEAs annual application rating process.

   b. The submission of an employee grievance in accordance with Section 2771, DEA Grievance Procedures.

   c. The forwarding of a response to a proposed adverse action to DEA's Deciding official in accordance with Section 2752, Discipline, Adverse Actions and Appeals. (DEA mailing privileges shall not be used to file appeals to the Merit Systems Protection Board or other adjudicatory body or to correspond with an employee's representative or attorney.

d. Communicating with or forwarding pertinent information to EEO counselors or investigators or filing initial appeals with the Equal Employment Opportunity Commission or the DOJ Complaints Adjudication Office.

H. Purchase of Seized Property. No employee of DEA may knowingly purchase, or have another person purchase on his or her behalf, property from the Federal government that was seized by DEA or another Federal agency during an investigation n which employees of DEA participated. Further, no employee may disclose to another person any information concerning such property (i.e., appraised value, etc.) which would give that person an advantage over other prospective bidders at auction.

I. Official Government Vehicles. Official Government vehicles (OGVs) shall only be used for official purposes. 31 U.S.C. 1349(b). The term official purposes will be interpreted strictly and will not be construed to encompass the mingling of official business with personal business. Use of an OGV for transportation of employees between their domiciles and places of employment can only be justified when affirmatively authorized by statute, as in 31 USC 1344.

1. The term Official Government Vehicles includes not only those vehicles assigned to DEA's fleet but also those vehicles which may be leased and rented and/or loaned to DEA by other agencies and entities to include vehicles rented or obtained pursuant to an agency travel orders, acquired under a government credit card or under the terms and conditions of the government car rental contract with various car rental companies. This term also includes aircraft and other modes of transportation.
2. OGVs shall be operated safely and prudently at all times. DEA personnel shall drive defensively and shall exercise due care in the operation of a vehicle. Except in exigent enforcement activities, DEA personnel shall obey all regulations, statutes, ordinances, and/or other applicable guidance in their operation of a vehicle. Even in exigent enforcement operations, vehicles shall be operated with due regard for the safety and preservation of human life.
3. An employee who willfully uses or authorizes the use of an OGV for other than official purposes is subject to disciplinary/adverse action. Title 31 USC1349(b) provides a minimum 30-day suspension for an employee who willfully uses or authorizes the use of any official Government owned or leased motor vehicle or aircraft for other than official purposes.
4. For the purpose of this section, willful use includes but is not limited to unauthorized use with or without illegal intent, intentional disregard, or plain indifference to statutory or regulatory requirements.
5. While not all encompassing, listed below are some examples of instances wherein the use of the OGV is not authorized:

    a. Operating an OGV without possessing a valid state driver's license from the state, territory or possession where currently assigned. (State driver's license includes those issued by the District of Columbia, Puerto Rico, or a territory or possession

of the United States.) The license must be in the operator's possession at all times while driving an OGV.

b. Using an OGV to visit relatives, friends, acquaintances, etc., when such visits are not conducted for official business purposes.

c. Using an OGV to transport any individual when such individual is not in an official business capacity.

d. Transporting children to and from school or a spouse or friend to and from work even though the school or place of work is on the regular route to the operator's official duty station.

e. Using the OGV for the express purpose of transporting or towing of personal property when not related to official business; i.e., transporting furniture, gardening equipment and the like or towing boats and/or trailers.

f. Permitting an unauthorized person to operate an OGV.

g. Using an OGV solely for commuting purposes or for transportation between a person's residence. Storage of an OGV at an employee's residence is permissible only when authority is obtained in accordance with the Agents Manual, Section 6124, and the Administrative Manual, Subsection 0325.5.

h. Traveling to and stopping at a drinking establishment when not in the interest of official business. General discussions of official business relating to enforcement activities conducted in a bar or cocktail lounge do not constitute official business.

i. Using an OGV for personal business such as leaving the duty station or residence to cash paychecks, to pay bills, drop off or pick up mail, pick up dry cleaning, grocery shopping, etc.

j. While under the influence or after the consumption of alcohol.

k. Leaving the scene of an accident, or not cooperating with appropriate authorities conducting an investigation of an accident or other vehicle related incident or inquiry.

6. Alcohol related incidents involving DEA employees operating an OGV or privately-owned vehicle (POV) will be handled as follows:

a. The SAC, CA, or Office Head will immediately suspend the certification for the privilege of home-to-work utilization of an OGV for any employee involved in an alcohol-related incident operating an OGV or POV.

b. This suspension will remain in effect until such time that the SAC, CA or Office Head feels confident that the offense is atypical of the employee's normal conduct and that recidivism is unlikely. In no event shall the suspension of the home-to-work driving certification be less than 60 days. In reaching this decision, the Employee Assistance Program (EAP), EAP Clinician, or other agency designated health official may be contacted.

c. The suspension of an individual's home-to-work certification will be reported in a teletype to Headquarters, (attention: OPR, HB, and HPMH). When an individual's home-to-work driving privileges are restored, reasons supporting the

decision shall be articulated via memorandum to HB. This memorandum to HB will be for informational purposes only, but HB can request additional if deemed appropriate.

d. SACs, CAs, and Office Heads are accountable for carefully exercising good judgment in making these determinations. In certain limited circumstances employees may transport dependents in an OGV when the dependents are accompanying them to quasi-social functions to which they have been invited in their official capacity. Prior approval must be granted before an OGV is use for such reasons. Employees should contact the Office of Personnel for additional guidance as needed.

7. Use of OGV's in foreign areas is also governed by embassy and other additional DEA policies and guidance.

J. DEA Records and Official Information. Employees will comply with all applicable regulations, guidance, and policy regarding the safe-guarding, review, and removal of documents by DEA personnel, the maintenance of personal papers by DEA personnel, and the security and integrity of official records. No employee shall:

1. Intentionally destroy, mutilate, remove, falsify, conceal, alter, or make an unauthorized copy of any Government record for his or her own purposes.
2. Make a false or fraudulent statement or create any false document.
3. Use information which directly or indirectly comes to that employee by reason of his or her employment with DEA for financial gain for himself/herself or for another person or make any other improper use of such information.
4. Communicate, furnish, transmit, or otherwise divulge privileged, administratively controlled or classified information to an unauthorized person.
5. Acquire, distribute, or maintain (either intentionally or in a negligent manner) administratively controlled, privileged, or classified information from another agency, person, or entity under false pretenses.

K. Employee Indebtedness. No employee is to fail, without good reason, to honor in a proper and timely manner all debts acknowledged by him or her to be valid, reduced to judgment by a court, or imposed by law, and to provide satisfactory settlement thereof.

L. Employee Testimony and Accuracy in Official Documents

1. DEA personnel, when directed to do so by appropriate authority or during the scope of their official duties, must testify or respond to questions under oath as required. This duty to respond fully and truthfully applies during administrative interviews and any other official agency business and is applicable whether the employee concerned is providing a statement about his or her own misconduct, the misconduct of others, observed facts, past recollections, opinions, or is providing a written or oral communication upon which

a trier of fact or other similar body or forum will or may have cause on which to rely or consider.

2. DEA personnel will testify truthfully in all matters and will always be honest and forthright in any statement, communication, testimony they author, provide, condone, or otherwise cause others to rely upon.
3. DEA personnel will recount and provide all facts, data, information, and any other form of evidence in a truthful and fully responsive manner. DEA personnel will not omit or distort facts or other information when questioned or when authoring, completing, reviewing, or assisting in the drafting of reports or other official documents. DEA personnel will ensure documents are accurate and complete. Documents requiring signature shall not be signed unless read and confirmed as accurate, and it is incumbent upon the employee to ensure that any and all information he/she provides, whether orally or in writing, is accurate and complete
4. In criminal matters in which the employee may be criminally prosecuted for his or her misfeasance or malfeasance, the employee may exercise his or her right against self-incrimination as afforded under the United States Constitution. In all other matters, the employee must respond fully to questions posed by appropriate personnel.
5. DEA core series personnel have a heightened duty to ensure information or testimony they provide under oath (or affirmation) in written or oral form is accurate, complete, and truthful. Documents executed under penalty of perjury or in matters of official interest shall always be accurate and shall not be signed unless read and are confirmed as accurate.
6. A DEA employee will not knowingly permit others to create, promulgate, communicate, distribute, or condone false, inaccurate, or incomplete testimony, statements, or other written or oral communication.

M. Employee Political Activity. The Hatch Act has been amended to lift many of the previous restrictions regarding political activity. Career members of the Senior Executive Service remain covered under the previous restrictions of the Hatch Act. (Employees with questions on political activity may contact the Office of Personnel or the Office of Chief Counsel.)

1. DEA personnel can:

   a. run as an independent candidate in partisan elections
   b. run as a candidate in a nonpartisan election
   c. register and vote as they choose
   d. assist in voter registration drives
   e. express opinions about candidates and issues
   f. contribute money to political campaigns
   g. attend political fund-raising functions
   h. attend and be active at political rallies and meetings
   i. join and be an active member of a political party or club
   j. sign nominating petitions

k. campaign for or against referendums, constitutional amendment and ordinances
l. campaign for or against candidates in partisan elections
m. distribute campaign literature in partisan elections (but not on duty)
n. hold office in political clubs or parties

2. DEA personnel cannot:

a. run as a partisan candidate in a partisan election
b. use their official authority to influence or interfere with an election
c. collect political contributions unless both individuals are members of the same union (if one exists) or employee organization and one solicited is not subordinate of the other
d. knowingly solicit or discourage the political activity of any person who has business before the agency
e. engage in political activity while on duty
f. engage in political activity while in uniform
g. engage in political activity while in an official vehicle
h. solicit political donations from the general public
i. wear political buttons or display other campaign items while on duty

N. Employee Participation in a Riot or Civil Disorder

1. DEA personnel will not participate or incite any act of civil disorder against any instrument of a local or state government or against the Federal government if the purpose or aim of such disorder is to undermine competent civil authority, cause anarchy, or disrupt the administration of justice or the delivery of traditional governmental services. While DEA personnel retain their constitutional rights in their private capacities to free speech and assembly, DEA personnel must be aware that, as government employees, their actions are viewed and examined by others with great scrutiny and their participation in an act of civil disorder may erode the general public's confidence in the actions of a government's duly elected or appointed officials.
2. DEA personnel convicted of a felony (any offense for which imprisonment is authorized for a term exceeding 1 year) by any Federal, State or local court of competent jurisdiction in connection with an act of civil disorder will, on the date of their conviction becoming final, be proposed for removal from their position with DEA. This penalty covers conviction of felony for:

a. Inciting a riot or civil disorder.
b. Organizing, promoting, encouraging, or participating in a riot or civil disorder.
c. Insurrection.
d. Aiding or abetting any person in inciting, organizing, promoting, or encouraging civil disorder.

O. Misuse of Office and Coercion. DEA personnel will not:

1. Use his or her official position for private gain.
2. Coerce or give the appearance of coercing any person to provide financial benefit to himself/herself or to another person through the use of his or her office.
3. Use his or her official position to give preferential treatment to another individual.
4. Attempt to bribe or intimidate public officials and/or witnesses.
5. Conduct unauthorized or illegal searches of premises, automobiles, or persons or deny the Constitutional rights of others.
6. Embezzle, steal, purloin, sell, convey, or dispose of in an unauthorized manner any record, voucher, money, substance, or thing of value to the United States.
7. Use his or her position to sell, collect for personal use, or otherwise dispose of controlled substances in an unauthorized manner.
8. Use his or her position to tamper with or remove any evidence purchased, seized, or otherwise in possession of DEA or one of its employees.
9. Solicit or otherwise engage in personal business transactions which involve or give the appearance of involving the use of official time or facilities.
10. Glean or garner information not commonly available to the general public and use that information for nonofficial purposes.
11. Obstruct or attempt to obstruct an official investigation, inquiry, or other matter of official interest.
12. Contact or in any way attempt to influence the DEA Deciding Officials, the DEA Board of Professional Conduct or any other person or entity who has before him or her a pending disciplinary matter or attempt to influence the process involving a disciplinary matter through indirect communications or pressure.
13. Distribute or disclose information not commonly available to the general public for nonofficial purposes.

P. Use of Intoxicating Beverages or Drugs

1. DEA personnel will not consume or be under the influence of intoxicants in DEA offices or on Government property designated for the conduct of official business.
2. DEA personnel will not consume or be under the influence of intoxicants during their official duty hours.
3. DEA personnel will not consume or be under the influence of intoxicants while operating an Official Government Vehicle.
4. Off-duty DEA personnel subject to recall to duty shall not permit themselves to be rendered unavailable for duty through the consumption of intoxicants.
5. Intoxicants deprive individuals of the normal clearness of intellect and personal control which a person would otherwise possess. As such, the use of such substances while on duty is inherently inconsistent with the mission of this agency. DEA personnel shall not

use a controlled substance except such substances as may be prescribed by a licensed physician for treatment of illness or condition or as contained in an over-the-counter medication.

6. No employee will use a controlled substance except to treat a medical condition as prescribed by a duly licensed medical professional. Department of Justice Order 1732.2 designates all positions within DEA as sensitive. DEA is excluded from the provisions of Public Law 91-616 and 92-225 and all regulations implementing these laws. Although DOJ Order 1732.2 precludes persons with alcohol or drug problems from DEA employment, DOJ Order 1792.1 allows employees with alcohol or drug problems to seek assistance under the Employee Assistance Program.
7. Employees in a duty status are prohibited from consuming alcoholic beverages or drugs. The phrase "under the influence" includes but is not limited to all of the publicly known and commonly accepted conditions and degrees of being under the influence (such as unsteady gait, slurred speech, fixed stare, loss of muscular control, strong odor of alcohol), but also includes any employee who has consumed alcoholic beverages or drugs to any extent - whether they are legally intoxicated under applicable state law or not, except as may be duly and specifically authorized for an undercover operation. There is no requirement that an employee's degree of impairment be determined with scientific accuracy by appropriate testing or that, if such testing is conducted, that the blood alcohol of the employee be at or above a certain level.

Q. Unprofessional Conduct

1. Every DEA employee is responsible for behaving in a professional manner appropriate to the setting, and in a civil and courteous manner toward other DEA employees and the general public. Employees will be mindful that their conduct and demeanor reflects directly upon DEA and will ensure that their actions do not reflect unfavorably upon DEA. No employee will act in a manner which will bring disgrace or disfavor upon DEA or act in a manner that will cause the general public to question, ridicule or attack the efforts of this agency or its personnel.
2. A DEA employee will not associate with individuals known or suspected to be involved in illegal drug trafficking or other criminal activity in other than a strictly professional capacity. This prohibition also applies to Confidential Source contacts and former Confidential Source contacts. Extrinsic social, financial or business contacts with individuals of this nature are **expressly prohibited**. DEA employees are to strictly maintain only the highest standards of conduct with respect to informants, known criminals, or with individuals engaged in criminally violative activity.

R. Unauthorized Recording of Employee Conversations. No employee is to record conversations of another individual without the mutual consent of all parties, except in the conduct of bona fide official investigations under the auspices of the Office of Professional Responsibility or other appropriate organization.

S. Occurrences an Employee Must Report to His/Her Supervisor:

1. An employee must inform his or her supervisor whenever he or she discharges a firearm, in accordance with Agents Manual, Section 6122, except when authorized at a firing range or other area in which firearms training is conducted.
2. An employee of DEA must immediately report to his or her supervisor any arrest and any instance whereby he or she has been taken into custody, held for investigation, or detained for questioning. Minor traffic violations while operating a non-Government vehicle, such as parking violations or other traffic violations involving a fine or collateral of $150 or less, need not be reported; however, any infraction with an official Government vehicle must be reported immediately to the employee's supervisor.
3. Any other illegal activity or other misconduct must be reported and is not limited to the above instances.

T. Reporting Situations Which Reflect on the Integrity of an Employee or on DEA. Allegations or complaints regarding infractions of these standards of conduct must be reported to proper DEA authorities.

1. Any employee who has any information which indicates or alleges that another employee of DEA is engaged in improper or illegal activities in violation of these standards of conduct will immediately report such information to his or her supervisor or directly to the Office of Professional Responsibility. (*See* Planning and Inspection Manual Section 8308.)
2. No employee may make a malicious report of misconduct or misfeasance against another DEA employee or any other individual. If a supervisor receives a report of misconduct, he or she must make a determination whether the matter can be handled at the local level or represents a serious matter which warrants reporting to the Office of Professional Responsibility. (See the Planning and Inspection Manual, Section 8121.) Consultation with the supervisor's chain-of-command or OPR officials should be obtained in questionable circumstances.

U. Discrimination. No employee may discriminate against any employee, applicant for employment, or person dealing with DEA on official business because of race, color, religion, national origin, sex, sexual orientation, age, or handicap.

V. Sexual Harassment and Other Unprofessional Conduct. Sexual harassment is a form of employee misconduct which undermines the integrity of the employment relationship. It destroys morale and interferes with the work productivity of its victims and the victim's coworkers. Every DEA employee is responsible for assuring that the work-place is free from sexual harassment. It is a violation of Federal law and of these Standards of Conduct. Sexual harassment is defined in 2713.3 of this Manual. That section also explains a victim's options to complain about and seek relief from sexual harassment.

W. Quid Pro Quo Harassment

1. Unwelcome sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an employee's employment or (2) submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting the individual.
2. A supervisor who uses explicit or implicit coercive sexual behavior to control, influence, or affect the career, salary, or job of an employee is engaging in sexual harassment. While not all encompassing, listed below are some examples of conduct which could constitute sexual harassment and could result in appropriate disciplinary/adverse action, up to and including demotion to a non-supervisory position or removal.

    a. Giving or promising personnel actions in exchange for sexual favors.
    b. Taking or threatening personnel actions because an individual refuses to engage in sexual conduct.
    c. Requiring an employee to tolerate sexually offensive behavior in order to retain the job.

X. Hostile or Offensive Work Environment. Unwelcome sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature also constitute sexual harassment when the conduct has the purpose or effect of affecting or interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment, whether the activity is carried out by a supervisor or a co-worker. Sexual harassment may be found when the conduct, considered in context, would be intimidating, hostile, or offensive to a reasonable person, regardless of whether the actor intended to offend. Either sex can commit sexual harassment. While not all encompassing, listed below are examples of instances which could result in appropriate disciplinary/adverse action.

1. Displaying 'pinup' calendars, sexually demeaning pictures, or graffiti in the work place.
2. Leaving offensive material on an employee's desk.
3. Deliberate or repeated unwelcome sexually explicit remarks, jokes, or teasing.
4. Maintaining or tolerating an office atmosphere pervaded by sexual slurs, insults, or innuendos.
5. Subjecting another employee to repeated unwelcome pressure for dates.
6. Requiring or pressuring employees to dress or behave in a sexually suggestive manner.
7. Arranging for or permitting sexually explicit entertainment in a work related context, at or away from the work-place.
8. Using or tolerating unwelcome, demeaning or inappropriate terms of address.
9. Ostracizing, or tolerating ostracism, of members of one gender by members of the other.

10. Repeated or deliberate unwelcome intentional contact with an individual's intimate body areas is sexual harassment (and may also be a criminal offense under applicable state law and/or an assault subject to mandatory reporting to OPR under Section 8308 of the Planning and Inspection Manual).

Y. Retaliation. No DEA employee shall take any reprisal action against another employee for exercising the right to file a report, an allegation to OPR, a complaint of discrimination (including sexual harassment), grievance, complaint of whistleblowing with the Office of Special Counsel, or appeal. Engaging in an act of retaliation may subject the responsible employee to appropriate disciplinary/adverse action, independent of the merit of the complaint, grievance, or appeal. While not all encompassing, listed below are some examples of actions which, if taken as a result of the exercise of a protected right, could be considered acts of reprisal subject to disciplinary action:

1. Inconsistent enforcement or increased severity of enforcement of existing rules, regulations, and policies, such as requiring the complainant to meet more stringent standards than other similarly situated employees.
2. Depriving a complainant of existing assignments, duty station, responsibilities, privileges, or fringe benefits.
3. Ostracism or verbal harassment of a complainant.

Z. Employee Dress. DEA personnel on official duty will present a businesslike appearance at all times. Except when authorized by their supervisor to use another mode of dress because of the nature of their regular job duties or as a result of the need to perform a special task or for other circumstance (e.g., range training or undercover surveillance), employees will adhere to the dress standards described herein. Male employees will wear dress shirts, ties and slacks. Suit or sport jackets will be worn when dealing with the public. Female employees will wear conservative dresses, dress slacks or skirts and sweaters or blouses. All employees will be neat and well-groomed. DEA personnel will dress professionally when called to testify or are otherwise representing DEA in an official capacity.

AA. Employee Candor and Truthfulness. DEA personnel will be frank and honest in the performance of their duties. DEA personnel will not create false documents or issue or utter false oral communications, provide false, misleading or inaccurate testimony, knowingly or negligently misrepresent facts, permit a known or suspected falsehood to continue unreported or unchallenged, or provide non-responsive answers to properly authorized officials such as supervisory personnel, prosecutors, or agency investigators.

BB. Employee Hours of Work. Employees are expected to report and be at their posts of duty during their regularly scheduled hours of work, except for authorized periods of leave and holidays. Employees shall be at their assigned post of duty at the beginning of their shift of duty and shall

remain at that post throughout the day, except for such breaks as may be authorized by supervisory personnel for the employee's comfort or meals. Employees are not permitted to independently adjust their shifts or posts of duty without supervisory approval.

CC. Insubordination. Employees shall follow the orders, directions, and policies of supervisors, managers, on scene commanders, and/or more senior officials, as well as all policies, procedures, regulations, and laws which govern their conduct or duties. Employees shall similarly obey the directions or commands of acting supervisory or management personnel.

2735.16 Light Duty - Shooting Incident. Any agent, directly involved in a shooting resulting in injury or death, will immediately be temporarily assigned by the SAC to Light Duty not to exceed 5 days. HP will extend the 5 days if required. The Shooting Team will notify HP of the agents involved so that HP can coordinate the appropriate actions with the SAC.

A. While on Temporary Light Duty the agent will not participate in any enforcement operations. Specific duties while in this status will be determined by the agent's immediate supervisor. Additionally, while in this status, the agent will be afforded the option, subject to the approval of the SAC, of using up to 5 days of administrative leave.

B. Within 10 working days of the shooting, the Office of Inspections will ensure that a preliminary investigation is conducted and presented to the Chief Inspector who will determine that the agent either be returned to normal duty or placed into another status (administrative leave or limited duty).

B. Deputized Officers involved in similar situations will also be placed into this Temporary Light Duty status; however, coordination with the parent agency must be ensured by the SAC.

2735.17 Limited Duty

A. Misconduct. All DEA employees who are involved in certain serious misconduct incidents may be placed on limited duty. **The Chairman, Board of Professional Conduct, is delegated the authority to place employees in a limited duty status during all or part of an advance notice period for a proposed adverse action.** While on limited duty for misconduct or allegations of misconduct incidents, DEA Agents will not participate in surveillance, arrests, searches, seizures, or in the development of new enforcement matters. Any employee on limited duty will normally be assigned duties deemed appropriate by management within the appropriate DEA office.

1. An employee may be placed on limited duty when the employee is under investigation by the Office of Professional Responsibility (OPR) or at anytime when the employee's official superiors determine that the employee's conduct warrants such action See 2752.13.

** Additions

2. A DEA Special Agent, or any other employee, who is placed in a limited duty status due to misconduct may be prohibited from operating an OGV, carrying a firearm, or carrying a DEA badge. The official placing the employee in the limited duty status will be responsible for making the determination regarding the employee's restricted duties. DEA credentials, or other identification, may be retained by the employee only to the extent required to access his/her assigned work place or to perform specifically assigned duties.
3. DEA agents who are placed on limited duty must be assigned a tour of duty that will include two hours of scheduled Availability Pay in addition to their regular eight hour duty day, i.e. 10 hours per work day and 50 hours per work week.

B. Medical. Limited duty can be defined as removing some or all of the normal duties of the assigned position from the employee for a specific amount of time. For any employee who cannot perform the functions of his/her job description, medical information should be submitted to the Office of Personnel, Health Services Unit (HPMH) for review prior to the employee's return to work. The incoming medical information should contain any restrictions his/her physician recommends. The Chief Medical Officer will review the information and advise whether the employee can return to full duty. If a Special Agent/Chemist cannot return to full duty, he/she will be placed on a medical advisory. The DEA Medical Officer will review the incoming medical information for a noncore emmployee and telefax the findings to the respective supervisor.

1. Any employee may be placed on limited duty for medical problems. Placing an employee on limited duty is not to be construed as a disciplinary action. The management official placing an employee on limited duty will define what duties may or may not be performed by the employee while in this status. Sufficient medical documentation is required before an employee is returned to full duty following a medical limited duty situation.
2. SACs, LAs, CAs, and Headquarters Officials are delegated authority to place employees in a limited duty status for periods of 30 days or less. HP is delegated the authority to place an employee in a limited duty status for periods in excess of 30 days.
3. Any official who initially places an employee on limited duty will notify HP within three (3) business days of this action. In emergency situations the notification requirement to HP must be accomplished within 24 hours. All such notifications will be in writing, and include notification to the affected employee(s).
4. Employees who are placed on limited duty will normally be assigned duties within the scope of their position, in conjunction with medical restrictions. Determinations as to whether they will be permitted to operate an OGV, carry a firearm or keep DEA credentials or badges will be made by the official placing the employee in a limited duty status and may be altered based on medical information.

2735.18 Medical Advisory Notification

A. Definition. Employees (specifically Special Agents, Chemists) will no longer be placed on medical restrictions as a result of a medical condition that prohibits the individual from performing the full range of duties of the position.

B. Medical Advisory Process. When a determination is made by the DEA Medical Officer that an employee has a medical condition, the Deputy Assistant Administrator for Personnel (HP) will send a medical advisory notification memorandum to the Special Agent in Charge (SAC), Country Attache (CA), Laboratory Chief (LC), Office Head (OH), or appropriate management official with a copy to the employee. The memorandum will state that the employee has a medical condition and identify any limitations this condition may entail.

C. If further clarification is needed, a Medical Fitness for Duty Examination (MFFDE) or Suitability Review Protocol examination (SRP) may be ordered. The employee will be examined by a DEA-appointed physician. The physician will be provided with a list of questions, a copy of the employee's performance work plan, and the current position description. This process allows the assessment of the employee's ability to perform specifically assigned duties.

D. If, based on the results of a Medical Fitness for Duty Examination, accommodation cannot be provided, reassignment within DEA or other appropriate action will be taken.

2735.19 DEA Smoking Guidelines

A. It is DEA policy to protect the rights of nonsmokers (both Federal employees and visitors) by prohibiting smoking in DEA-occupied buildings and facilities. To the extent feasible, DEA will attempt to identify smoking areas in the vicinity of Federal facilities.

B. DEA will establish a "nonsmoking" program to assist smokers who wish to stop smoking.

2735.20 Penalty Guidelines. Appendix 2735A is a partial listing of offenses and the corresponding possible penalties that may be imposed for certain types of offenses. These penalties are in addition to any applicable penalty prescribed by law.*

*Revision

# Memorandum

| Subject | Date |
|---|---|
| Diversion Control Program (FFS: 060-01) | AUG - 3 2001 |

To
Special Agents in Charge
Diversion Program Managers

From Joseph D. Keefe
Chief of Operations

The last official clarification memorandum concerning the Diversion Control Program (DCP) was issued by then Administrator of the Drug Enforcement Administration (DEA) Francis M. Mullen, Jr. on June 18, 1984. Since that time, there have been several key amendments to the Controlled Substances Act. As a result of those amendments and the resulting additional duties of managing the regulated Chemical Industry, it is appropriate to issue a clarifying statement on the duties of the Diversion Investigator (DI) workforce and its specific role and responsibilities. The work of the DIs and of the entire program are essential components of the overall effort to achieve DEA's mission.

**General Mission Statement:**

The DEA DCP was established to administer this country's closed distribution system for controlled substances and regulated chemicals as well as to prevent the diversion of those substances into the illicit drug market. The DCP is devoted to working in partnership with conscientious registrants throughout the United States, while investigating the diversion of legal substances for illicit purposes worldwide.

**Diversion Investigators:**

The DI is a specialist who is responsible for addressing the problem of diversion of controlled pharmaceuticals and regulated chemicals from the legitimate channels in which they are manufactured, distributed and dispensed. The role of the DI is to investigate suspected sources of diversion and to initiate appropriate administrative, civil and/or criminal action against them.

In order to accomplish this mission, a wide range of work activities is employed by DIs. A full range of diversion investigations, including pre-registrant, scheduled, security, complaint (i.e., public interest, civil, or criminal), within the drug and chemical program areas are conducted by DIs. However, DIs must stay within the scope of their authority when conducting complaint investigations. DIs must concentrate their efforts on members of the registrant community and other authorized handlers of these substances and not on individuals that are in the traditional realm of



EXHIBIT Plaintiffs 12
PENGAD 800-631-6989

criminal activity. Also, whenever possible, DIs should limit their activity to only the highest priority targets warranting federal investigation.

The DI position was not established as an operational law enforcement position. For the purposes of this memorandum, an operational law enforcement position includes but is not limited to those duties traditionally limited to DEA Special Agents (SAs) such as the service of arrest and search warrants, surveillance, directing and/or paying confidential sources, authorization to carry a firearm, and being on call 24 hours a day. Therefore the following restrictions continue to apply when DIs conduct investigations:

**Work in an Undercover Capacity:**

Undercover Purchase of Evidence – Investigators may continue to initiate, coordinate and control cases involving the illegal sale of pharmaceutical controlled substances/and or listed chemicals by a registrant or other authorized individuals. The undercover purchase of evidence involving direct contact with a suspect where federal, state or local prosecution is anticipated will include DEA SA assistance or approval for the actual undercover purchase. It is, however, the responsibility of the Diversion Group Supervisor and 1811 Field Management to ensure all DEA established procedures are adhered to. Face-to-face, in-person, undercover purchases must be made by a SA or by an authorized state/local law enforcement officer. An SA will control the ongoing circumstances of the buy situation, and the advisability of such an approach. In those instances which involve indirect contact with the subject, such as over the Internet, telephone or by mail, DIs may effect the undercover purchase or obtaining of evidence in accordance with DEA/DOJ guidelines. An operational plan must be approved by an ASAC prior to the commencement of any undercover activities.

**Control Confidential Sources:**

DIs will not direct, register or pay Confidential Sources (CS). A DI may, however, assist in the debriefing of established CSs relating to the diversion or availability of legitimate drugs and/or listed chemicals. The controlling and paying of CSs will be conducted by SAs.

**Interviews of Other Sources of Information:**

DIs will routinely conduct debriefings, interrogations and interviews of those individuals associated with prescription surveys, verifications of prescriptions, legitimate purchases/sales of controlled substances and listed chemicals. These individuals may include agents of registrants as well as patients.

Direct contact with individuals/entities of questionable backgrounds who may present a safety threat will be made with SA personnel in attendance.

**Moving and Stationary Surveillance:**

SAs or authorized state or local personnel will conduct all surveillance. Specifically, surveillance outside of a registered location will not be performed by DIs. Remote surveillance through the use of surveillance cameras is authorized if it poses no safety threat. All surveillance activity will be approved by an ASAC.

**Arrests and Execution of Search Warrants:**

SAs or other law enforcement personnel will execute arrest and search warrants. DIs cannot be members of an entry team, perimeter security, etc. DIs will remain in stand-by status at a safe distance until the location of the search warrant has been secured and determined to be safe for entry. Operational law enforcement personnel will determine when it is appropriate for DI personnel to enter the premises to assist in the search and/or interview of the subjects. All operational plans involving diversion personnel will be approved by an ASAC.

**Special Agents assigned to the Diversion Groups:**

To ensure the DIs have consistent access to SA personnel, each Diversion Group in every Division office will have two (2) SAs assigned full-time to support their activities. However, these SAs will report to a GS-1811-14 Group Supervisor for oversight in Agent-type activities. In offices that do not have a dedicated Diversion Group, a SA will be identified to be the primary point of contact for the DIs when they require support. The SAs will be responsible for conducting all operational activities of the DI group. Evaluations and workplans will be developed for the SAs that are assigned to these duties and the SAs will receive their evaluations from the designated 1811 Group Supervisor. Duty specific training will be provided to those agents identified for these assignments. This policy will be reviewed at the end of one year by the Deputy Assistant Administrator of the Office of Diversion Control (OD) with the respective Special Agents in Charge to ensure compliance and to address any concerns or issues which may have arisen during the year. At that time, the Chief of Operations will determine if the agent assignments should continue as stated above.

Tactical Diversion Squads (TDSs) are by their nature operational. Each Special Agent in Charge (SAC) must evaluate the work being conducted by their TDS. If the division management is satisfied that the level of violator being investigated is appropriate for that division, then the SAC must assign an SA to the TDS Group Supervisor position. This assignment should be at least two (2) years in length. The Office of Diversion Control, with the Office of Personnel (HP), will develop work plans and evaluations for these positions. The TDS should also concentrate on forged prescriptions/subterfuge to obtain controlled substances, organized fraudulent prescriptions rings, burglaries and robberies of registrants, in-transit thefts of controlled substances and employee theft.

**Chain of Command:**

The Diversion Program Manager (DPM) position was created to provide field division management with access to an expert in the area of diversion control. The position was also established to provide a field management structure for the DIs in the field. We have examined the value and effectiveness of the DPM position from the perspectives both of Division management and of the Diversion Program. As a result of this examination, a review will be undertaken by OD to determine whether the DPM position will be retained in each Division.

An ASAC in each division will be designated as the point of contact for the DCP's operational activities. This ASAC will be the second line supervisor for the agents assigned to the program. This ASAC will review all operational plans and ensure that the DIs have the assistance and support they need in all investigations.

**Vehicles:**

As is current DOJ/DEA policy, DIs may utilize OGVs in the performance of their duties. Under the current DEA OGV plan for routine fieldwork, DIs are authorized home-to-work (HTW) use of OGVs at the convenience of the government, on a case-by-case basis. All HTW use of OGVs by DIs must be approved by the SAC on a case-by-case basis. Approvals for extended periods of time are no longer appropriate. Fifteen-day approvals will be the maximum permitted. This process should not be used by field management to routinely approve HTW for its employees. Each SAC will submit all 349c forms, including case number and purpose, to the Deputy Assistant Administrator, Office of Diversion Control, every 90 days.

The Office of Diversion Control is presently undertaking a review of the appropriate OGV/DI ratio and will communicate that shortly to the field.

cc: Laura M. Nagel, OD

# Memorandum

| Subject | Date |
|---|---|
| Submission of DEA Form 349C for Diversion Investigators (FFS: 060-01) | SEP - 3 2004 |

| To | From |
|---|---|
| Special Agents in Charge<br>Diversion Program Managers | W. Michael Furgason, Sr.<br>Chief of Operations |

This is in reference to the memorandum dated August 3, 2001 from Joseph D. Keefe, then Chief of Operations, subject: Diversion Control Program (copy attached).

The referenced memorandum states, "Each SAC will submit all 349c forms, including case number and purpose, to the Deputy Assistant Administrator, Office of Diversion Control, every 90 days." This is to advise that, effective immediately, this action is no longer required.

If you have any questions regarding this action, please contact William J. Walker, Deputy Assistant Administrator, Office of Diversion Control at (202) 307-7165.

Attachment

# Memorandum

| Subject | Date |
|---|---|
| Certification for Limited Home-to-Work Utilization of Official Government Vehicle: Field Work (DFN 1120-09) | |

To

From

- ☐ Special Agent in Charge
- ☐ Country Attache
- ☐ Office Head
- ☐ Laboratory Chief
- ☐ Resident Agent in Charge

Certification is requested for limited home-to-work utilization of the DEA Official Government Vehicle (OGV) identified below. This utilization and subsequent storage of the OGV at or near my residence is necessary to conduct field work which requires travel directly between my residence and a distant location other than my official duty station. I understand that this certification may be granted only on a CASE-BY-CASE basis. The OGV will be used within the definition of field work from

____________________, ____ to ____________________, ____ for the purpose of

*(give statement of field work assignment)* ________________________________________

________________________________________________________________

________________________________________________________________

Home Address: (No., Street, City & State) ________________________________

________________________________

Distance from Office to Residence: ________ Miles OGV No. ________________

==========================================================================

I certify that this home-to-work utilization is required for the performance of field work.

________________________________________ ____________________

*(Signature and Title of Authorizing Official)* *(Date)*

==========================================================================

**TO BE COMPLETED BY EMPLOYEE UPON RETURN OF OGV:**

Beginning Odometer Reading: ____________ Ending Odometer Reading: ____________

Total Miles Driven: ____________

The foregoing limited home-to-work utilization was necessary to conduct activities within the definition of field work.

________________________________________ ____________________

*(Employee's Signature and Title/Position)* *(Date)*

FORM DEA-349c (1-06) *Previous editions are obsolete*
Electronic Form Version Designed in JetForm 5.2 Version

# SUBCHAPTER 032 PROPERTY (MOTOR VEHICLES)

## 0320 GENERAL

Detailed Fleet Management statutes are found in the Code of Federal Regulations (CFR) 41. Copies of CFR 41 can be obtained from the Government Printing Office, Superintendent of Documents, Washington D.C. 20402 or by logging on to ***http://www.gsa.gov***, select Policy then Motor Vehicle Management. Specific guidance regarding CFR 41 and other fleet management issues may be obtained from the Fleet Management Unit (SAOV).

See Exhibit 1/032, Glossary of Acronyms used in this subchapter.

The Assistant Administrator, Operational Support Division (SC) is the designated Property Management Officer (PMO) for the Drug Enforcement Administration (DEA) with oversight responsibility for the administration, coordination and control of the DEA Fleet Management Program. All vehicles controlled by DEA, whether acquired through purchase, forfeiture, interagency transfer, or lease, are considered Official Government Vehicles (OGVs). Special Agents in Charge (SACs), Regional Directors (RDs), Country Attaches (CAs), Laboratory Directors (LDs), and Headquarters Office Heads (HQ-OHs) are the designated Fleet Management Officers (FMOs) for their respective offices.

FMOs are responsible for the overall operation and control of all OGV's (DEA owned, leased or rental vehicles) assigned to their respective offices and for ensuring compliance with CFR 41, and agency regulations, policies, and procedures. These officials have primary responsibility for the proper use, maintenance, and protection of OGVs assigned to their operations.

A. All DEA employees, and all non-DEA employees authorized to drive DEA OGVs, are responsible for complying with CFR 41 and agency regulations, policies and procedures when operating OGVs. If an employee uses, or authorizes the use of, an OGV for other than official purposes, the employee is subject to suspension of at least one month or other disciplinary action. The use of OGVs is prohibited under the following circumstances (see memorandum from Deputy Administrator Michele M. Leonhart, dated July 3, 2006, subject Use of Official Government Vehicles; also see 2735.15, paragraph I, of the Personnel Manual and 6124.3 of the Agents Manual):

1. While under the influence of alcohol or drugs.
2. Solely for the purpose of travel to and from residences.
3. In the conduct of personal business.
4. Transporting any person not engaged in the conduct of official business or otherwise not being transported in the interest of the Government.

B. Contractors may use OGVs when authorized under applicable DEA procedures and in accordance with FMR 102-34.230 under the following conditions:

1. OGVs are used for official purposes only and solely in the performance of the contract.
2. OGVs cannot be used for transportation between residence and place of employment.
3. Contractors must:

EXHIBIT
PENGAD 800-631-6989
Plaintiffs
13

a. Establish and enforce suitable penalties against employees who use, or authorize the use of, such OGVs for unofficial purposes or for other than in the performance of the contract; and
b. Pay any expenses or cost, without reimbursement from DEA, for using OGVs other than in the performance of the contract.

---

**CONTENTS**

0320.1 Classes of OGVs

0320.2 Vehicle Ceilings

0320.3 Vehicle Identification

0320.4 State Registration/Inspection

0320.5 Emergency Equipment

0320.6 Vehicle Files

0320.7 Vehicle Operation

0320.8 Related Matters

---

**0320.1 Classes of OGVs**

A. Upon placement into DEA service, OGVs are either classified as a Primary, Special Purpose, or Pool vehicle.

B. Primary Vehicles. A "Primary" OGV is any standard vehicle purchased under GSA contract, or seized or transferred vehicles similar to those purchased via GSA and used for traditional law enforcement activities. Because of their general utility, these vehicles are grouped under the heading "Primary" vehicles for the purpose of establishing OGV ceilings. Barring exceptional circumstances, all OGVs assigned to foreign offices shall be considered primary vehicles.

C. Special Purpose Vehicles. Those vehicles which are not of general utility e.g., surveillance sedans and vans, taxi cabs, clandestine laboratory trucks, motorcycles, etc., or forfeited vehicles with a market value above ***$50,000*** at the time they are placed into DEA service and their intended use is for ***specific long-term undercover operations with an estimated duration of one year or more*** [otherwise the vehicles shall be classified as primary vehicles].

1. Special purpose vehicles shall not be assigned to individual employees nor shall they be used for purposes other than those for which they were placed into service, i.e., surveillance or undercover purposes.
2. They must be stored in a secure location between utilization, and a log must be kept reflecting each use. Thus, a hardbound logbook shall be kept for each special purpose vehicle, having the following headings:

Date Locale (of use)
Employee's Name Beginning Mileage
Synopsis of Activity Ending Mileage
Case Number

3. The logbook ***shall not*** be kept in the OGV, but in a central, secure location. Special purpose vehicles are not counted against an office's OGV ceiling. However, on an annual basis, SA shall monitor the number, types and utilization of special purpose vehicles assigned to an office to ensure proper utilization.
4. Offices who wish to convert vehicles currently designated as special purpose may do so under either of the following conditions:

a. When, after being in DEA service for ***one year or more*** as a special purpose vehicle, and the present market value is less than $50,000, or
b. When a Field Division is below its OGV ceiling and replacement vehicles are not pending.

The advantage of conversion is to gain additional flexibility in its use. However, the disadvantage is that it shall then be counted against the office's primary OGV ceiling. All requests to convert special purpose vehicles to primary vehicles shall be sent to SA for concurrence.

5. Certain types of vehicles classified as standard or nonstandard which have other modifications (e.g., a van which has been converted for surveillance purposes) may be reclassified as special purpose. Field offices may initiate either action by memorandum to SAOV. The memorandum shall contain a detailed justification outlining all pertinent facts. Upon concurrence, SAOV shall reclassify the vehicle and field management shall be advised accordingly.
6. With certain long term undercover operations, in the SAC's judgment, it may be necessary to use a special purpose vehicle in the same manner as a primary vehicle. When such a situation arises, the SAC should submit a request to the Deputy Assistant Administrator, Office of Administration (SA) asking for a waiver. The request must include the period for which such use is necessary. Upon SA concurrence, Field management shall be advised accordingly.

D. Pool Vehicles. A Pool vehicle is a primary OGV that is eligible for surplus, but is in good operating and safe condition to meet administrative needs. These OGVs ***do not count against an office's OGV ceiling***, and ***shall not*** be used for home-to-work. A logbook is not necessary unless required as part of the Field Division's office policy. Pool vehicles are identified with a "U" at the end of the OGV number, for example, W06-0001U.

**0320.2 Vehicle Ceilings**

A. Primary OGV ceilings are established based upon the following ratios for domestic and foreign field offices:

1 Vehicle 1 Special Agent (GS 1811)
1 Vehicle 1 Diversion Investigator Group Supervisor (GS 1801 14)
4 Vehicles 5 Diversion Investigators (GS 1801s)
1 Vehicle 1 Investigative Technology Specialist (GS 391)
1 Vehicle 2 Foreign Investigative Aids (FIAs)

B. Primary OGV ceilings shall be based upon the Position and On-Board Staffing reports and Table of Organization, and shall be reviewed periodically for trends and reconciled via the Annual OGV Report.

C. Where an office's primary fleet exceeds it's established authorized OGV ceiling, justification for vehicle retention must be provided to SA. Where the excess cannot be justified, SA shall contact field management to initiate corrective measures; i.e., excess or transfer OGVs elsewhere in the agency.

D. Special purpose vehicles are not counted against Field Office ceilings, but are counted in the overall number of vehicles in the office's OGV inventory. SA shall monitor the number, types and utilization of these vehicles for each field office.

E. Vehicle ceilings for the Laboratories, El Paso Intelligence Center (EPIC), Aviation Division (OA), Office of Training (TR) and HQs are not based upon core employee assignment ratios, but rather programmatic requirements.

F. Requests for OGV ceiling increases for FSNs shall be in writing (memorandum or teletype) to SA. They must address the following:

1. The identity of these employees, and a full description of their duties.
2. Description of the insurance coverage necessary and available in the host country including cost.
3. Description of the embassy or host country restrictions, if any, governing this situation.
4. Description of the circumstances under which these employees shall use these vehicles.

Upon receipt, SAOV shall forward the request to the Office of International Operations (OF) for programmatic review, and to the Office of Chief Counsel (CC) for legal review. Upon concurrence of both offices, SAOV shall adjust the office's OGV ceiling and notify the requesting office accordingly.

**0320.3 Vehicle Identification**

A. Upon placing an OGV into service (or, in the case of a rented/leased vehicle, where the rental/lease is to extend beyond 90 days), SAOV shall assign an OGV identification number. Once assigned, the OGV identification number shall be recorded on all documents related to the use of this vehicle (e.g., maintenance records, repair bills, fuel receipts, etc.).

B. The identification number has seven characters: 1 (Type-see below), 2&3 (Year placed into service), 4/5/6/&7 (Sequential number). For example: W06-0001 indicates that the vehicle is a station wagon and the first vehicle placed into service in FY 2006. The types of vehicles are symbolized by using the following letters:

| | | | |
|---|---|---|---|
| S | Sedan | H | Trailer |
| C | Taxi Cab | B | Bus |
| W | Station Wagon | R | Recreational Vehicle (Motor home, etc) |
| V | Van | M | Motorcycle |
| T | Truck | L | Leased |

C. OGV identification numbers are formally assigned via the DEA Form 87, Vehicle Assignment Record (DEA-87). SAOV shall prepare this document with an original plus one copy for the receiving office. The receiving office shall sign the form and return the original to SAOV.

D. DEA OGVs shall not bear any overt markings identifying them as such. A DEA Official Business

placard may be used for parking in those situations where such use would not compromise security. These placards may only be used in connection with official duties (also see 0320.7.C).

**0320.4 State Registration/Inspection**

A. All OGVs shall be registered and inspected in full accordance with the laws of the state in which they are assigned.

B. Liaison should be established with appropriate authorities so that OGVs can be registered without compromising security (i.e., the fact that they are OGVs is not revealed during routine inquiry). This may take the form of a confidential state registration file, or the use of fictitious names.

C. The field office shall maintain a record of all license plates issued or assigned to each OGV. License plates shall not be used on another OGV without proper documentation on file. All unused license plates are to be stored in a locked/secure place with restricted access.

D. Operator Safety Inspections. In addition to periodic inspections required by the state or local jurisdictions in which the OGV is operated, each vehicle operator shall check the OGV daily for safety defects, such as tire wear, condition of body and glass areas, burned-out bulbs, etc. These and other mechanical difficulties experienced while operating the vehicle (i.e., brake failure, steering resistance or steering wheel play, etc.) shall be immediately reported to the operator's supervisor and the office fleet manager. If a vehicle operator feels that the OGV is unsafe for operation, an immediate inspection by a qualified mechanic shall be authorized by the operator's supervisor or the office fleet manager to avert the possible occurrence of a serious accident. Mechanical defects that do not impair the safe operation of the vehicle are to be recorded on the DEA-349 and subsequently corrected within 30 days.

**0320.5 Emergency Equipment**

A. FMOs must ensure that all OGVs are equipped with the following:

| | |
|---|---|
| Good spare tire | First aid kit |
| Jack/lug wrench | Flashlight |
| Fire extinguisher | Jumper cables |
| Flares | Accident Package w/disposable camera |

B. FMOs shall decide which OGVs under their control shall be equipped with emergency lights/sirens, based upon optional requirements. This equipment shall be purchased and installed in accordance with local ordinances. Such equipment may only be used in accordance with 6124.5 of the Agents Manual. The use of personally owned emergency equipment is prohibited.

**0320.6 Vehicle Files**

A. Every Field Division and Country Office to which OGVs are assigned shall maintain the official OGV files for the District and Resident offices under their authority. The OGV files maintained by the District and Resident offices are considered working files. Whenever an OGV is transferred to an office outside an offices authority, the official OGV file shall be transferred with it.

B. In the case of a non-DEA vehicle assigned to a DEA funded TF a vehicle file shall be established and maintained at the field office to which the vehicle is assigned. This would also apply where the TF Agreement specifies that DEA shall assume the costs of fuel, maintenance and repair of non DEA

owned vehicles (also see Subchapter 0329.1).

C. DEA OGV files shall contain all correspondence relating to the acquisition, maintenance, repair, and ultimate vehicle disposition. This includes:

1. DEA-87, Motor Vehicle Assignment Record (and all supporting documents).
2. All documents relating to registration/licensing/inspection.
3. Copies of DEA-349a, Motor Vehicle Repair Request/Authorization.
4. Copies of all repair/maintenance invoices.
5. Copies of all DEA-349s, Monthly Motor Vehicle Report.
6. Copies of all accident reports/investigations (or a document cross referencing to a separate accident file).

**0320.7 Vehicle Operation**

A. The policies contained herein apply to the use of OGVs in general. Specific policies concerning the following matters are found in 6124.3 of the Agents Manual and/or on Webster under Manuals, Miscellaneous Documents, Other Policies:

1. Misuse/unauthorized use of an OGV
2. Home-to-work use of an OGV
3. Commuting Distances between Domicile and Work
4. Use by non DEA personnel
5. Use in a foreign country
6. Use in pursuit situations
7. Use of emergency lights/siren
8. Use of OGVs for DEA-Sponsored Courses

B. Individuals holding a valid state drivers license, issued by the state in which either the employee is permanently stationed and/or has his/her principal place of residence, may operate OGVs. Immediate supervisors shall periodically check to ensure that motor vehicle operators have valid drivers' licenses in their possessions while operating OGVs.

C. Traffic and parking citations will be reported to the employee's supervisor within 48 hours. In each instance, the circumstances causing the citation will be reviewed. In the event that the supervisor believes that an employee abused his/her authority in violation of the Standard of Conduct, the procedures delineated in Appendix A and Planning and Inspection Manual Sections 8306.3 and 8307 of the Agents Manual will be used for guidance (also see 6124.5 Operating Safety of the Agents Manual).

D. Unattended OGVs shall be secured and locked. Also see 6122.42 of the Agents Manual for policy regarding the storage of firearms, and 6124.7 of the Agents Manual for policy concerning the prohibition of storing seized property, official advanced funds, drug evidence and other sensitive equipment or documents in OGVs.

E. Executive Order (EO) 13043 requires all seated occupants of an OGV to have their seat belts fastened when the OGV is in motion. Disciplinary action may be taken for violation. Also see 6124.5 (C) of the Agents Manual.

F. EO 13058 bans the use of tobacco products in any Government-owned workplace, to include OGVs. Disciplinary action may be taken for violation.

**0320.8 Related Matters**

A. OGV Monitoring. FMOs shall continuously monitor the utilization of primary and special purpose OGVs to determine underutilization. Similarly, SAOV shall monitor vehicle utilization throughout DEA and, where necessary, recommend the reassignment of underutilized vehicles (also see 0326).

B. Containment Vehicles. OGVs used to support Vehicle Containment Training (VCT) shall be high-mileage, ***roadworthy*** vehicles that have been identified for replacement through the procurement and/or forfeiture process. DEA Field Divisions shall provide SAOV with the OGV numbers of vehicles used for VCT so that they can be annotated on the office's OGV inventory. OGVs used in support of VCT shall not be designated as Special Purpose vehicles, and will count against an office's primary OGV ceiling to ensure that they will be disposed of in a timely manner. There are two reasons for this decision.

1. DEA needs to recover the proceeds from OGV sales while incurring nominal damage to the vehicles. To do otherwise would result in more than usual damage to the vehicles; this would lower the amount of proceeds received from OGV sales.
2. By alternating vehicles used for VCT, this will limit unnecessary spending of operational funds on maintenance, gasoline, registration and tags, parking and storage fees, etc.

Accordingly, DEA Field Divisions shall proactively schedule VCT in conjunction with the arrival of replacement vehicles (new and/or forfeited vehicles). If additional training is needed later, then other high-mileage vehicles shall be identified and used to meet this need. Once VCT is completed, the OGVs shall be immediately processed for disposal. Any damages to OGVs used in VCT shall be duly noted in the OGV files (to include an estimate to have damages repaired) and provided to SAOV when the Field Division initiates disposal action. Since VCT is self-contained and shall not involve danger to human life or damage to private or public property, Accident Reports shall not be required, but shall be reported as an "Incident" (also see 6124.82 of the Agents Manual).

C. Non-standard Vehicles. Forfeited luxury/prestigious vehicles not available for purchase through GSA contract are considered non-standard vehicles. These vehicles are defined as, but are not limited to, motor vehicles manufactured by Acura, Alfa Romeo, Audi, BMW, Cadillac, Infiniti, Lexus, Lincoln, Mercedes-Benz, SAAB, Volvo, etc. SACs, Associate Special Agents in Charge (A/SAC), and Assistant Special Agents in Charge (ASAC) are prohibited from driving non-standard vehicles. Personnel in these positions shall operate standard vehicles purchased through GSA.

Further, nonstandard vehicles shall not be used to transport outside dignitaries or visiting DEA officials, or used in other manner that may create an erroneous appearance of liberal generosity by DEA.

D. Exotic and High Maintenance Vehicles. Vehicles such as Rolls Royce, Masarati, Ferrari, Clenet, Zimmer, Lamborghini, DeLorean, Jaguar, Corvette, Porsche, etc., shall not be placed into official use. These and similar vehicles are excessively expensive to maintain and so distinctive it is not in DEA's best interest to place them into official use.

E. Privately Owned Vehicles (POV) are vehicles owned or controlled by DEA employees that may be used in the conduct of official travel, but ***shall not*** be used to conduct official enforcement operations. Policies and procedures applicable to the use of a POV in lieu of other transportation for travel purposes are available in the government travel regulations, which can be obtained from GSA or by logging on to ***http://www.gsa.gov***.

G. Foreign Service Nationals (FSNs). In some Country Offices, FSNs are contract employees acting in the capacity of Investigative Aides; the nature of their duties requires the use of an OGV. There is no provision under PL 99-550 for Home-to-Work use of OGVs by FSN employees. Any OGVs assigned to a CO for use by FSN employees shall be considered Pool vehicles for general office use. However, there are certain considerations that must be taken into account before authorizing the use of OGVs by FSNs. Such employees are not protected from liability by either diplomatic immunity or DEA's authority to pay tort claims. These employees may give rise to claims for amounts reflective of prevailing awards in the host country and therefore shall obtain host country insurance coverage for any actions prior to driving an OGV.

[WebSter Home] [Contents] [Search] [What's New] [Help] [Feedback]
[Previous Section] [Next Section]

Encyclopedias

63C Am. Jur. 2d Public Funds § 54.

Law Review and Journal Commentaries

Pulling the purse strings of the Commander in Chief. Peter Raven-Hansen and William C. Banks, 80 Va.L.Rev. 833 (1994).

Texts and Treatises

Business and Commercial Litigation in Federal Courts § 80.8.

### WESTLAW ELECTRONIC RESEARCH

See WESTLAW guide following the Explanation pages of this volume.

## § 1344. Passenger carrier use

(a)(1) Funds available to a Federal agency, by appropriation or otherwise, may be expended by the Federal agency for the maintenance, operation, or repair of any passenger carrier only to the extent that such carrier is used to provide transportation for official purposes. Notwithstanding any other provision of law, transporting any individual other than the individuals listed in subsections (b) and (c) of this section between such individual's residence and such individual's place of employment is not transportation for an official purpose.

(2) For purposes of paragraph (1), transportation between the residence of an officer or employee and various locations that is—

(A) required for the performance of field work, in accordance with regulations prescribed pursuant to subsection (e) of this section, or

(B) essential for the safe and efficient performance of intelligence, counterintelligence, protective services, or criminal law enforcement duties,

is transportation for an official purpose, when approved in writing by the head of the Federal agency.

(b) A passenger carrier may be used to transport between residence and place of employment the following officers and employees of Federal agencies:

(1)(A) the President and the Vice President;

(B) no more than 6 officers or employees in the Executive Office of the President, as designated by the President; and

(C) no more than 10 additional officers or employees of Federal agencies, as designated by the President;

(2) the Chief Justice and the Associate Justices of the Supreme Court;

(3)(A) officers compensated at Level I of the Executive Schedule pursuant to section 5312 of title 5; and





(B) a single pr clause (A) of this officer that such tr

(4) principal di United States Aml

(5) the Deputy Defense, the Sec Army, the Secreta man of the Joint Coast Guard;

(6) the Directo rector of the Fed trator of the Drug

(7) the Chairm Reserve System;

(8) the Comptr Postmaster Gener

(9) an officer o a Federal agency subsection (d) of pursuant to parag circumstances pr emergency exists, erations make su official business.

Except as provided in tion made pursuant to of a passenger carrier residence and place o than 15 calendar days.

(c) A passenger car dence and place of en specifically authorized whom transportation State Department Bas 10, or section 8(a)(1)

(d)(1) Any determi section shall be in writ officer or employee af the duration of the au a passenger carrier for employment.

PENGAD 800-631-6989 EXHIBIT Plaintiff's 15

Chief. Peter Raven-Hansen and

ourts § 30.8

RESEARCH

pages of this volume

gency, by appropriation or
eral agency for the mainte-
senger carrier only to the
e transportation for official
ovision of law, transporting
listed in subsections (b) and
dual's residence and such
ansportation for an official

ransportation between the
various locations that is—

d field work, in accordance
t to subsection (e) of this

ient performance of intelli-
services, or criminal law

when approved in writing by

to transport between resi-
ving officers and employees

resident;

mployees in the Executive
ed by the President; and
icers or employees of Feder-
ident;
iate Justices of the Supreme

el I of the Executive Sched-
and



(B) a single principal deputy to an officer described in subclause (A) of this clause, when a determination is made by such officer that such transportation is appropriate;

(4) principal diplomatic and consular officials abroad, and the United States Ambassador to the United Nations;

(5) the Deputy Secretary of Defense and Under Secretaries of Defense, the Secretary of the Air Force, the Secretary of the Army, the Secretary of the Navy, the members and Vice Chairman of the Joint Chiefs of Staff, and the Commandant of the Coast Guard;

(6) the Director of the Central Intelligence Agency, the Director of the Federal Bureau of Investigation, and the Administrator of the Drug Enforcement Administration;

(7) the Chairman of the Board of Governors of the Federal Reserve System;

(8) the Comptroller General of the United States and the Postmaster General of the United States; and

(9) an officer or employee with regard to whom the head of a Federal agency makes a determination, in accordance with subsection (d) of this section and with regulations prescribed pursuant to paragraph (1) of subsection (e), that highly unusual circumstances present a clear and present danger, that an emergency exists, or that other compelling operational considerations make such transportation essential to the conduct of official business.

Except as provided in paragraph (2) of subsection (d), any authorization made pursuant to clause (9) of this subsection to permit the use of a passenger carrier to transport an officer or employee between residence and place of employment shall be effective for not more than 15 calendar days.

(c) A passenger carrier may be used to transport between residence and place of employment any person for whom protection is specifically authorized pursuant to section 3056(a) of title 18 or for whom transportation is authorized pursuant to section 28 of the State Department Basic Authorities Act of 1956, section 2637 of title 10, or section 8(a)(1) of the Central Intelligence Agency Act of 1949.

(d)(1) Any determination made under subsection (b)(9) of this section shall be in writing and shall include the name and title of the officer or employee affected, the reason for such determination, and the duration of the authorization for such officer or employee to use a passenger carrier for transportation between residence and place of employment.

(2) If a clear and present danger, an emergency, or a compelling operational consideration described in subsection (b)(9) of this section extends or may extend for a period in excess of 15 calendar days, the head of the Federal agency shall determine whether an authorization under such paragraph shall be extended in excess of 15 calendar days for a period of not more than 90 additional calendar days. Determinations made under this paragraph may be reviewed by the head of such agency at the end of each such period, and, where appropriate, a subsequent determination may be made whether such danger, emergency, or consideration continues to exist and whether an additional extension, not to exceed 90 calendar days, may be authorized. Determinations made under this paragraph shall be in accordance with regulations prescribed pursuant to paragraph (1) of subsection (e).

(3) The authority to make designations under subsection (b)(1) of this section and to make determinations pursuant to subsections (a)(2) and (b)(3)(B) and (9) of this section and pursuant to paragraph (2) of this subsection may not be delegated, except that, with respect to the Executive Office of the President, the President may delegate the authority of the President under subsection (b)(9) of this section to an officer in the Executive Office of the President. No designation or determination under this section may be made solely or principally for the comfort or convenience of the officer or employee.

(4) Notification of each designation or determination made under subsection (b)(1), (3)(B), and (9) of this section and under paragraph (2) of this subsection, including the name and title of the officer or employee affected, the reason for any determination under subsection (b)(9), and the expected duration of any authorization under subsection (b)(9), shall be transmitted promptly to the Committee on Government Operations of the House of Representatives and the Committee on Governmental Affairs of the Senate.

(e)(1) Not later than March 15, 1987, the Administrator of General Services, after consultation with the Comptroller General, the Director of the Office of Management and Budget, and the Director of the Administrative Office of the United States Courts, shall promulgate regulations governing the heads of all Federal agencies in making the determinations authorized by subsections (a)(2)(A), (b)(9), and (d)(2) of this section. Such regulations shall specify that the comfort and convenience of an officer or employee is not sufficient justification for authorizations of transportation under this section.

(2) In promulgating regulations under paragraph (1) of this subsection, the Administrator of General Services shall provide criteria defining the term "field work" for purposes of subsection (a)(2)(A) of this section. Such criteria shall ensure that transportation between





an employee's residen
authorized only to the
tially increase the effici

(f) Each Federal ag
necessary to establish
tation provided betwee
al's place of employme

(g) As used in this se

(1) the term "p
vehicle, aircraft, b
tion that is owned
and

(2) the term "F

(A) a depar
the Act of Aug

(B) an Exe
section 101 of

(C) a milit
section 102 of

(D) a Gove
section 103(1)

(E) a Gove
defined in sec

(F) a mixe
term is define

(G) any est
ernment (inc

(H) any in
dependent re
title 44);

(I) the Sm

(J) any no
ed States,

except that such
District of Colum

(h) Notwithstandin
to the United States P

(Pub.L. 97–258, Sept. 1
1986, 100 Stat. 3067; P
4, 1987, 101 Stat. 1176
1987, 101 Stat. 1329, 1

mergency, or a compelling
section (b)(9) of this sec-
in excess of 15 calendar
all determine whether an
e extended in excess of 15
an 90 additional calendar
aragraph may be reviewed
t each such period, and,
ation may be made wheth-
on continues to exist and
ed 90 calendar days, may
der this paragraph shall be
pursuant to paragraph (1)

under subsection (b)(1) of
pursuant to subsections
nd pursuant to paragraph
, except that, with respect
e President may delegate
ction (b)(9) of this section
President. No designation
made solely or principal-
icer or employee.

etermination made under
tion and under paragraph
and title of the officer or
ermination under subsec-
any authorization under
mptly to the Committee on
Representatives and the
Senate.

e Administrator of General
mptroller General, the Di-
Budget, and the Director of
States Courts, shall promul-
f all Federal agencies in
subsections (a)(2)(A), (b)(9),
tions shall specify that the
employee is not sufficient
ortation under this section.
paragraph (1) of this sub-
rvices shall provide criteria
ses of subsection (a)(2)(A) of
that transportation between



an employee's residence and the location of the field work will be authorized only to the extent that such transportation will substantially increase the efficiency and economy of the Government.

(f) Each Federal agency shall maintain logs or other records necessary to establish the official purpose for Government transportation provided between an individual's residence and such individual's place of employment pursuant to this section.

(g) As used in this section—

(1) the term "passenger carrier" means a passenger motor vehicle, aircraft, boat, ship, or other similar means of transportation that is owned or leased by the United States Government; and

(2) the term "Federal agency" means—

(A) a department (as such term is defined in section 18 of the Act of August 2, 1946 (41 U.S.C. 5a));

(B) an Executive department (as such term is defined in section 101 of title 5);

(C) a military department (as such term is defined in section 102 of title 5);

(D) a Government corporation (as such term is defined in section 103(1) of title 5);

(E) a Government controlled corporation (as such term is defined in section 103(2) of title 5);

(F) a mixed-ownership Government corporation (as such term is defined in section 9101(2) of this title);

(G) any establishment in the executive branch of the Government (including the Executive Office of the President);

(H) any independent regulatory agency (including an independent regulatory agency specified in section 3502(10) of title 44);

(I) the Smithsonian Institution; and

(J) any nonappropriated fund instrumentality of the United States,

except that such term does not include the government of the District of Columbia.

(h) Notwithstanding section 410(a) of title 39, this section applies to the United States Postal Service.

(Pub.L. 97–258, Sept. 13, 1982, 96 Stat. 924; Pub.L. 99–550, § 1(a), Oct. 27 1986, 100 Stat. 3067; Pub.L. 100–180, Div. A, Title XIII, § 1314(d)(2), Dec. 4, 1987, 101 Stat. 1176; Pub.L. 100–202, § 101(a)[Title IV, § 407], Dec. 22, 1987, 101 Stat. 1329, 1329–26; Pub.L. 101–510, Div. A, Title III, § 326(b),

Case 1:07-cv-00003-MMS Document 33-3 Filed 07/31/2008 Page 67 of 99



Nov. 5, 1990, 104 Stat. 1531; Pub.L. 103-272, § 4(f)(2), July 5, 1994, 108 Stat. 1363; Pub.L. 104-91, Title I, § 101(a), Jan. 6, 1996, 110 Stat. 11, as amended Pub.L. 104-99, Title II, § 211, Jan. 26, 1996, 110 Stat. 37.)

## HISTORICAL AND STATUTORY NOTES

### Revision Notes and Legislative Reports

1982 Acts

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 1344(a) | 31:638a(c)(2) (1st sentence) | July 16, 1914, ch. 141, § 5(c)(2) (1st, last sentences), 38 Stat. 508; restated Aug. 2, 1946, ch. 744, § 16(a), 60 Stat. 810. |
| 1344(b) | 31:638a(c)(2) (last sentence) | |

In subsection (a), before clause (1), the words "officers and employees of the Government" are substituted for "officers and employees" for clarity. In clause (2), the words "performing field work requiring transportation" are substituted for "engaged in field work the character of whose duties makes such transportation necessary" to eliminate unnecessary words. The word "agency" is substituted for "department" because of § 101 of the revised title [§ 101 of this title] and for consistency with the source provisions restated in the section and § 1341 [§ 1341 of this title].

In subsection (b)(2), the words "section 101 of the title 5" are used because of § 7(b) of the Act of September 6, 1966 (Pub.L. 89-554, 80 Stat. 631) [set out as a note preceding § 101 of Title 5, Government Organization and Employees].

In subsection (b)(3), the words "ambassadors, ministers, charges d'affaires" are omitted as being included in "principal diplomatic and consular officials".

**1986 Acts.** House Report No. 99-451, see 1986 U.S. Code Cong. and Adm. News, p. 5171.

**1990 Acts.** House Report No. 101-665, House Conference Report No. 101-923, and Statement by President, see 1990 U.S. Code Cong. and Adm. News, p. 2931.

**1994 Acts.** House Report No. 103-180, see 1994 U.S. Code Cong. and Adm. News, p. 818.

### References in Text

Section 28 of the State Department Basic Authorities Act of 1956, referred to in subsec. (c), is classified to 22 U.S.C.A. § 2700.

Section 8(a)(1) of the Central Intelligence Agency Act of 1949, referred to in subsec. (c), is classified to 50 U.S.C.A. § 403j(a)(1).

Section 3502 of title 44, referred to in subsec. (g)(2)(H), which in par. (10) defined "independent regulatory agency", was omitted in the general amendment of chapter 35 of Title 44 by Pub.L. 104-13, § 2, May 22, 1995, 109 Stat. 163. Pub.L. 104-13 enacted a new 44 U.S.C.A. § 3502 which also defines "independent regulatory agency".

### Codification

Section 101(a) of Pub.L. 104-91, as amended by section 211 of Pub.L. 104-99, provided in part that section 118 of the General Provisions for the Department of Justice in Title I of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations "Act", 1996 (H.R. 2076) as passed by the House of Representatives on Dec. 6, 1995, was enacted into permanent law. Such section 118 of H.R. 2076 amended subsec. (b)(6) of this section; see 1996 Amendments note set out under this section.

### Amendments

**1996 Amendments.** Subsec. (b)(6). Pub.L. 104-91, § 101(a), as amended Pub.L. 104-99, § 211, inserted provisions relating to the Administrator of the Drug Enforcement Administration. See Codification note set out under this section.

**1994 Amendments.** Pub.L. 103-272, § 4(f)(2), amended and expanded the directory language of section 101(a)[Title IV, § 407] of Pub.L. 100-202 so as to amend subsecs. (b), (d), and (e) of this

### Cross References

Availability of appropriations for protection and management of national forests for payment of telephone service installed in private residences, see section 580f of Title 16, Conservation.

### Notes of Decisions

Local calls 1
Necessity of telephone service 2
Occupation of premises 3

**1. Local calls**

Message unit telephone calls made within a particular telephone exchange area from private residence of government employees were local and were within the prohibition of former section 679 of this title. 35 Comp.Gen. 615 (1956).

**2. Necessity of telephone service**

Although official duties of the Commander of the Seventh Coast Guard District require that he be available twenty-four hours a day to respond to problems arising from the Cuban Refugee Freedom Flotilla. Former section 679 of this title prohibited the Commander from being reimbursed by the government for the costs associated with installing and maintaining a telephone in his residence. 1980, 59 Comp.Gen. 723.

Former section 679 of the title prohibited payment from appropriated funds of any part of the expense of furnishing telephone service to a government officer or employee in a private residence irrespective of the desirability or necessity of such service from an official standpoint. 35 Comp.Gen. 28 (1955).

**3. Occupation of premises**

Although former section 679 of this title prohibited use of appropriated funds for telephone service in private residence, said section was not applicable where neither outgoing nor incoming Air Deputy occupied subject premises during period covered by charges in question. 1981, 60 Comp.Gen. 490.

## § 1349. Adverse personnel actions

(a) An officer or employee of the United States Government or of the District of Columbia government violating section 1341(a) or 1342 of this title shall be subject to appropriate administrative discipline including, when circumstances warrant, suspension from duty without pay or removal from office.

(b) An officer or employee who willfully uses or authorizes the use of a passenger motor vehicle or aircraft owned or leased by the United States Government (except for an official purpose authorized by section 1344 of this title) or otherwise violates section 1344 shall be suspended without pay by the head of the agency. The officer or employee shall be suspended for at least one month, and when circumstances warrant, for a longer period or summarily removed from office.

(Pub.L. 97–258, Sept. 13, 1982, 96 Stat. 926.)

### Historical and Revision Notes

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 1349(a) | 31:665(i)(1) (words before semicolon related to (a), (b)). | R.S. § 3679(i)(1) (words before semicolon related to (a), (b)); Mar. 3, 1905, ch. 1484, § 4 (1st par.), 33 Stat. 1257; Feb. 27, 1906, ch. 510, § 3, 34 Stat. 48; restated Sept. 6, 1950, ch. 896, § 1211, 64 Stat. 768. |



EXHIBIT Plaintiffs 16
PENGAD 800-631-6989

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ZORAIDA GONZALEZ, et al., Plaintiffs,

v.

THE UNITED STATES, Defendant.

Case No. 07-790C (Judge Emily C. Hewitt)

KATHY L. FEDERICO, et al., Plaintiffs,

v.

THE UNITED STATES, Defendant.

Case No. 08-44C (Judge Marian Blank Horn)

MATTHEW J. CRUSAN, et al., Plaintiffs,

v.

UNITED STATES OF AMERICA, Defendant.

(CONT.)

Case No. 07-434C (Judge Marian Blank Horn)

Thursday, July 17, 2008

DEPOSITION OF: GARY L. BOGGS





fd244021-18a8-4a06-a517-4355e3a3cc7e

----------------------------

EVANGELA FORBES, :

Plaintiff, :

v. : Case No. 06-510C
: (Judge Charles F.
UNITED STATES OF AMERICA, : Lettow)

Defendant. :

GARY L. BOGGS

called for examination by Counsel for the Plaintiffs, pursuant to notice of deposition, in the offices of James & Hoffman, located at

1101 17th Street, N.W. at 10:00 a.m., when were present on behalf of the respective parties:



APPEARANCES:
On Behalf of the Plaintiffs:
JULES BERNSTEIN, ESQ.
Of: Bernstein & Lipsett, P.C.
1920 L Street, N.W.
Suite 303
Washington, D.C. 20036-5004
(202) 955-1390
(202) 296-7220 (fax)

EDGAR JAMES, ESQ.
Of: James & Hoffman
1101 17th Street, N.W.
Suite 510
Washington, D.C. 20036
(202) 496-0500
(202) 496-0555 (fax)

On Behalf of the Defendant:

WILLIAM P. RAYEL, ESQ.
Trial Attorney
Of: Commercial Litigation Branch
Civil Division
U.S. Department of Justice

1100 L Street, N.W.
Room 12100
Washington, D.C. 20530
(202) 616-0302
(202) 307-0972 (fax)

MICHAEL G. SEIDEL, ESQ.

Senior Attorney
Of: Office of Chief Counsel
Drug Enforcement Administration
U.S. Department of Justice
Washington, D.C. 20537
(202) 307-4736
(202) 307-7950 (fax)



TABLE OF CONTENTS


| Witness: | Direct | Cross |
|---|---|---|
| Gary L. Boggs | 6 | 110 |

Exhibits:

| Number | Description | Page |
|---|---|---|
| 1 | Notice of Deposition Case No. 07-790C | 16 |
| 2 | Notice of Deposition Case No. 08-44C | 16 |
| 3 | Notice of Deposition Case No. 07-434C | 16 |
| 4 | Notice of Deposition Case No. 06-510C | 16 |
| 5 | Memorandum on Certification for Limited Home-to-Work Utilization of Official Government Vehicle: Field Work (FFS 1120-09) May 12, 2004 | 16 |
| 6 | Part 102-4 - Nondiscrimination in Federal Financial Assistance Programs (Reserved) | 36 |
| 7 | Order: 04-A-012 Subject: Home to Work Usage of OGVs - May 6, 2004 | 63 |
| 8 | 6124, Agents Manual DEA Sensitive | 68 |
| 9 | Appendix A - Page 9 of 21 | 87 |




Exhibits:


| Number | Description | Page |
|---|---|---|
| 10 | Memorandum on Use of Official Government Vehicles (DFN: 060-01) - July 3, 2006 | 89 |
| 11 | DEA Standards of Conduct | 90 |
| 12 | Memorandum on Diversion Control Program (FFS: 060-01) August 3, 2001 | 95 |
| 13 | Subchapter 032 Property (Motor Vehicles) | 98 |
| 14 | Compensation for disability or death of employee | 102 |
| 15 | Passenger carrier use | 107 |
| 16 | Adverse personnel actions | 108 |

P-R-O-C-E-E-D-I-N-G-S
10:00 a.m.
Whereupon,
GARY LEE BOGGS
was called as a witness and, having been first duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MR. BERNSTEIN:
Q For the record, my name is Jules Bernstein, counsel for the Plaintiffs in the four cases pending in the United States Court of Federal Claims, in which this deposition is being conducted.
For the record those cases are Zoraida Gonzalez, et al. v. United States, Case No. 07-790C, before Judge Emily C. Hewitt, Kathy L. Federico, et al. v. United States, Case No. 08-44C, before Judge Marian Blank Horn, Matthew J. Crusan, et al., plaintiffs v. United States, Case No. 07-434C, before Judge Marian Blank Horn, and Evangela



Forbes, plaintiff v. United States of America, Case No. 06-51C, Judge Charles F. Lettow.
Now for the record too, I'm accompanied by my co-counsel in this case, Edgar James, who is here. First, let me ask the witness to state his full name for the record?
A Gary Lee Boggs.
Q Do you want to spell it for the Gary?
A G-A-R-Y.
Q Gary B.?
A Lee.
Q Oh, that's L-E-E.
A That's correct.
Q Okay. Gary Lee Boggs, B-O-G-G-S?
A That's correct.
Q Mr. Boggs, before we begin, just a couple of preliminaries, and that is to say first, in the interest of the record, we'd appreciate your speaking clearly and what sometimes happens in these depositions is



people will nod yes or no but we need obviously a verbal answer for the court reporter.
Obviously, both of us should not be speaking at the same time, and I will do my best to avoid it and I'm sure you will do the same. And then, let me ask you whether -- well first of all, with whom have you discussed this deposition?
A I've discussed this deposition with our agency counsel, Mike Seidel.
Q My apologies, for the record, if counsel for the Defendant, United States, would state their names for the record?
MR. RAYEL: William Rayel, R-A-Y-E-L, Department of Justice.
SS Michael Seidel, spelled S-E-I-D-E-L, Department of Justice, Drug Enforcement Administration.
BY MR. BERNSTEIN:
Q So you have discussed this deposition with both counsel who are here?



A That's correct.
Q Now with regard to your position, could you state what your position is?
A My position is I'm a special agent assigned to the Drug Enforcement Administration, and currently I'm the Deputy Assistant to the Deputy Assistant Administrator for the Office of Diversion Control.
Q And in that capacity, what is your position described as, or what grade are you, as well as what grade are you?
A I'm a GS-15, 1811.
Q And that is a management position?
A Yes, it is.
Q And you are a criminal investigator?
A Yes, I am.
Q That's your position description. It describes you as a criminal investigator for the Drug Enforcement Administration?
A Yes.

Q Now in your present job, what are your duties?
A They would probably be commensurate with like a chief of staff. I work directly for the Deputy Assistant Administrator in the Office of Diversion Control. I oversee making arrangements for that individual to testify before Congress, meetings with industry, day-to-day personnel issues, a whole host of tasks.
Q And under your boss, is the entire Diversion investigator, is it a division? How is it described?
A It's called the Office of Diversion Control. It's not a division of its own.
Q And how many diversion investigators are in that office or under the Diversion, Office of Diversion Investigator Control?
A In its entirety?
Q In the United States or in the

Page 10

United States.
A I believe that we have approximately 513 positions, not all of which are filled. There are diversion investigators. We have chemists, scientists. We have special agents assigned to the program.
Q Do you have a breakdown of how many people are 1801s, which is the occupational code for Diversion investigator? How many positions are 1801?
A Positions are approximately 513.
Q Even the chemists and what have you are Diversion investigators?
A No.
Q So I'm only -- I thought you said that there were 513 positions, including say chemists or others, then, people who are described as Diversion investigators? Did I get it wrong?
A Yes, you did.
Q Can you clarify?

Page 11

A Within the Division Control Program, there are numerous job series. Of the one job series that you asked, about the Diversion investigators, we have approximately 513 positions.
Q And of those 513 positions, how many of them are designated as managerial?
A I couldn't tell you off the top of my head right now. I don't know.
Q But is the division between managerial and non-managerial, or the difference between a GS and a GM today?
A Yes. The group supervisors in the Diversion groups are either a Diversion investigator GS-14, or a special agent, GS-14. Then we have Diversion Program managers that are either a GS-14 or GS-15 Diversion investigator.
Q I see. Let me -- now you know, of course, that you are here testifying on behalf of the agency, rather than as an individual?
A Yes.

Page 12

Q Okay, and that is presumed Section 30(b)(6) of the rules of the United States Court of Federal Claims? I'm not testing your knowledge as a lawyer, but in fact, I can read that rule to you and what the rule essentially says is that parties to a lawsuit, say the plaintiffs, may seek the agency to testify, and then the agency designates an individual to speak on its behalf.
So we have not called you in your individual capacity, but as a representative representing and being able to testify on behalf of the agency. Counsel can comment, but that is, if you look at the Notice of Deposition, we say it's under Rule 30(b)(6), which basically asks you to testify on behalf of the agency.
So your testimony will be the agency's. Although it will be coming out of your mouth, you will be speaking on behalf of DEA. So that is the point, and I just want to get that on the record, so that you will

Page 13

understand this is not testing your personal knowledge, but what the agency knows, which is a heavier, it seems to me burden, in terms of your ability to answer the questions.

But on the other hand, a 30(b)(6) witness is required to be able to testify on behalf of the institution, in this case DEA. Now in terms of your history of employment at DEA, can you take us through it quickly?

A I was hired in 1985 by the Drug Enforcement Administration in the Orlando, Florida office. Subsequent to my change --

Q In what capacity?

A As a special agent. Subsequent to that I went to the Training Academy in Brunswick, Georgia, and then upon graduation --

Q What year was that?

A 1985. Subsequent to that graduation from that Academy class, I was transferred to the Detroit Field Division. I worked in the Detroit Field Division until



2003, when I was transferred to headquarters.

Q And were you then a -- what grade were you when you were transferred to headquarters?

A A GS-14.

Q So you were -- when did you become a manager, if you will, or a GM?

A In March of 1999 I was promoted to a group supervisor's position in Detroit.

Q And so you have been at headquarters since 90 --

A Since 2003.

MR. BERNSTEIN: 2003. Now let me show you, I have a lot of paper here, so you'll have to forgive me for passing around a lot of stuff, and do not be intimidated by this stack, because we are not going through the entire stack.

But let me show you what I'm asking the court reporter to mark as Plaintiff's Exhibit 5. For the record, let's consider those first four Notices of



Deposition as Plaintiff's Exhibit 1, 2, 3 and 4.

(Whereupon, the documents referred to were marked for identification as Plaintiff Exhibits 1, 2, 3 and 4.)

MR. BERNSTEIN: So we are now looking at what I've asked the court reporter to mark as Plaintiff's Exhibit 5, and so that is your copy, and as a matter of fact here's an extra which will make that a little simpler.

Can you identify, just by running through them quickly, these documents?

THE WITNESS: Yes, I can.

BY MR. BERNSTEIN:

Q Will you proceed to do so?

A I'll look at every single one of them, they appear to be copies of a DEA Form 349-C, which is a certification form for home to work use, under the field work category.

Q And these are, looking at them,



did you participate in the preparation of the government's response to Plaintiff's discovery request in this case?

A No, I did not.

Q So did you know that the government had provided this stack of material to us?

A I know that there were some of the 349-Cs that were provided. Specifically which ones, I do not know.

Q But you have not looked at these particular documents before you got here?

A No, I did not.

Q Along those lines, did you discuss your testimony with anyone other than your counsel?

A No, I did not.

Q And with regard to this document, these are -- is there any question in your mind that these are -- that these are government documents provided to us in this case?







Neal R. Gross and Co., Inc.
202-234-4433

fd244021-18a8-4a06-a517-4355e3a3cc7e

A They appear to be, though again, I have not looked at every single one of them.
Q Well but looking at the first page, if we can go through it, can you -- first of all describe what this document seeks to accomplish?
MR. RAYEL: Objection, vague. You can answer.
MR. BERNSTEIN: Go ahead.
THE WITNESS: It appears to document a certification for, in this case, a Diversion investigator, Denise Jordan, for a home to work utilization of an official government vehicle, with under two different case numbers provided on the form.
The form is a requirement for field work that requires the use of an official government vehicle.
BY MR. BERNSTEIN:
Q Now when you say "field work," what do you mean by field work?
A Field work is a requirement under

Page 18

Title 31 for home to work utilization of an official government vehicle.
Q When you say "a requirement under Title 31," what do you -- Title 31 of United States Code?
A Yes.
Q And so when you say it is a requirement, what do you mean?
A The Title 31 has certain specific requirements for utilization of federal employees to take an official government vehicle home, one of which is field work.
Q That they be engaged in field work?
A Yes.
Q And can you describe field work, what this field work consists of?
A An example of field work in the instance with a Diversion investigator would be where they would conduct either a regulatory civil or criminal investigation, that would be conducted other than at the

Page 19

normal place of the Drug Enforcement Administration office.
It would be at a location of say, a DEA registrant, such as a pharmacist or a manufacturer or distributor that's a registrant with DEA, that they would have to go out and do some type of an investigation that involves those, and it would be more convenient to take the government vehicle from their home to that location, as opposed to coming into work, picking up a car and then going out to that location.
Q And so this, looking at this document, do you have any idea what FFS, the subject "FFS 1120-09" is?
A FFS is a filing system number for particular categories of different events or circumstances within our agency, and it is a filing system where forms or memos would be filed.
There's a list of different numbers for each category of where that

Page 20

document should be filed in our filing system.
Q But looking at all of these documents, they all say 1120, FFS 1120-09. Are those unique to Ms. Jordan, or do they have something -- would other people's 349-Cs be in such a file?
A They're not unique in this case, Diversion investigator Jordan. It's a filing system number that lets the secretary or file clerk know where, in our filing system, that this type of a document should be filed for future retrieval. It's not specific to the individual.
Q Is it specific to the vehicle?
A No, it is not.
Q Are there any files -- so that all of Ms. Jordan's 349-Cs would be in one file. I mean these all came out of file -- well actually, I'll have to say, if you look at the back group, where there are some in here, let's say DFN 1120-09, and others that say FFS 1120-9. Can you explain the difference

Page 21

between those two?
A Originally, the FFS, I believe it's the federal filing system number, that that filing system was then transferred or changed to utilization of a DFN system. But it's still the same premise, where a secretary or a clerk would file a particular document for later retrieval.
Q So would the files for Ms. Jordan be in that place exclusively? I think I've answered my own question, because I'm looking at another set of documents provided by the government involving another agent, and her material is in DFN 1120-09.
So wouldn't that suggest that this is not a unique number for Ms. Jordan?
A It is not.
Q So there would be many Diversion investigators whose 349-Cs would be in that file, or at least more than one for the sake of this discussion?
A That's correct, and it would be



maybe specific to the particular office. It's not a cumulative file. It's a centralized file. It's a file within each of the offices, as to where that file would be.
Q So can you tell from this document in which office Ms. Jordan works?
A Only in that what the case number is on there, and where her home address is. But I cannot specifically tell you -- from this form, I cannot tell you specifically which office she's assigned to.
Q Now looking at the next line, two, can you make out what that says, the handwritten material?
A Yes. That would be Associate SAC Wilbur Plumber.
Q And why would this go from presumably from, if you look at the right-hand side from Ms. Jordan to Mr. Plumber?
A It's the policy within the Drug Enforcement Administration that approval for field work be approved at the SES, Senior



Executive Service level, which in many offices is the special agent in charge.
In this particular office, which was the New York Field Division Office, the associate SAC is an SES level position and has the authority to approve or deny home to work utilization for this individual on field work.
Q So continuing on the form, looking at the paragraph beginning "Certification is requested," if you could read that to yourself please.
(Witness reviewing document.)
BY MR. BERNSTEIN:
Q And continuing, because the paragraph does continue at the bottom, for the purpose of "to conduct chemical verification on target and associates under CI-022097 and CI-032033." So what is the purpose of this paragraph, insofar as Ms. Jordan having submitted it to Mr. Plumber?
A They're outlining what circumstances or which investigation, in this



particular case, that DI Jordan would be working on, under the category of field work, and during which dates that authorization or that the field work would be conducted.
Q And the dates would be between May 14th and May 21st of 2004; is that correct?
A That's what's on the form, yes.
Q And then home address, that would be Ms. Jordan's home address?
A That's correct.
Q Actually looking through the forms very quickly, you would agree that her home address remained the same during the entire period covered by these forms, would you not?
A That appears to be correct.
Q And she then says "Distance from office to residence." Is that -- what is the purpose of her indicating that? She says "nine miles."
A The purpose of that is to determine how far away the individual resides. Generally, the field divisional offices, the







Neal R. Gross and Co., Inc.
202-234-4433

fd244021-18a8-4a06-a517-4355e3a3cc7e

special agent in charge sets a radius for which people can utilize an official government vehicle and take the vehicle to their residence.
If they live outside of that radius, there would either need to be an exception or they would not be approved to drive to that distance. It also would be to help determine whether or not it would be in the best interest of the government for this individual to utilize an official government vehicle in a home to work basis, to drive from their home to wherever the location was that they needed to go to, in order to conduct the field work.
Q And how is that limit or radius determined? On what basis is it determined?
A The radius is generally determined on the needs of the agency, and the efficient use of an official government vehicle.
Q So would it vary from area to area?



A It very well likely could, yes.
Q Would you have some examples that you might know of such variations?
A I believe in some offices, the radius is about 50 miles, and in other offices it may be either shorter than that or maybe a little bit longer than that, depending on the circumstances of that particular office.
Q Is that radius determination made in each office?
A It is supposed to be made by the special agent in charge for that division, field division, yes.
Q Is there any approval required for that? Is there any -- is there any special approval at some level within the agency for that determination?
A It depends. There's two different job series that generally deal with official government vehicles. One is the 1811 special agents, and one is the Diversion investigators.



The Diversion investigators would fill out this particular form generally as it relates to field work, and it's on a case-by-case basis. With the special agents, they fill out a quarterly certification, which includes the distance to the residence, as well as an annual certification by the special agent in charge.
Q And is there a fixed maximum agency-wide or government side for the radius, if you know?
A The radius is usually determined by the special agent in charge for the specific division that they are -- of their area of responsibility.
Q But that wasn't -- my apologies. That wasn't the question. The question was nationally, either agency-wide or government-wide, is there a fixed maximum, beyond which no office may go in fixing the radius, if you know?
A I believe there is a policy within



the government, that the radius is 50 miles. Then incrementally, the special agents in charge have the discretion --
Q Let me just -- and pardon me for interrupting. It is what it is, but I was just asking whether you knew, and I'm not certain about the 50 miles either. But whatever it is, it is. I mean it would be a government-wide policy, if there is one.
Now going to the next -- to the line OGV number, can you explain what that's about?
A Each official government vehicle within the Drug Enforcement Administration is assigned a unique number. The first letter or character in that number, in this case it's an S, which stands for sedan.
If it was a T, it would mean that it was a truck, and there's different codes for whatever the particular vehicle is. The next number is the year of the vehicle, and then the number after that is the unique







Neal R. Gross and Co., Inc.
202-234-4433

fd244021-18a8-4a06-a517-4355e3a3cc7e

numbers to that specific vehicle.
In this case, the number ends with the letter D, which implies that it's a diversion vehicle.
Q So there would be a difference between let us say vehicles that 1811s used, and Diversion investigators used?
A The answer to that is yes and no, depending on which -- whether or not the agent is assigned to the Diversion Program, or whether or not the diversion is not assigned to a Diversion Program.
Q So that if a vehicle were assigned to -- so it's not, these vehicles are not unique to one or another program, is what you're saying? I mean does it depend upon a particular assignment whether it gets a D or not?
A Whether or not it gets a D is whether or not the vehicle falls within the Diversion Control Program. The funding for that vehicle within the Diversion Control



Program comes from the diversion fee account, as opposed to appropriated monies on the other side of the house.
So if it is a Diversion vehicle, it will have a D. If a person is assigned to the Diversion Program and assigned an official government vehicle, chances are they will have a vehicle that has a D as a designator.
Q Now looking at the next couple of lines, which say "I certify that this home to work utilization is required for the performance of field work," and that presumably would probably have to be signed by Mr. Plumber. Is that a fair conclusion?
A It would be signed by either the special agent in charge or the special agent in charge's designee. In this particular example of this particular document, you are correct. That would be Mr. Plumber's authorization.
Q And going now below, the next line, can you explain what has happened here,



or what material within these lines, between the double line and the line at the bottom represent?
A This represents the beginning odometer reading of the vehicle when it was taken out of -- from the office, and what the ending odometer reading when it was returned to the office, and what the total miles driven would be, the difference between the two numbers.
Q And for some reason, there is no ending odometer reading on this form.
A On this particular one, that's correct.
Q But then look at the next document, the one that is dated 05-18-2004, and going back to the bottom of the section, where it says "Total Miles Driven, Zero." What does that suggest to you or what does that mean to you?
A It would mean to me that the vehicle was not driven away from the office.



Q So there was a requisition, but for some reason it wasn't used?
A That's the only thing I can conclude from this.
MR. RAYEL: Objection.
MR. BERNSTEIN: That's a possible conclusion?
THE WITNESS: Yes.
BY MR. BERNSTEIN:
Q Now look at the third, June 1, 2004. Doesn't that tell us --
A I'm sorry. I don't have it yet. I don't have that date.
Q June 1st, 2004.
A Okay.
Q Doesn't that tell us that between June 4th of 2004 and June 14 of 2004, Ms. Jordan drove, represented that she drove 372 miles in connection with field work?
A She would have driven from the office and conducted, you know, to home to work, as well as the field work, as well as







Neal R. Gross and Co., Inc.
202-234-4433

fd244021-18a8-4a06-a517-4355e3a3cc7e

returning that vehicle to the office, yes.
Q But why do you say to the office as well as to field work?
A If she would have taken, and I can't conclude from this document the particular steps in which she worked. Generally, it would be they would take the vehicle home in the evening, at the end of their shift, to pursue the field work the following day, and then at some point in time would have returned that vehicle back to the office.
Q When you say "returned the vehicle back to the office," wouldn't the vehicle have gone home with her at the end of the day?
A Not necessarily.
Q But possibly. I mean she wouldn't park it at the office after doing field work and then get her own transportation home, or would she?
A It could be possible that when they went out to do the field work, that the

Page 34

field work did not take the entire day, and at the midpoint or with the conclusion that field work, they still had a certain amount of time left in their work day, where they would have returned that vehicle to the office as opposed to going home.
Q And where would the vehicle be placed when it came back to the office?
A Usually they're stored in either a parking lot or garage or --
Q So there is parking space for these vehicles at facilities?
A Yes.
Q And they might be stored there overnight?
A At the DEA facility, yes.
Q And these vehicles are kept by DEA at say the headquarters of the office when they're not in use?
A That's correct.
Q Now flipping to the next document, if we could go off the record for just a

Page 35

moment or two, so we don't waste a lot of time.
(Off the record.)
MR. BERNSTEIN: We can go back on the record. Mr. Boggs, let me hand you a document that I have asked the court reporter to mark as Plaintiff's Exhibit 6. First, I'll ask you if you have ever seen that document in any form before?
(Whereupon, the document referred to was marked for identification as Plaintiff's Exhibit 6.)
THE WITNESS: No, I have not.
BY MR. BERNSTEIN:
Q Calling your attention to Part 102-5, "Home to Work Transportation," now looking at Section 102-5.10, now you do recognize this, however, let me first ask you, as something out of the Code of Federal Regulations?
A Yes.
Q And what we have here, I think we

Page 36

will all agree, is something from 41 CFR Sec 102-5.10. So looking at 102-5.10, you would agree, would you not, that this part, and I'm just quoting, this part covers the use of government passenger carriers, to transport employees between their homes and places of work, that these regulations do apply to field work by Diversion investigators?
MR. RAYEL: Objection. Calls for a legal conclusion. You can answer.
THE WITNESS: I can't conclude that this particular, this section that you read.
BY MR. BERNSTEIN:
Q Well, it is broad enough to cover it, let's put it that way. Let me just say this is not something that's going to be quite particularly controversial at all.
But going to Section 102-5.20, who is not covered by this part? That says that employees who are on official travel, TDY. Can you explain what this TDY?

Page 37



Neal R. Gross and Co., Inc.
202-234-4433

fd244021-18a8-4a06-a517-4355e3a3cc7e

A TDY is like a temporary duty assignment, generally away from your official duty station for a specified period of time.
Q And are Diversion investigators ever on TDY?
A Yes.
Q But their field work is not part of TDY; is that correct?
A Not necessarily.
Q So it might, on occasion, be part of TDY?
A It could be.
Q Now then looking at (c), "Employees are essential for the safe and efficient performance of intelligence, counterintelligence, protective services or criminal law enforcement duties when designated in writing as such by their agency head."
Now that, wouldn't you agree, really makes reference to 1811s, criminal investigators?



MR. RAYEL: Objection. Calls for a legal conclusion. You can answer.
THE WITNESS: I believe under the portion of the criminal law enforcement duties, that would fall under the 1811 responsibilities.
BY MR. BERNSTEIN:
Q But not Diversion investigators, as far as you know?
A Not Diversion investigators.
Q Now so basically you've not reviewed these regulations prior to this deposition?
A That's correct.
Q You've never seen them before is what you said?
A That's correct.
Q Now looking at 102-5.30, you will see a definition section. Who is the agency head presently of DEA, for the record?
A The acting administrator for the Drug Enforcement Administration at this time



is Michele Leonhart.
Q Continuing in the next column, "Compelling operational," the definition "compelling operational considerations means that those circumstances where home to work transportation is essential to the conduct of official business, or would substantially increase a federal agency's efficiency and economy."
Is that provision applicable, applied by the agency in connection with field work by Diversion investigators?
A I'm not I understand your question.
Q Well, the question is does this describe our -- is the field work performed by Diversion investigators, does that fall within this definition of compelling operational considerations?
A I believe that's a component of the field work considerations.
Q Okay. Then looking at the



definition of employee, further on down that column, "Employee means a federal officer or employee of a federal agency, including an officer or enlisted members of the Armed Forces." Are Diversion investigators employees within the meaning of that provision?
MR. RAYEL: Objection. Calls for a legal conclusion. You can answer.
THE WITNESS: I don't know.
BY MR. BERNSTEIN:
Q You do not know. Are you saying that you don't know whether a Diversion investigator within the understanding of DEA, is a federal officer or employee of a federal agency?
A They are an employee of the federal agency, yes.
Q Thank you, and looking at the definition of federal agency, we'll skip that since there's a reference to statutory provisions. But is the DEA part of an







Neal R. Gross and Co., Inc.
202-234-4433

fd244021-18a8-4a06-a517-4355e3a3cc7e

executive branch of the United States government?

A Yes, it is.

Q And which is that?

A The Department of Justice.

Q Thank you. Now in the regulations, there is a definition at the bottom of that column entitled "Field Work." It says "Federal work means official work requiring the employee's presence at various locations other than his/her regular place of work (multiple stops, itinerant-type travel) within the accepted local commuting area. Limiting use beyond the local commuting area or transportation to remote locations that are only accessible by government-provided transportation are examples of field work." Is that an accurate description of field work within DEA?

A I think it's a cursory overview of the definition of field work, yes.

Q Well, it's what the CFR, at least

Page 42

for the purposes of these regulations, describes field work. Obviously what you're saying is that it's probably broader, if you were to talk about it operationally.

Then looking at passenger carrier, there's no question, is there, that a passenger carrier means a motor vehicle, leased or rented or owned by the United States. Is that a fair statement?

A Yes.

Q And then looking at the definition of work, would you agree that that definition of work describes what Diversion investigators do in their jobs, in the course of engaging in field work?

(Witness reviewing document.)

THE WITNESS: I would agree that that's the statement within the CFR cited.

BY MR. BERNSTEIN:

Q Well, does that describe what Diversion investigators do? That is to say, field work is work within the meaning of that

Page 43

definition. Is that true?

A I do not agree that this definition describes what the Diversion investigators do when performing field work.

Q What you're saying is that DEA does not? We're not asking you for your opinion, but whether DEA, on whose behalf you are speaking in this 30(b)(6) deposition, doesn't believe that this describes what Diversion investigators do?

A That's correct.

Q That DEA does not agree with that?

A I do not agree that that encompasses all of the activities which define field work of a Diversion investigator.

Q But it does define some? You just said that it didn't define all, but it defines some of what they do?

A I believe this definition defines where the location of the work would be taking place.

Q Now looking next at 102-5.35, if

Page 44

you could review that.

(Witness reviewing document.)

BY MR. BERNSTEIN:

Q And just focusing on the second from last sentence. "Those employees engaged in field work, or faced with a clear and present danger, an emergency or a compelling operational consideration, may be authorized home to work transportation as determined by their agency head."

Now -- and then it says "No other employees are authorized home to work transportation." Is that a fair representation of how the circumstances in which home to work transportation is authorized by DEA for field work by Diversion investigators?

A Yes.

Q Now looking at 102-5.45, and it's really in the form of a question. Should determinations be completed before an employee is provided with home to work transportation.

Page 45

The answer is yes, determination should be completed before an employee is provided with home to work transportation, unless it is impracticable to do so. Is that the policy of DEA with respect to authorizing home to work transportation by Diversion investigators?
A Yes.
Q So are there occasions where it is impracticable to provide authorization or make those determinations prior to authorizing home to work transportation?
A In the instance of a Diversion investigator? Well, there might be.
Q Do you know of any? I've asked too many questions, but do you know of any instances where home to work transportation is authorized, even though the determination had not been made because it was impracticable to do so?
A But my question is are you specifically referring to Diversion investigators?



Q Yes.
A I'm not aware of any.
Q So generally, DEA is in a position to determine in advance whether home to work transportation, the driving of OGVs will be conducted? That is to say, as a general proposition, before anyone is authorized -- any Diversion investigator is authorized to take a vehicle out, a determination is made that is within the rules and is appropriate?
A That's correct.
Q And for the purposes of field work?
A That's correct.
Q Now I think you said earlier that it was, in the case of Ms. Jordan, there were some limitation on the amount of time. I'm looking at 102-5.60. There are two options there, are there not?
A Yes.
Q And as to those two options, are both of options utilized by DEA in authorizing



Diversion investigators to drive government vehicles for field work?
A No, they're not.
Q Can you explain why not or what the policy is?
A The Drug Enforcement Administration policy for field work for Diversion investigator is that within a 15 day period of time, there's a certification that's done on the DEA 349-C, does not exceed or would not exceed a 15-day period.
Q How long has that been the policy?
A As long as I can remember.
Q And that goes back several years?
A Yes.
Q At least to say 2005?
A Prior to that even.
Q Next, looking at 102-5.70. Have you finished reading it?
A Yes.
Q Are those the considerations that are utilized by DEA in determining to



authorize home to work transportation for field work by Diversion investigators?
A Yes, it is.
Q And looking at (b) in 102-5.70, it says that "the use of home to work transportation for field work should be authorized only to the extent that such transportation will substantially increase the efficiency and economy of the government." Can you explain how such transportation, as described in 102-5.70, substantially increases the efficiency and economy of the government?
A An example of that might be where it would be more advantageous to the government for the employee to drive from the residence to the location of the field work, than it would be for the employee to drive from their residence to the Drug Enforcement Administration office, check out a pool car or an official government vehicle, and then drive to the location where the field work is.
Q So how, and when you say that's an

example, can you state how that advantages the government?
A It would be an advantage to the government in the fact that the employee would be able to reach their field work location and perform their field work location for a greater period of time, for the normal work hours, than they would be to go to the office to pick up the car.
Q Based upon your experience, can you give us a concrete example, using perhaps time and mileage, where that would happen? I mean concretize, if you would, the example that you gave?
A There may be an instance where a DEA registrant location, which would be say a manufacturer or distributor, where the Diversion investigator would be conducting either an audit or an investigation at that location.
That location is closer to the employee's residence than it is for the

Page 50

employee to go drive from the residence to the DEA office, and then turn around and go from the DEA office out to where that manufacturer's location is.
Q So basically what is -- so the efficiency, what is the efficiency in that connection?
A The efficiency is that they could be on site of the field location for a greater period of time, to conduct whatever business that they need to conduct.
Q And that is because they go directly from their home in the government vehicle, to the site where they do their field work, rather than go to their office, get a car and then go back?
A That is correct.
Q That is why it is substantially -- why the efficiency and economy of the government is substantially increased?
A That is correct.
Q And would you say more work gets

Page 51

done by the Diversion investigator under those circumstances?
A Once they're at the field suite location, that would be correct, yes.
Q So they would go to their home to the field location, begin working at that point, rather than having to spend a great deal of time getting there, by getting their car at the office?
A That's correct.
Q And how about at the other end of the day. Suppose they complete their work at that location that you were describing. Would there be any efficiency related to -- would there be any efficiency related to their driving from that location directly home?
A I think the example that I described still would apply, that they would be able to work for a longer period of time at the field site location.
Q Because they would have to drive their car -- isn't it because they'd have to

Page 52

drive their car back to their office, and the time that they spend driving their car back to their office, they would now spending -- they could spend at the location doing their work?
A That's correct.
Q That is the substantial increase in the efficiency and economy to the government?
A That's correct.
Q Looking at 102-5.75, looking at the note to 102-5.75, and my apologies for the smaller print, can you explain what's going on in that paragraph?
MR. RAYEL: Objection. Calls for a legal conclusion.
MR. BERNSTEIN: My apologies for interrupting you, because I know you weren't finished. But are you ready? Can I ask a more focused question? Let me change the question slightly to say does this paragraph describe situations that present themselves to DEA in connection with Diversion

Page 53

investigators?
THE WITNESS: I think it could, yes.
BY MR. BERNSTEIN:
Q But does it? Are you familiar with any?
A I think I could understand certain scenarios that it would apply, yes.
Q Well, if you could just provide us one as an example.
A That the employee would be going to the field site location, but not necessarily on a day-by-day basis. It may be intermittent due to other work duties.
Q So what would happen then?
A It depends on the circumstance.
Q But take one illustration of the circumstance. Give us one illustration of what it might look like?
A If during the 15 day period of time that they were authorized to do field work, the first two days they went to the



field site location to do that, but on the third day they needed to be in court, or they needed to be at the duty, the DEA duty office location, they would be required to be not at the field site location. They would be required to be at the location where the DEA office is or the courthouse or whatever. They may not be performing field work.
Q Are you saying that when you have to go to court, that you are not engaged in field work, that you would not drive to the courthouse?
A In the instance of Detroit, the courthouse was a block away from the office. I would not be driving there.
Q So really, whether it was field work would depend on where the courthouse might be? I mean you might have to go to, in the case of Ms. Jordan, you might have to go to the courthouse in Westchester County, wherever that is, and her office is in Manhattan. So that might be field work under



those circumstances, would you not say?
A You would still have to -- in order for justification in the home to work in that particular instance, again you would have to go back to whether or not there was a benefit to the government, and whether or not the location of where that field work was, was substantially different from the investigator's home, as opposed to where the office is.
It still may be convenient for, in the advantage of the government, for that person to drive their own car to work, and then take a government car from work to the courthouse in this particular example.
Q But in the example, there might be a trial in connection with one of the cases that the car was authorized to be taken out for? I mean there might be circumstances where the Diversion investigator would go to the courthouse every day for a two week trial, and the courthouse was in Yonkers or



something?
A But that would not necessarily be a home to work utilization of the vehicle. It would be a justification for utilization of the OGV or the official Government vehicle, but not necessarily fall under the field work exemption of home to work.
Q You say not necessarily, but it might? And I don't think I'm trying to quibble with you, but it might fall within field work to go to the trial?
A It could.
Q To meet with the prosecutor or explain things to the prosecutor or what have you. But it's possible?
A It is possible.
Q Looking at 102-5.95, if you could review that please.
(Witness reviewing document.)
BY MR. BERNSTEIN:
Q Can you explain what is meant there?







Neal R. Gross and Co., Inc.
202-234-4433

fd244021-18a8-4a06-a517-4355e3a3cc7e

A I would understand that to mean that just because it may be convenient for the employee to utilize a government vehicle, that that in and of itself is not justification for the certification under field work requirement, in this particular case with the Diversion investigator.

Q And looking then at 102-5.100 on the next page, is it a fair statement that DEA's authorization of OGVs for Diversion investigators is intended always to be for official purposes?

A That is not a true statement.

Q Can you tell us what a true statement would be?

A I believe in July of 2006, the Deputy Administrator, Michele Leonhart, published a memorandum that goes to the second part of this particular section, 102-5.100, in that she authorized the use of an OGV for incidental purposes, for the employee that was driving and certified to have that vehicle for

Page 58

personal use.

Q And what does that personal use consist of?

A For incidental things such as picking up dry cleaning, picking up a loaf of bread, going in certain circumstances going to a workout facility or fitness facility.

Q Does it include driving any family member in the vehicle?

A A family member is excluded from that.

Q Or friend? Friend or family member.

A It's exclusive to government employees and contractors.

Q When you say contractors, you mean contractors for DEA?

A Yes.

Q Now looking at 102-5.110, does DEA submit its determinations to the Congressional committees indicated, as provided under 102-5.110?

Page 59

A I believe that we would report any of those -- any such reporting would go through the Department of Justice.

Q Well, do you know whether the Department of Justice reports to those Congressional committees on Diversion investigator driving to those committees?

A I really do not know.

Q Now looking at 102-5.120, does DEA comply with all of the requirements of 102-5.120?

A Yes, it does.

Q And where are those logs or other records maintained?

A They're maintained in the individual car files for the particular vehicle, and there's also the certifications with respect to the special agents and the annual certification done by the special agent in charge, that are maintained in the specific field divisions.

Q And would you agree that the

Page 60

information requested in 102-5.120 is what is contained in what we have marked as Plaintiff's Exhibit 5, namely the stack of 349-Cs of Denise Jordan?

A Those are examples, yes.

Q All of the information that's sought in that regulatory provision is contained in this form, I mean just looking, putting them side by side. So this is what is required to be kept?

A That's correct.

Q And how long are these records kept?

A They're generally kept for usually either a two year period of time or a three year period of time?

Q So that at present, these were provided, Plaintiff's Exhibit 5, goes back from June 1st of 2004 through at least May of 2008. That is not -- that is what's in the file today, which is what was provided to us. Would you -- I don't think you necessarily

Page 61

know, but that's a pretty reasonable conclusion, would you not say?

A Conclusion to what?

Q Well, the conclusion -- my apologies for the question, that what was provided to us, the 349-Cs for June 1, 2004, all the way through May of 2008, were in that file that you just described, for the cars?

A I believe that's a fair statement, yes.

Q I mean there might be more, but least these are part of, all or part of what was there?

A It would be all of this particular form. Usually in the car files there's other forms that are in that file. But in terms of a 349-C, yes.

MR. BERNSTEIN: Anybody okay for a short break?

MR. RAYEL: Sure.

MR. BERNSTEIN: Thanks.

(Whereupon, a short recess was

Page 62

taken.)

MR. BERNSTEIN: On the record.

BY MR. BERNSTEIN:

Q Mr. Boggs, let me give you a copy of what I'm going to ask the court report to mark as Plaintiff's Exhibit 7.

(Whereupon, the document referred to was marked as Plaintiff's Deposition Exhibit No. 7 for identification.)

BY MR. BERNSTEIN:

Q And if you could review that document, I think it would help to speed matters up.

A (Examining document.)

Q As to Plaintiff's Exhibit 7, have you reviewed the document, Mr. Boggs?

A Yes, I have.

Q And can you characterize what this document is?

A It's a copy of what would be considered by the agency as a divisional

Page 63

order, and in this particular instance, it's a divisional order for the New York Field Division that's dated May 6th, 2004, that describes the home-to-work use of an official government vehicle, or an OGV.

Q In your own words, can you characterize what the document seeks to achieve?

MR. RAYEL: Objection. Vague.

You can answer.

THE WITNESS: The document sets for the policy under certain circumstances or under certain terms for home-to-work usage of an OGV within the New York Field Divisional Office. It sets forth the radius for which is a maximum radius for the OGV to be taken from the Field Divisional Office to home and return. It describes the reporting requirements and in some instances the chain of command for those reports or certifications for the use of the home-to-work forms that would be filed out by the DEA employees.

Page 64

Q And those forms are referenced on page 2, are they not, as Form 349(b) or 349(c), as appropriate?

And what does the "appropriate" stand for or what does it signify in connection with those two forms?

A The 349(b) is a form that would be completed by a DEA Special Agent or a DEA task force officer who was assigned a DEA official government vehicle. That particular form is filled out on a quarterly basis, or unless there is some specific change in the individual's residence or other necessary criteria for the form that needed to be updated in case it was changed to a different car or different -- if it was reassigned to a different individual, that form would have to be updated.

A D-349(c) is the home-to-work field work form that the diversion investigators would fill out on a case-by-case basis.

Page 65

Q And so this is an official document of the New York Field Division, is it not?
A I can't say whether or not it has been superseded by another document.
Q But let me just say that --
A But it's a representation of a document that --
Q It was provided to us in discovery by the government. So I think it's fair to assume that is the current document, and Anthony P. Placido, is he still, if you know, the Special Agent in Charge?
A I know that he is not the Special Agent in Charge. He is no longer there.
Q Now, looking at the provision that says, "The policy of the New York Field Division for qualification for home-to-work OGV usage authorization shall be that the one-way distance for an employee from their residence to 99 Tenth Avenue shall not exceed 75 miles."



And how does that work, if you will?
A The Special Agent in Charge of the particular division sets through a divisional order for that particular division what the rate is, and in this case it has been set by Mr. Placido at 75 miles one way from the actual New York Field Division Office.
Q So that if an employee lived within 60 miles of that office, it would be appropriate under this order for that -- in the appropriate circumstances of requirement for field work or whatever would be the case for criminal investigators, 1811s, to authorize an OGV?
A Under the particular criteria, if it's either a diversion investigator on a case-by-case basis, yes, or if it's in a case of a Special Agent or task force officer that filled out a 349(b), they would have to live within that 75 mile radius.
Q And the reference in the third



paragraph to 41 CFR 101-6-402 is what we looked at as Plaintiff's Exhibit 6.
A I do not believe it -- I do not believe it goes to -6.
Q Oh, I see. What you're saying is that this is 101? One, oh, one, dash, three is what we have here, but not six. Is that --
MR. RAYEL: We have 102, don't we?
THE WITNESS: One, oh, two?
MR. BERNSTEIN: One, oh, two? They've changed some of these numbers, but in any event, I'll have to check that myself. In any event, you're quite correct that this is not 101-6.
Now, I'm going to ask the reporter to mark as Plaintiff's Exhibit 8.
(Whereupon, the document referred to was marked as Plaintiff's Deposition Exhibit No. 8 for identification.)
MR. BERNSTEIN: And let you just on kind of a cursory basis just take a look at



this.
BY MR. BERNSTEIN:
Q And can you identify this document?
A This document is a subset of Section 6124 of the DEA Agent's Manual. It begins on page 9 and goes to page 30 of a 34-page section.
Q For the record, let me state that this document was provided to Plaintiffs by the government in response to a discovery request.
And looking first at the bottom of the page BA, page 00001, which is page 9 of 34 here, the Paragraph 6124.21, if you could review that please.
A (Examining document.)
Q Looking at the sentence that says, "Such assignments will be in the interest of DEA and are not an employee prerogative," that's the third line. Can you what that is intended to mean within the operation of DEA?





Neal R. Gross and Co., Inc.
202-234-4433

fd244021-18a8-4a06-a517-4355e3a3cc7e

A Within the means of DEA what that particularly is alluding to is that the agency and the supervisors within the specific area where the vehicle is assigned will specifically assign the specific car to a specific individual as opposed to the individual deciding which vehicle they would prefer over another vehicle.

The determination of what vehicle gets assigned is a managerial decision as opposed to the employee decision.

Q Looking at Paragraph B on the next page, the last sentence, and I'll read it aloud, "Agents, diversion investigators and other DEA employees who use vehicles for official use will be held strictly responsible for the operation, maintenance and intermittent storage of the vehicles as outlined in this section."

Now, what does maintenance of these vehicles mean or what is involved in the maintenance of the vehicles by diversion

Page 70

investigators?

A The maintenance of the particular vehicles, there's certain criteria or certain policies within the agency as to what maintenance will be performed and when it will be performed on the government vehicle, and in this particular instance of this section, it's the responsibility of the employee that is assigned to that vehicle to insure that maintenance is conducted within the appropriate year time frame or maintenance criteria is set forth by the manufacturer of the automobile.

Q So that DEA diversion investigators are required to see to it that the appropriate maintenance is achieved on their vehicle to which they are assigned?

A They're required to insure that it's done, that it gets accomplished. As an example, if the oil change should be every 3,000 miles, that when that 3,000 period, time comes around, the employee is responsible to

Page 71

-- that gets assigned to that vehicle to insure that the oil is changed.

Q Kind of a housekeeping question. If in week one and two you're assigned X vehicle and in week three and four you're assigned Y vehicle, is it that the person has the same vehicle and knows when the 3,000 mile check is required or that's just handled practically?

A In the case of diversion investigators, it would be a managerial -- the oversight of the manager, the first line supervisor to insure that the vehicle maintenance a certain maintenance and whoever had that vehicle at the time or whatever manager decided who needed to get it done. It's a little bit more convoluted with a diversion investigator than it is with an agent because the agent is assigned a specific car continually.

Q That really was the point of my question. Now, in that connection, when is

Page 72

this maintenance performed?

A It would depend on what maintenance it is.

Q Well, let's take the maintenance -- suppose there were a fender bender on a car and it had to go to the shop to be fixed. Would the diversion investigator be required to get it to the shop?

A I guess that depends on the significance of the fender bender. If the car was drivable, it would be the responsibility of the employee.

Q And when would the employee do that?

A Generally it would be done within a relatively short period of time of the incident that caused --

Q But during working hours?

A Absolutely.

Q And now looking at the bottom of page 12, now, you testified earlier that there was some loosening of the rules with regard to

Page 73

official purposes. Looking at 6124.3, it declares that official government vehicles will be used only for official purposes. "The term 'official purposes' will be interpreted strictly and will not be construed to encompass the mingling of official business with personal business. Use of an OGV for transportation of employees between their domicile and place of employment can only be justified when affirmatively authorized by statute in Title 31, Section 1344," to which you made reference earlier; is that correct, that statutory provision?

A That's correct.

Q But here when the car is being driven for field work, under this provision isn't driving the car for such field work an official purpose?

A When it's being driven to the location of the field work, that would be for official purposes, yes.

Q And then looking at page 13, in

Page 74

the middle of the page, Paragraph 2, if you could read that, please.

A (Examining document.)

Q Are the requirements and policies set forth in Paragraph 2, are they adhered to by DEA?

A Yes, they are.

Q And looking at Paragraph (b), second line from the bottom, if you could read that, please, to yourself.

A (Examining document.)

Q Does that accurately reflect the policy and practice of DEA?

A Yes, it does.

Q Calling your attention to page 15, and then continuing on to A, 6124.33 at the bottom, are those provisions consistent with the policies and practices of DEA?

A Yes, they are.

Q Now, looking at 6124.34 on page 16, have you reviewed that?

A Yes, I have.

Page 75

Q Now, this provision of the manual refers to TDY. Can you explain the impact, if you will, of these provisions in connection with TDY?

A What this section provides for is that if an employee is in a temporary duty status and they are using an official government vehicle, that they are also able to use the government vehicle in order to go to a restaurant or, in this case, specifically specifies place of worship or a cleaning establishment for their clothes, anything that would be involved with having to do with those types of examples.

Q But to do so, looking at the last sentence, is declared for the purpose of fostering continued efficient performance of government business so that they are -- so making those stops, if you will, fosters the continued efficient performance of government business, according to this provision.

A Well, it's not that they

Page 76

necessarily make stops. In this particular instance when an employee is in a TDY status, they are essentially living away from their residence for a specified period of time in a hotel or in a long-term residential place, and in that capacity, they're authorized under this section to go to restaurants or pick up their dry cleaning or things like that.

Q Now, looking at page 19, at the bottom, 6124.39.

A (Examining document.)

Q Does that revision reflect the policy and practice of DEA?

A Yes, it does.

Q Now, what would qualify, and if you could give us a couple of examples, of an alcohol related incident while operating an OGV?

A If someone was driving an OGV under the influence of alcohol would be an example.

Q Well, when you say "under the

Page 77

influence," is drinking prior to driving, immediately prior to driving, prohibited by DEA for diversion investigators?
A Yes, it is.
Q So if one were to have a drink or a beer before driving the vehicle, would they be subject to the loss of their privilege of home-to-work utilization of an '08 OGV or would that not be an alcohol related incident?
A If it was an instance where they were either arrested or charged with a safety offense or whatever, that matter would be referred to our Office of Professional Responsibility, but this particular portion of the manual would kick in and the supervisor or the Special Agent in charge would suspend the employee's utilization of an OGV for a period of time.
Q But the employee might otherwise be suspended from his position or her position as a result of this same incident.
A That's correct.

Page 78

Q So this would be a lesser, if you will, a lesser penalty, since if you were suspended for three months, what difference does it make if your privilege of home-to-work utilization is withdrawn?
A This would go into effect immediately, whereas the determination or outcome of the incident that was referred to OPR may come at a much later time.
Q I see. Oh, that explains it quite well.
Now, looking at the next page, page 20, 6124.5, and the first sentence, "use of personal owned vehicles, POVs, in any aspect of an enforcement operation is prohibited."
Is that the policy and practice of DEA?
A Yes, it is.
Q And so if you are a diversion investigator, you are prohibited from using your official vehicle for official business

Page 79

or, put differently, and you can answer both, or to perform your job.
A That's correct, other than the fact that this particular section is referring to an enforcement operation. It's not referring to the --
Q So the diversion investigators are never involved in enforcement operations is what you're saying?
A Never involved in any enforcement operations while they are in -- commenced -- they may be involved in setting it up. They may be involved in after it is concluded, and in this particular instance I'm thinking of an example of, say, the execution of a search warrant or the conducting of a surveillance. The diversion investigator may be involved in setting up those types of activities, but not actually engaged in the execution of it.
Q And now looking on page 23, 6124.61, looking at the second sentence, focusing on the second sentence.

Page 80

Failure to perform at appropriate intervals all required maintenance could result in disciplinary action or personal liability for damages as attributable to neglect.
Is that consistent with the policy and practice of DEA?
A First of all, you did not read that verbatim.
Q That's correct.
A And I will --
Q I wasn't read it, but go ahead. You can answer.
A It is the responsibility of the employee to make sure that the maintenance is performed in an appropriate -- at appropriate times, and if they do not do that, they are subject to disciplinary action.
Q And how about the one about personal liability for damages? Are you aware of any case in which that has been the result?
A I believe that there may have been

Page 81

instances where if the person was using the OGV, say, as an example of maybe an alcohol related offense, that they may be subject to the damages of that particular vehicle since they were operating it in a manner inconsistent with the policies of the agency.
Q And that would be true of, for example, when they were driving the vehicle for the purposes of field work?
A I'm not sure I understand your question.
Q Well, can you repeat your answer? You said the person might be held liable if they had had an accident where they were at fault perhaps because they had been drinking, and suppose -- let's posit the case where a person is driving home from field work and has been drinking and has an accident.
Wouldn't it be the case based upon what you just said that the employee might be held liable for the accident?
A They may be held liable for the



accident because they were drinking, not because they were returning from field work.
Q But it might happen when they were returning from field work.
A That's possible, yes.
Q Now, let's stick with that for a moment. Suppose a diversion investigator were returning home in a government vehicle from field work and had an accident and was hurt. What would the situation be insofar as worker's compensation is concerned?
A I'm not an expert on worker's compensation.
Q Well, you are DEA and you do know what happens, and DEA does know what happens when one of its employees is injured while driving an OGV returning home from field work. Is that employee entitled to worker's comp., federal worker's compensation?
A I'm not --
Q If that person is employed by DEA.
A I'm not an authority on worker's



compensation.
Q Well, you are DEA, and this is something that DEA ought to know. I am sympathetic to the fact that you are a 30(b)(6) witness and are supposed to know everything that DEA knows. I know that's not -- perhaps in some respects not realistic, and I think we can determine otherwise, but I would have to say this is something that DEA does know, and we would like to ask that the government provide us with the answer to that question since the witness himself does not know.
MR. SEIDEL: It is something that maybe we --
MR. BERNSTEIN: Pardon?
MR. SEIDEL: It is something that maybe we can clarify with you when we have a break.
MR. BERNSTEIN: Surely.
MR. SEIDEL: When you finish.
MR. BERNSTEIN: I mean, obviously,



we are sympathetic to this situation of requesting that the witness is not familiar with.
BY MR. BERNSTEIN:
Q Now, looking at page 26, 6124.67.
A (Examining document.)
Q This is an elaboration, is it not, of what you testified to earlier about the responsibilities of an OGV operator to conduct routine maintenance and required repairs, is it not?
A Yes, it is.
Q And this represents the both policy and practice of DEA in these matters?
A Yes, it does.
Q And now looking at 6124.8 on page 27, now this -- have you completed looking at it?
A Yes.
Q These provisions having to do in 6124.8 of the manual dealing with accidents, these represent the policies and practices of

DEA with regard to accidents that occur while its employees are driving OGVs; is that correct?
A Yes, it is.
Q And these policies and practices apply, do they not, when diversion investigators are driving from their home to their field work assignments and returning from field work assignments to their home; is that correct?
A That would apply to a diversion investigator when they're driving an OGV, period.
Q Period, but also -- but also not excluding time when they are driving from home to a field work assignment and from a field work assignment to home?
MR. RAYEL: Objection. Asked and answered.
You can answer.
THE WITNESS: It applies whenever they're driving an OGV.

Page 86

MR. BERNSTEIN: Let me show you what I'm going to ask the court reporter to mark as Plaintiff's Exhibit 9; is that correct?
(Whereupon, the document referred to was marked as Plaintiff's Deposition Exhibit No. 9 for identification.)
MR. BERNSTEIN: Now, this document was provided to us by the government in connection with its response to discovery.
BY MR. BERNSTEIN:
Q And the question is do you recognize or can you identify what this document is?
A It's Appendix A that outlines specific information regarding the use of an OGV and some of the prohibitions of using an OGV and some of the responsibilities of the person that's assigned an OGV within the Drug Enforcement Administration.
Q Is it Appendix A to the manual or

Page 87

do you know what it's the Appendix A to?
A I believe it's Appendix A to the manual, yes.
Q And so this is currently in effect insofar as you are aware?
A Yes, it is.
Q Can you review it and state whether the policies and practices set forth in this Appendix A, pages 9 through 11, are followed by DEA insofar as they apply to diversion investigators?
A (Examining document.)
Q Okay. Shall I repeat the question?
A Yes.
Q Do these provisions of Appendix A represent the current policies and practices of DEA insofar as the employment and work of diversion investigators are concerned?
A It does with the exception of any superseding policy or in the case of a divisional order that supersedes anything

Page 88

that's set forth in this appendix.
Q And what are those superseding orders?
A One of the examples is the 2006 memorandum by the Deputy Administrator, Michele Leonhart, that basically allowed incidental stops, personal related stops along the way.
Q Are there any --
A That supersedes this particular document.
Q Are there any other succeeding documents of which you are aware?
A Not that I'm aware of, no.
Q Let me show you what I will ask the court reporter to mark as Plaintiff's Exhibit 10.
(Whereupon, the document referred to was marked as Plaintiff's Deposition Exhibit No. 10 for identification.)
BY MR. BERNSTEIN:

Page 89

Q And ask you whether that is the document to which you just made reference, i.e., the order from Deputy Administrator Michele M. Leonhart.
A It is that. It is a representation of the document, yes.
Q But it is the document.
A Yeah, it's a copy of it, yes.
Q Yes. Next let me ask you to look at, review what I will ask the court reporter to mark as Plaintiff's Exhibit 11.
(Whereupon, the document referred to was marked as Plaintiff's Deposition Exhibit No. 11 for identification.)
BY MR. BERNSTEIN:
Q And ask whether you can identify the document.
A (Examining document.)
Q Can you identify the document?
A Yes, I can.
Q Would you do so, please?



A It's a section, Section 2735, of the DEA Personnel Manual.
Q And is this the current -- is this the currently applicable DEA standards of conduct?
A It is. There's been some modifications and certain minor corrections that have been made into this or that apply, but essentially it's the same document unless it's superseded by either an additional memorandum from the Administrator or from a divisional order.
Q Now, calling your attention to Section 2735.15, regrettably I don't believe we have page numbers here, but I'm looking at a page that has on it "use of government property," and that's about, oh, eight pages, nine pages in.
MR. SEIDEL: Is there a paragraph number, Jules?
MR. BERNSTEIN: Yeah, it's G, use of government property.



BY MR. BERNSTEIN:
Q And looking at that and then looking at G, I, which is on the next page, official government vehicles, can you state whether those provisions represent the policies and practices of DEA at this time insofar as its diversion investigator employees are concerned?
MR. RAYEL: You're asking about both G and I?
MR. BERNSTEIN: Let's start with G.
THE WITNESS: All right. G is current reflection of policy at the Drug Enforcement Administration.
BY MR. BERNSTEIN:
Q And the same question with regard to I.
A With the exception of the superseding memorandum that was done on July 2006 by the Deputy Administrator Michele Leonhart, that does allow for limited personal



business, this does reflect current policy.
(Pause in proceedings.)
BY MR. BERNSTEIN:
Q Now, calling your attention to P, which is a few pages back, looking at P-2, and I'll read it into the record, "DEA personnel will not consume or be under the influence of intoxicants during their official duty hours.
Now, the question is may DEA diversion investigators consume or be under the influence of intoxicants while driving between their home and the situs of their field work.
A Can they be?
Q Well, they physically can be, but consistent with this provision, may they be?
A No.
Q Are they permitted to be? Are they permitted to consume or be under the influence of intoxicants while they are driving their government vehicles between their home and an assigned situs of field







Neal R. Gross and Co., Inc.
202-234-4433

fd244021-18a8-4a06-a517-4355e3a3cc7e

work?
MR. RAYEL: Objection. Compound.
THE WITNESS: No. They are not allowed to consume alcohol.
BY MR. BERNSTEIN:
Q While they're driving their --
A While they're operating --
Q While they're driving their OGVs.
And that would be true for -- that would be the same answer for three, which says, "DEA personnel will not consume or be under the influence of intoxicants while operating an official government vehicle"; is that correct, that they may not consume or be under the influence while operating an official government vehicle?
A That's correct.
Q And looking at five, does that state the reason why or a reason why they are prohibited from consuming or being under the influence of intoxicants?
And when we say "intoxicants,"



that includes earlier -- that includes alcoholic beverages. Is that true?
A Yes.
Q So a reason why they may not consume or be under the influence of intoxicants is, according to DEA, intoxicants deprive individuals of the normal clearness of intellect and personal control, which a person would otherwise possess, and that as such the use of such substances while on duty is inherently inconsistent with the mission of this agency, namely DEA. Is that -- is that an accurate statement of the view of DEA?
A Yes, it is.
Q The next one I'll show you what I'm going to ask the court reporter to mark as Plaintiff's Exhibit 12.
(Whereupon, the document referred to was marked as Plaintiff's Deposition Exhibit No. 12 for identification.)
BY MR. BERNSTEIN:



Q If you could review -- are you familiar with the document?
A It's actually three documents.
Q Oh, and are they -- actually they were provided to us by the government as if they were one document, and of course you are correct that there are three separate documents here, and I just got the impression from the way they were provided that they were one document, but let's talk about the first one, the one that consists of four pages.
Can you identify that document?
A This is a memorandum that was authored by Joseph Keefe, who was the Chief of Operations at the time, and the memo was authored in August of 2001, and it describes the diversion control program, the role of the diversion investigators within that program and what types of activities they either can perform or cannot perform.
It also delineates what Special Agents who are assigned to diversion groups



would be doing and under what particular circumstances the chain of command structure within the diversion control program in the use of official government vehicles within the program.
Q And generally, although this document is dated August 3rd, 2001, is this document or the contents of this document still in effect and represents the views, policies and practices of DEA with regard to the diversion control program?
A One portion of this particular memorandum was superseded, which is the second document which you handed me in the memorandum by at that time the Chief of Operations, Mike Ferguson, and this particular memorandum was dated in September of 2004, which superseded a portion of the 2001 Joe Keefe memorandum.
Q But subject to that change, is the August 3, 2001 Joe Keefe memorandum, as you describe it, still in effect?
A Yes, it is.







Neal R. Gross and Co., Inc.
202-234-4433

fd244021-18a8-4a06-a517-4355e3a3cc7e

Q And so insofar as the description of the diversion investigator's position on page 1 and thereafter up onto page 2 and beyond perhaps, those do describe what the job of diversion investigator is. Is that a fair statement?
A It's a summary of it, yes.
Q Now, looking at the last page, can you identify that document?
A The last page is a DEA Form 349(c), which is a certification for home to use of an official government vehicle under the field work exemption.
Q And so that is what all DEA diversion investigators must presently fill out and submit when they seek to requisition OGVs for the purpose of field work?
A Yes.
Q Let me give you what I will ask the court reporter to identify as Plaintiff's Exhibit 13.
(Whereupon, the document referred to was marked as Plaintiff's Deposition Exhibit No. 13 for identification.)
BY MR. BERNSTEIN:
Q I ask you to review the document.
A (Examining document.)
Q Have you seen this document before?
A Yes, I have.
Q When was the last time you saw it?
A Yesterday.
Q And so did you review it yesterday?
A Yes, I did.
Q And does it accurately reflect the present policies and practices of DEA with regard to motor vehicles property?
A It does unless there are certain sections within the manual site here that were superseded by divisional order.
Q But for most purposes, would you agree that for most purposes this represents

Page 98

the part of the administrative manual that is operational that is in effect today?
A Yes, I would.
Q And there may be exceptions.
A Yes.
Q Now, when was the last time you personally utilized an OGV for DEA?
A I'm sure within the last 12 months, but I don't remember the specific date.
Q And how about in the year 2007? Did you utilize an OGV?
A I believe I probably did, yes.
Q And how about 2006?
A Yes.
Q And 2005?
A I believe so, yes.
Q And in what capacity did you do so?
A I would have checked out a pool vehicle form headquarters in order to either drive myself or a supervisor to a particular location.
Q But, of course, you did so in your capacity as an 1811, criminal investigator; is that correct?
A I did so in the capacity of the performance of the duties and mission of the agency.
Q But not as a diversion investigator.
A Well, not a diversion investigator.
Q Right. That was all I was really alluding to, but the question really is this. And I know that criminal investigators, 1811s, do not pay any tax on the value of the use of the vehicle that the government or DEA does not issue tax reports for criminal investigators in connection with the use of their cars for home-to-work driving. That is an established fact.
But do diversion investigators receive anything from DEA indicating that they

Page 99

Page 100

Page 101

may owe a tax on the value of the vehicle to them?
A No, they do not.
Q And do you know why not? I mean DEA should know why not, but I'm asking you the question.
A The vehicle is being used for official government purposes and is not a personal benefit to the employee that would be subject under the terms of the IRS code.
Q Okay. Now, let me show you what I'm going to ask the court reporter to mark as Plaintiff's Exhibit 14.
(Whereupon, the document referred to was marked as Plaintiff's Deposition Exhibit No. 14 for identification.)
BY MR. BERNSTEIN:
Q Can you identify this document?
A No, I cannot.
Q Are you familiar with the policies of DEA with regard to the payment of

Page 102

compensation in connection with disability or death of its employees?
A No, I cannot.
Q DEA doesn't know what happens if one of its employees is disabled while in its employ?
MR. RAYEL: Well, that's kind of broad. He's not DEA in its entirety. He's DEA for purposes here.
MR. BERNSTEIN: Well, let's look at it.
MR. RAYEL: You just asked generally about the practices of DEA in general.
MR. BERNSTEIN: Yes.
BY MR. BERNSTEIN:
Q The customs, practices, policies, instructions, guidelines, rules, laws, and regulations in effect and as applied at and by DEA relating to the driving of government vehicles between home and work by occupational Code 1801, diversion investigators employed by

Page 103

DEA, commencing 2003 to date.
Now, of course, the question is if a diversion investigator is driving home in a government vehicle and is an accident from field work to home and is disabled in an accident, is that employee entitled to disability compensation under federal law?
A I cannot answer that question. I do not know.
Q Well, it's under -- it's forgivable, but I mean, it is a fairly simple question.
And what about insurance for employees who might be killed in the course of employment or other benefits for widows or widowers in connection with someone who might be killed while driving a GOV, a diversion investigator while driving a GOV between a field work assignment and home?
MR. RAYEL: Objection. Vague.
You can answer.
THE WITNESS: There's a multitude

Page 104

of financial offsets that are available to survivors of family members that are injured in the line of duty.
BY MR. BERNSTEIN:
Q So that when the diversion investigator is driving from an assignment field work to home in a GOV is that employee engaged in the line of duty? In the line of duty.
MR. RAYEL: Objection. Legal conclusion.
You can answer.
MR. BERNSTEIN: Pardon?
THE WITNESS: I can't answer the question. I don't know.
MR. SEIDEL: If this relates back to the same issue and you wanted to answer it, then I think we certainly owe you an answer. So I mean if you're just hammering away at the same thing I don't know if you're going to get anywhere with --
MR. BERNSTEIN: Okay.

Page 105

MR. SEIDEL: We can get you an answer. I think you're entitled to an answer.

MR. BERNSTEIN: Well, okay, and that's fine. I said it before. I appreciate the fact that you don't know everything there is to know that DEA knows, although the rules, the court's rules say you are supposed to, but --

MR. SEIDEL: Well, I'll just leave it. You know, your request is very vague. It implies driving.

BY MR. BERNSTEIN:

Q Let's put it this way. What happens so that we can understand what we are looking for here; what happens when a diversion investigator is without fault injured and disabled driving from home or driving from a field assignment in a GOV to home? What benefits is that employee entitled to under federal law, or killed for that matter in the course of such driving in an accident?

Page 106

A I mean, there's an answer, you know.

MR. SEIDEL: That's a fair question, you know.

THE WITNESS: Okay.

MR. SEIDEL: We can discern.

BY MR. BERNSTEIN:

Q Now, earlier you mentioned 31 USC 1344, and let me ask the court reporter to mark it was Plaintiff's Exhibit 15.

(Whereupon, the document referred to was marked as Plaintiff's Deposition Exhibit No. 15 for identification.)

BY MR. BERNSTEIN:

Q And ask you to look at that if you would please.

A (Examining document.)

Q And I'm calling your attention to 2(a). Is this 1344 the same 1344 that you mentioned earlier as the source of the basis upon which diversion investigators are

Page 107

provided with OGVs?

A Yes it is.

Q And I think we're coming to the end here.

Let me show you what I'm going to ask the court reporter to mark as Plaintiff's Exhibit 15.

PARTICIPANT: Sixteen.

MR. BERNSTEIN: Sixteen.

(Whereupon, the document referred to was marked as Plaintiff's Deposition Exhibit No. 16 for identification.)

BY MR. BERNSTEIN:

Q And ask whether you have ever -- whether you are familiar with this statutory provision, 31 USC Section 1349.

I'm really focusing on Subsection B.

A I'm familiar with policies of our agency that encompasses the spirit of this section, yes.

Page 108

Q And in fact, isn't it a fact that this section is implemented by DEA insofar as the wilful misuse of a GOV?

A Yes.

MR. BERNSTEIN: No further questions.

MR. RAYEL: Okay. Can we go off the record?

MR. BERNSTEIN: Sure.

(Whereupon, the foregoing matter went off the record at 12:46 p.m. and went back on the record at 1:03 p.m.)

MR. BERNSTEIN: Back on the record.

The court reporter told me that when I put in the notice of depositions, she didn't get on the record the identification as Plaintiff's Exhibit, respectively, 1, 2, 3 and 4. So I'm asking her now to make those notices of deposition Plaintiff's Exhibits 1, 2, 3 and 4, if you have no objection. Do you

Page 109

have something?
MR. RAYEL: Just a couple of quick things.

CROSS EXAMINATION

BY MR. RAYEL:

Q Going back to Exhibit 5, my exhibit, there's a beginning odometer reading and ending odometer reading. What do those signify exactly?
A The beginning odometer reading is what currently on the car when it's being checked out for the particular use, and the ending odometer reading would be the ending mileage once it's returned to the DEA office, and then the total miles drive is the difference between those two numbers for all of the driving conducted while the vehicle was away from the office.
Q Okay, and in terms of the justification for home-to-work driving, is field work the only justification for home-to-work driving for diversion investigators?



A Yes, it is.
Q So it's never based on emergencies?
A No.
Q Or clear and present danger?
A That's correct.
Q Or compelling operational considerations?
A That's correct.
MR. RAYEL: Okay. That's it.
MR. BERNSTEIN: I have nothing further except we will get to you and you have the right to read your deposition, of course.
MR. RAYEL: Yeah, we would like to read and sign, correct.
MR. BERNSTEIN: And we will get back. Shall we get it to -- Will, is that the best way to proceed?
MR. RAYEL: That's fine.
MR. BERNSTEIN: Give it to you tomorrow or perhaps the latest would be Monday. This has to do with the schedules



that we have worked out with Shellim (phonetic) for filing and the courts for filing various motions and the like. So that's why we're kind of getting this expedited.
MR. RAYEL: Okay.
MR. BERNSTEIN: So you should have that I would say by Monday.
MR. RAYEL: Okay. Great.
MR. SEIDEL: On that one issue.
MR. BERNSTEIN: Yes. Well, was there just one or were there two?
MR. SEIDEL: No, I think perhaps there was just one.
MR. RAYEL: Yeah, well, it's really your same scenario there.
MR. BERNSTEIN: We're off the record.
(Whereupon, at 1:06 p.m., the deposition was concluded, signature being exercised.)

July 17, 2008 Deposition of Gary L. Boggs
Errata Sheet

| Page:Line | Change |
|---|---|
| 9:6 | Change "Deputy" to "Executive" |
| 16:18 | Change "I'll look at" to "I did not look at" |
| 23:16 | Change "Wilbur" to "Wilbert" |
| 40:13 | Change "I'm not I understand" to "I'm not sure I understand" |
| 52:3 | Change "suite" to "site" |
| 64:12 | Change "for" to "forth" |
| 64:22 | Change "filed" to filled" |
| 67:6 | Change "rate" to "radius" |
| 71:9, 18 | Change "insure" to "ensure" |
| 72:13 | Change "insure" to "ensure" |
| 78:11 | Change "safety" to "criminal" |
| 97:2-3 | Change lines to read "circumstances, the chain of command structure within the diversion control program, and the" |
| 110:15 | Change "drive" to "driven" |

AUTHENTICATION BY SIGNATURE

I, the undersigned, do hereby certify by my signature hereunder that I have read the foregoing deposition of testimony given by me on July 17, 2008, and find said transcription to be a true and accurate record, as corrected.

Gary L. Boggs

Gary L. Boggs

Sworn to and subscribed before me this 23rd day of July, 2008.

TRACY R. KING
Notary Public
Commonwealth of Virginia
364044
My Commission Expires Dec 31, 2009

Tracy R. King
Notary Public

My commission expires December 31, 2009